UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

SEP 2 8 2006

CASE NUMBER  1:06MS00435

IN RE SCIENTIFIC-ATLANTA, INC.
SECURITIES LITIGATION

JUDGE: Ellen Segal Huvelle

DECK TYPE: Miscellanous

DATE STAMP: 09/28/2006

## MOTION TO QUASH OR MODIFY SUBPOENA SERVED ON THE SECURITIES AND EXCHANGE COMMISSION OR, IN THE ALTERNATIVE, FOR PROTECTIVE ORDER

Pursuant to Fed. R. Civ. P. 26 and 45, Scientific-Atlanta, Inc., James

F. McDonald, and Wallace G. Haislip (the "S-A Defendants"), parties to the

above-referenced case, hereby move this Court for an Order quashing or

modifying the subpoena purportedly served on the Securities and Exchange

Commission (the "SEC") on August 8, 2006, or, in the alternative, for a

protective order directing that the requested discovery not be had for the

reasons set forth in Defendants' Memorandum in Support, filed concurrently

herewith.

The Private Securities Litigation Reform Act (the "Reform Act")

directs that all discovery shall be stayed during the pendency of any motion

to dismiss filed by a defendant that challenges the sufficiency of federal

securities law claims.  By virtue of the subpoena at issue here, Plaintiffs in

the above-referenced case seek discovery on securities fraud allegations

pending against Scientific-Atlanta, Inc. ("S-A") in several cases in the

United States District Court for the Southern District of New York.  In each

of these cases, S-A has filed motions to dismiss pursuant to the Reform Act

that are still pending.  Accordingly, the Reform Act's discovery stay

provision bars Plaintiffs' requested discovery until, at a minimum, such time

as there has been a ruling on these pending motions to dismiss.  The S-A

Defendants respectfully request that the Court grant their Motion and

enforce the Act's discovery stay requirement.

Pursuant to this Court's Local Rule 7(m), the S-A Defendants certify

that they have discussed this Motion with opposing counsel in advance of

filing in a good-faith effort to determine whether there is any opposition to

the relief sought.  Plaintiffs have informed Defendants that they oppose the

relief sought by this Motion and the parties were unable to narrow the areas

of disagreement.

Respectfully submitted, this 28th day of September, 2006.

Robert N. Driscoll
D.C. Bar No. 486451

ALSTON & BIRD LLP
950 F Street NW
Washington, DC 20004-1404
Tel.:  (202) 756-3300
Fax:  (202) 756-3333

LEGAL01/13019341v7

Oscar N. Persons
Georgia Bar No. 573500
Susan E. Hurd
Georgia Bar No. 379628
Kelly C. Wilcove
Georgia Bar No. 185682

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
Tel.: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Defendants*

LEGAL01/13019341v7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE SCIENTIFIC-ATLANTA, INC. SECURITIES LITIGATION | ) ) ) ) | Civil Action File No. _____ |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH OR MODIFY SUBPOENA SERVED ON THE SECURITIES AND EXCHANGE COMMISSION OR, IN THE ALTERNATIVE, FOR PROTECTIVE ORDER

Pursuant to Fed. R. Civ. P. 26 and 45, Scientific-Atlanta, Inc., James F. McDonald, and Wallace G. Haislip (the "S-A Defendants") respectfully request that this Court quash or modify the subpoena Plaintiffs purportedly served on the Securities and Exchange Commission (the "SEC") or, in the alternative, that the Court enter a protective order directing that the discovery not be had for the reasons set forth below.

## I.    INTRODUCTION AND FACTUAL BACKGROUND

This Motion pertains to a third-party subpoena for documents served by Plaintiffs in the above-referenced putative securities fraud class action pending before the Honorable Judge Richard W. Story in the United States District Court for the Northern District of Georgia.[1]  Plaintiffs purportedly

---

[1]    In re Scientific-Atlanta, Inc. Sec. Litig., No. 1:01-CV-1950-RWS (N.D. Ga. filed July 24, 2001).

served this subpoena on the District of Columbia offices of the SEC on August 8, 2006. A copy of the subpoena is attached as Exhibit A. Pursuant to discussions between Plaintiffs' counsel and the SEC, an agreement was reached to limit the scope of Plaintiffs' discovery requests "to those records produced by Scientific-Atlanta, Inc." (Letter from Celia L. Jacoby, SEC Senior Counsel, dated September 21, 2006, at 2 (attached as Exhibit B).) Also, the SEC stated its intention to suspend any production in response to this subpoena pending resolution of Defendants' Motion to Quash. (See at 3.)

The documents requested by Plaintiffs' subpoena pertain to certain marketing support transactions between Scientific Atlanta ("S-A") and one of its customers, Adelphia Communications Corporation ("Adelphia"). (See Exhibit A, Schedule A at 3-5.) These transactions were also the subject of an investigation by the SEC,[2] and, pursuant to that investigation, S-A produced internal company documents to the SEC concerning these transactions, which Plaintiffs now seek with their subpoena.

S-A is also a party to certain Multi-District Litigation proceedings involving Adelphia that are pending before the Honorable Lawrence M. McKenna in the United States District Court for the Southern District of

---

[2]    See SEC v. Scientific-Atlanta, Inc., No. 06 Civ. 4823 (S.D.N.Y. filed June 22, 2006). A copy of the SEC's Complaint is attached as Exhibit C.

New York.[3]  S-A has been sued in several cases in the MDL that assert

federal securities fraud claims based on the existence of these same

marketing support transactions.[4]  All of the Adelphia-related cases in the

MDL have been consolidated for pre-trial proceedings, including discovery,

and the mandatory stay of discovery under the Private Securities Litigation

Reform Act (the "Reform Act"), 15 U.S.C. § 78u-4(b)(3)(B), is in place in

these cases.[5]  S-A has filed motions to dismiss in each one of the cases

against it in the Adelphia MDL.[6]  No ruling, however, has been issued on

any of S-A's motions.

## II.    ARGUMENT AND ANALYSIS

### A.    This Court Has Broad Discretion To Quash The Subpoena.

Defendants ask this Court to use its discretion and quash Plaintiffs'

third-party subpoena to the SEC.  "It has long been recognized that trial

---

[3]    In re Adelphia Commc'ns Corp. Sec. and Derivative Litig., No. 1:03-MD-1529
(LMM) (S.D.N.Y.)

[4]    See Argent Classic Convertible Arbitrage Fund L.P. v. Scientific-Atlanta, Inc.,
No. 1:04-CV-05759 (S.D.N.Y. filed July 23, 2004) (putative class action asserting claims
against S-A under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934); see
also W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche, LLP, No. 1:03-CV-05752
(S.D.N.Y. filed Aug. 1, 2003) (individual action purporting to assert claims against S-A
under Sections 10(b) and 20(a) of the 1934 Act); Joseph Stocke v. John J. Rigas, No.
1:03-CV-05754 (S.D.N.Y. filed Dec. 22, 2003) (individual action purporting to assert
claims against S-A under Section 10(b) of the 1934 Act).  A copy of the Argent
Complaint is attached hereto as Exhibit D and is illustrative of the claims pending in the
Adelphia MDL.  (See Argent Compl. ¶¶ 2-6.)

[5]    A copy of Judge McKenna's Case Management Order confirming the existence of
the Reform Act discovery stay is attached hereto as Exhibit E.

[6]    A copy (without exhibits) of the Motion to Dismiss and Memorandum of Law in
Support filed by S-A in Argent is attached hereto as Exhibit F.

courts are vested with broad discretion to manage the conduct of discovery."

Chavous v. Dist. of Columbia Fin. Responsibility and Mgmt. Assistance

Auth., 201 F.R.D. 1, 2 (D.D.C. 2001). Accordingly, district courts possess

"broad powers to regulate or prevent discovery and such powers have

always been freely exercised." Brennan v. Local Union No. 639, Int'l Bhd.

of Teamsters, 494 F.2d 1092, 1100 (D.C. Cir. 1974).

Quashing this subpoena is proper and necessary under the law. This

Court has jurisdiction over the subpoenaed party -- the District of Columbia

office of the SEC -- and, pursuant to Rule 45, can issue any orders necessary

to bring the subpoena in compliance with the Federal Rules of Civil

Procedure and other relevant federal law, including the Reform Act. See

Fed. R. Civ. P. 45(c)(3)(A). The Reform Act's stay provision applies both

to discovery sought from parties and also from non-parties, as is the case

here. See In re Carnegie Int'l Corp. Sec. Litig., 107 F. Supp. 2d 676 (D. Md.

2000) (quashing third-party subpoena pursuant to the Reform Act stay).

This is especially true where another court has issued an order barring

discovery on matters at issue in the documents sought. See generally

Dushkin Publ'g Group, Inc. v. Kinko's Serv. Corp., 136 F.R.D. 334 (D.D.C.

1991) (denying on comity grounds production of documents protected by an

order from the Southern District of New York); Donovan v. Lewnowski, 221

- 4 -

F.R.D. 587 (S.D. Fla. 2004) (holding that "comity" compelled the court to quash the subpoena since another court barred discovery of the documents).

Here, as discussed below, discovery on the issues sought by Plaintiffs is prohibited both by the Reform Act and a prior order of the Adelphia MDL Court that was expressly designed to enforce the stay provision.

## B.     Federal Law And A Prior Court Order Forbid Discovery Of Scientific-Atlanta's Documents Produced To The SEC.

Plaintiffs' subpoena seeks documents S-A produced to the SEC on its business dealings with Adelphia, including the marketing support transactions. Yet that discovery violates S-A's federally-protected (and court-ordered) right to a discovery stay pending the decision on its motions to dismiss in the Adelphia MDL.[7]

The Reform Act offers broad protections against discovery to any defendant, such as S-A, once a motion to dismiss under the Act has been filed. Specifically, "[a]ll discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u-

---

[7]     The S-A Defendants have previously asserted other objections to Plaintiffs' efforts to seek discovery regarding the marketing support transactions and the related SEC investigation. This Motion is without prejudice to these other objections previously tendered to Plaintiffs' proposed line of inquiry. (See Defendants' Responses to Plaintiffs' Third Request for the Production of Documents, served Oct. 17, 2005 (attached hereto as Exhibit G).)

- 5 -

4(b)(3)(B) (emphasis added). The Reform Act codifies the intent of Congress that defendants should not be forced to participate in discovery regarding claims against them unless and until a plaintiff has proven that the matters at issue could be the subject of a cognizable securities fraud claim.

Before Congress enacted the Reform Act, plaintiffs could file "frivolous lawsuits and [use them] as a vehicle 'in order to conduct discovery in the hopes of finding a sustainable claim not alleged in the complaint.'" In re Vivendi Universal S.A. Sec. Litig., 381 F. Supp. 2d 129, 129-30 (S.D.N.Y. 2003) (denying lift of Reform Act stay where plaintiffs sought documents from, amongst other sources, the SEC). Thus, Congress created the Reform Act stay "to prevent exploitation of the class action mechanism by plaintiffs in securities cases" and to curb perceived discovery abuses in this area. In re Smith Barney Transfer Agent Litig., No. 05-7583, 2006 WL 1738078, at *1 (S.D.N.Y. June 26, 2006) (refusing to lift discovery stay pending decision on motion to dismiss); see also Vivendi, 381 F. Supp. 2d at 129-30.

Since the Reform Act's passage, numerous courts have invoked its discovery stay and denied discovery on matters at issue in pending motions to dismiss, including discovery sought from third-parties. In re Fannie Mae Sec. Litig., 362 F. Supp. 2d 37, 38 (D.D.C. 2005) (enforcing stay against

- 6 -

third-party subpoena); <u>In re AOL Time Warner Sec. and ERISA Litig.</u>, 02

Civ. 8853, 2003 WL 22227945, at *1 (S.D.N.Y. Sept. 26, 2003) (enforcing

Reform Act stay when party sought discovery in a separate action also

pending against AOL); <u>see also</u> <u>Smith Barney</u>, 2006 WL 1738078, at *1; <u>In</u>

<u>re Nw. Corp. Sec. Litig.</u>, 329 F. Supp. 2d 1105, 1111-12 (D.S.D. 2004)

(enforcing stay when party sought discovery after motion to dismiss filed);

<u>In re Salomon Analyst Litig.</u>, 373 F. Supp. 2d 252 (S.D.N.Y. 2005)

(enforcing stay); <u>Vivendi</u>, 381 F. Supp. 2d at 129-30 (same).

  The Reform Act stay applies here because the documents Plaintiffs

seek from the SEC regarding the marketing support transactions go to the

heart of the matters at issue in S-A's motions to dismiss before Judge

McKenna. <u>Compare</u> Plaintiffs' Subpoena to SEC at ¶ 7 (attached as Exhibit

A) (asking for documents relating to the marketing support transactions)

<u>with</u> <u>Argent</u> Compl. at ¶¶ 2-6 (attached as Exhibit D) (dealing with claims

regarding the marketing support transactions).

  Further, upholding the stay is especially critical here because S-A has

argued in the Adelphia MDL that no securities fraud claim by any plaintiff is

possible as a matter of law based on these marketing support transactions.

As discussed in more detail in S-A's briefs before Judge McKenna, the

Supreme Court's decision in <u>Central Bank of Denver, N.A. v. First Interstate</u>

- 7 -

Bank of Denver, N.A., 511 U.S. 164 (1994), flatly precludes private litigants from bringing claims based on the marketing support transactions at issue.[8] Accordingly, before any plaintiff seeking to prosecute claims against S-A should be allowed access to S-A's documents on this subject, the Company's motions to dismiss on these same issues should be decided on their merits.

Indeed, pending his decision on Central Bank, Judge McKenna entered an Order that made clear the existence of the mandatory stay as to S-A and other moving parties and explicitly barred any discovery: "[a]bsent further Order of the Court, there shall be no discovery."[9] Thus, allowing discovery here would not only interfere with S-A's right to have the claims against it first judged under the Reform Act and Supreme Court precedent, but it would also interfere with Judge McKenna's case management and his Order that discovery on these issues not go forward at the present time.

**C.    The Reform Act And Prior Court Order Stay Discovery Regarding The Marketing Support Transactions, Regardless Of The Venue.**

It is irrelevant that the propounding parties seeking S-A's documents from the SEC (1) are not parties to any cases in the Adelphia MDL and (2) do not seek discovery directly from a party in those cases. It would, for

---

[8]    See, e.g., Sept. 27, 2004 Argent Motion To Dismiss (Attached as Exhibit F.)
[9]    December 5, 2003 Case Management Order (attached as Exhibit E.)

example, defy logic and the law to allow parties to perform an "end-run" around the Reform Act stay simply by seeking discovery of a party's documents in another case.  See, e.g., AOL Time Warner, 2003 WL 22227945, at *1 n.1 (S.D.N.Y. Sept. 26, 2003) (enforcing the stay in separate federal case with issues common to stayed securities case, and noting "Congress [is] concerned with litigation tactics designed to sidestep the [Reform Act's] mandatory stay provision.").

In cases such as the present one, where discovery has been stayed under the Reform Act, courts forbid parties in other cases from seeking discovery on the issues of the stayed case.  See, e.g., AOL Time Warner, 2003 WL 22227945, at *3 (forbidding discovery in federal ERISA action on issues common to securities action where Reform Act stay was in effect). Indeed, Congress was so concerned with attempts to circumvent the Reform Act stay by seeking discovery in another suit that it passed the Securities Litigation Uniform Standards Act ("SLUSA").  See 15 U.S.C. § 78u-4(b)(3)(D); see also Shwartz v. TXU Corp., No. 3:02-CV-2243-K, 2004 WL 1732477, at *1 (N.D. Tex. July 30, 2004) (noting that Congress passed SLUSA "to prevent plaintiffs in securities fraud cases from evading the protections afforded by [the Reform Act's] discovery stay.").  SLUSA extends a federal court's power to protect the Reform Act discovery stay,

allowing it to forbid related discovery in a parallel state court case. See, e.g., Adelphia Comm. Corp. v. Rigas, 293 B.R. 337, 360 (Bankr. S.D.N.Y. 2003) ("Adelphia I") (staying state court action in favor of motions to dismiss regarding securities law claims); see also Schwartz, 2004 WL 1732477, at *2; In re DPL Inc. Sec. Litig., 247 F. Supp. 2d 946 (S.D. Ohio 2003).

Further, and as noted above, the Reform Act stay also bars the present attempt to secure S-A documents from a third-party. Courts uniformly recognize that the stay applies with equal force to discovery requests aimed at third-parties. See, e.g., In re Fannie Mae Sec. Litig., 362 F. Supp. 2d 37 (D.D.C. 2005) (finding Reform Act stay barred production of documents that Fannie Mae produced to various government agencies); Vivendi, 381 F. Supp. 2d at 129-30 (finding that Reform Act stay barred production of documents Vivendi produced to, among other government agencies, the SEC).

**D.    Plaintiffs Can Offer No Reason To Lift Reform Act Stay.**

Plaintiffs have not articulated any compelling reason to lift the stay to allow the discovery they seek. Plaintiffs (and the class they purport to represent) are not shareholders of Adelphia and they do not purport to have any claims based on the marketing support transactions at issue in the SEC investigation and the Adelphia MDL. For example, it is undisputed that

Plaintiffs' Complaint makes no reference to the marketing support transactions between S-A and Adelphia.[10]  Moreover, other plaintiffs have already been appointed "Lead Plaintiff" in the Adelphia MDL for purposes of pursuing any possible claims against S-A associated with these transactions.  These claims are now the subject of S-A's pending motions to dismiss, which must be resolved before any further proceedings may take place.  Finally, it is important to note that there has been no Order from Judge Story to the effect that discovery into the marketing support transactions is relevant to Plaintiffs' claims, nor have Defendants ever agreed that such discovery would be relevant.

## III.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that their Motion be granted and that this Court order that the requested production from the SEC will not occur.  Pursuant to Local Rule 7(c), a proposed order is attached hereto as Exhibit I, granting the relief requested by Defendants.

---

[10]    A copy of Plaintiffs' Complaint is attached as Exhibit H.

Respectfully submitted, this 28th day of September, 2006.

Robert N. Driscoll
D.C. Bar No. 486451

ALSTON & BIRD LLP
950 F Street NW
Washington, DC 20004-1404
Tel.: (202) 756-3300
Fax: (202) 756-3333

Oscar N. Persons
Georgia Bar No. 573500
Susan E. Hurd
Georgia Bar No. 379628
Kelly C. Wilcove
Georgia Bar No. 185682

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
Tel.: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Defendants*

- 12 -

# LOCAL RULE 7.1 CERTIFICATION

In re Scientific-Atlanta, Inc. Securities Litigation

Certificate required by LCvR 7.1 of the Local Rules of the United States District Court for the District of Columbia:

I, the undersigned, counsel of record for Scientific-Atlanta, Inc., certify that to the best of my knowledge and belief, the following are parent companies, subsidiaries or affiliates of Scientific-Atlanta, Inc., which have any outstanding securities in the hands of the public:
CISCO SYSTEMS, INC.
These representations are made in order that judges of this court may determine the need for recusal.

Respectfully submitted, this 28th day of September, 2006.

Robert N. Driscoll
D.C. Bar No. 486451

ALSTON & BIRD LLP
950 F Street NW
Washington, DC 20004-1404
Tel.: (202) 756-3300
Fax: (202) 756-3333

Oscar N. Persons
Georgia Bar No. 573500
Susan E. Hurd
Georgia Bar No. 379628
Kelly C. Wilcove
Georgia Bar No. 185682
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
Tel.: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Defendants*

- 13 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE SCIENTIFIC-ATLANTA, INC. ) SECURITIES LITIGATION ) | Civil Action File No. _____ |

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of

the within and foregoing **MOTION TO QUASH OR MODIFY**

**SUBPOENA SERVED ON THE SECURITIES AND EXCHANGE**

**COMMISSION OR, IN THE ALTERNATIVE, FOR A PROTECTIVE**

**ORDER AND MEMORANDUM OF LAW IN SUPPORT** by depositing

same in the United States Mail addressed as follows:

> Meryl W. Edelstein
> Chitwood Harley Harnes LLP
> 2300 Promenade II
> 1230 Peachtree Street NE
> Atlanta, GA 30309
>
> Juli Farris
> Keller Rohrback LLP
> 1201 Third Avenue, Suite 3200
> Seattle, WA 98101
>
> Celia L. Jacoby
> U. S. Securities and Exchange Commission
> Office of the General Counsel
> 100 F Street NE
> Washington, DC 20549

This 28th day of September, 2006.

Robert N. Driscoll
D.C. Bar No. 486451

ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004-1404
Tel.: (202) 756-3300
Fax: (202) 756-3333

Oscar N. Persons
Georgia Bar No. 573500
Susan E. Hurd
Georgia Bar No. 379628
Kelly C. Wilcove
Georgia Bar No. 185682

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
Tel.: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Defendants*

LEGAL01/13019341v7

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
OFFICE OF THE GENERAL COUNSEL
100 F Street, N.E.
Washington, D.C.  20549-9612

RECEIVED

SEP 2 8 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

THIS FACSIMILE TRANSMISSION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM OR TO WHICH IT IS ADDRESSED. IT MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL OR OTHERWISE PROTECTED FROM DISCLOSURE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED AND MAY VIOLATE APPLICABLE LAW. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DESTROY THE ORIGINAL MESSAGE. THANK YOU.

September 6, 2006

Please deliver the following pages to:

Name:          Stephen S. Cowen, Esq.
               King & Spalding LLP

Fax Number:  404-572-5136

Subject:       In re Scientific-Atlanta Securities Litigation

Total number of pages (including this cover sheet):  9

From:  Celia Jacoby

Telephone Number:  202-551-5158
Telecopier Number:  202-772-9263

Notes:



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

OFFICE OF THE
GENERAL COUNSEL

Mail Stop 9612                                    September 6, 2006

<u>U.S. mail and facsimile</u>

Stephen S. Cowen, Esq.
King & Spalding LLP
191 Peachtreet Street
Atlanta, Georgia 20202-1763

　　　　Re:    *In the matter of Adelphia Communications Corporation*, NY-7026

Dear Mr. Cowen:

　　　　I am writing with regard to your request on behalf of Scientific-Atlanta, Inc. for confidential treatment of documents produced to the Securities and Exchange Commission in connection with the cited investigation. The Commission has received a subpoena in *In re Scientific-Atlanta, Inc. Securities Litigation*, Case No. 1:01-CV-1950-RWS (pending in N.D. Georgia), possibly requiring the production of certain documents subject to this confidential treatment request. For your information, a copy of the subpoena is enclosed.

　　　　The Commission does not have available to it privileges that would prevent production of the requested documents. We are notifying you of the subpoena in advance of production to allow you to take whatever action you deem appropriate under the circumstances. Please note that your request for confidential treatment, which was made under the Commission's Freedom of Information Act regulations, does not apply to a discovery request made through compulsory process under the Federal Rules of Civil Procedure. If you have any questions, please call me at 202-551-5158.

　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　Celia L. Jacoby
　　　　　　　　　　　　Senior Counsel

Enclosure

AO88 (Rev. 11/91) Subpoena in a Civil Case

RECEIVED
AUG 0 8 2006
OFFICE OF THE SECRETARY

# United States District Court

### DISTRICT OF COLUMBIA

## SUBPOENA IN A CIVIL CASE

IN RE SCIENTIFIC-ATLANTA, INC.
SECURITIES LITIGATION

CASE NUMBER:   United States District Court for the
Northern District of Georgia
Civil Action File No.
1:01-CV-1950-RWS

TO:   Christopher Cox, Chairman
Securities and Exchange Commission
100 F. Street, N.E.
Washington, D.C. 20549

[   ] YOU ARE COMMANDED to appear in the United States District Court at the place, date and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

[ ] YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

[X] YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
    See attached "Schedule A" for a list of requested documents.

| PLACE | DATE AND TIME |
|---|---|
| Finkelstein, Thompson & Loughran The Duvall Foundry 1050 30th Street, N.W. Washington, DC 20007 | September 5, 2006 10:00 a.m. |

[   ] YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT): | DATE |
|---|---|
| *Tracy Rezvani*    Attorney for Plaintiffs | August 4, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER:
Tracy D. Rezvani
Finkelstein, Thompson & Loughran
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC 20007
(202) 337-8000

(See Rule 45, Federal Rules of Civil Procedure on Reverse)

RECEIVED
AUG 0 8 2006
OFFICE OF THE SECRETARY

SEP-06-2006  15:01                                                                    P.04

AO88 (Rev. 11/91) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | | PLACE |
|---|---|---|---|
| **SERVED** | | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

_____
DATE

SIGNATURE OF SERVER

_____

OF SERVER                                                                              ADDRESS

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(C) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(D) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

## RELEVANT TIME PERIOD

Unless otherwise indicated, the discovery requests set forth herein seek documents and information concerning the time period January 1, 2000 through and including December 31, 2003.

## DEFINITION AND INSTRUCTIONS

1.    "Scientific-Atlanta" or "the Company" means Scientific-Atlanta, Incorporated, any of its divisions, subdivisions, offices, subsidiaries, affiliates, predecessors, successors, joint ventures, parents, partners, present or former officers, directors, agents, representatives, employees (including, but not limited to, its attorneys, accountants, auditors and advisors), and all other persons or entities acting or purporting to act on its behalf.

2.    "Adelphia" means Adelphia Communications Corp., any of its divisions, subdivisions, offices, subsidiaries, affiliates, predecessors, successors, joint ventures, parents, partners, present or former officers, directors, agents, representatives, employees (including, but not limited to, its attorneys, accountants, auditors and advisors), and all other persons or entities acting or purporting to act on its behalf.

3.    "AA" means Arthur Andersen, any of its divisions, subdivisions, offices, subsidiaries, affiliates, predecessors, successors, joint ventures, parents, partners, present or former officers, directors, agents, representatives, employees (including, but not limited to, its attorneys, accountants, auditors and advisors), and all other persons or entities acting or purporting to act on its behalf.

4.    "Securities & Exchange Commission" or "SEC" means the United States Securities and Exchange Commission, including its regional and branch offices and its

1

commissioners, associate and assistant directors, attorneys, accountants, staff, experts and

employees thereof.

     5.    "Document(s)" has the same meaning as "writings," which is defined in Fed. R.

Civ. P. 34(a) and Fed. R. Evid. 1001, and is used herein in the broadest possible sense and

includes, but is not limited to, data, metadata, videotape and motion pictures, and electronic,

mechanical or electric records or representations, including e-mail, whether "accessible" or

"inaccessible" as those two terms are defined in *Zubulake v. UBS Warburg et al.*, slip op. at 6-8,

2003 WL 21087884 (S.D.N.Y. May 13, 2003), as well as correspondence, letters, contracts,

agreements, memoranda, statements, bills, schedules, receipts, invoices, records of purchases or

sale, brochures, projections, budgets, calendars, reports, studies, minutes, resolutions, due

diligence files, promissory notes, loan documents, letters of credit, notes (handwritten or

otherwise), messages, analyses, plans, evaluations, diaries, agendas, announcements, manuals,

telephone message slips, telephone bills, telephone logs, telephone toll records, press releases,

transcripts, scripts, graphs, charts, computer directories, computer disks, computer tapes,

databases, database records, electronic workpapers, or any other written, printed, typed, taped,

filmed, or graphic matter however produced or reproduced. "Document(s)" further includes non-

identical copies, including, but not limited to, drafts, revisions, alterations, modifications,

changes, markups, amendments of the foregoing or comments or notations appearing on the

foregoing which are not part of the original text, including any electronic metadata associated

therewith, database formulas, database relational information, and database replicas.

"Document(s)" also includes the file, folder tabs, and labels appended to or containing any

documents.

     6.    The terms "you" and "yours" shall mean the SEC as defined above.

## DOCUMENTS REQUESTED

1.     All documents Scientific-Atlanta provided to you in connection with your investigation which resulted in the Complaint entitled *Securities and Exchange Commission v. Scientific-Atlanta, Inc.*, S.D.N.Y. No. 06 Civ. 4823 (PKC).

2.     All documents reflecting any communications between you and persons currently or formerly employed by or representing Scientific-Atlanta in connection with your investigation which resulted in the Complaint entitled *Securities and Exchange Commission v. Scientific-Atlanta, Inc.*, S.D.N.Y. No. 06 Civ. 4823 (PKC).

3.     All documents Adelphia provided to you in connection with your investigation which resulted in the Complaint entitled *Securities and Exchange Commission v. Scientific-Atlanta, Inc.*, S.D.N.Y. No. 06 Civ. 4823 (PKC).

4.     All documents reflecting any communications between you and persons currently or formerly employed by or representing Adelphia in connection with your investigation which resulted in the Complaint entitled *Securities and Exchange Commission v. Scientific-Atlanta, Inc.*, S.D.N.Y. No. 06 Civ. 4823 (PKC).

5.     All documents AA provided to you in connection with your investigation which resulted in the Complaint entitled *Securities and Exchange Commission v. Scientific-Atlanta, Inc.*, S.D.N.Y. No. 06 Civ. 4823 (PKC).

6.     All documents reflecting any communications between you and persons currently or formerly employed by or representing AA in connection with your investigation which resulted in the Complaint entitled *Securities and Exchange Commission v. Scientific-Atlanta, Inc.*, S.D.N.Y. No. 06 Civ. 4823 (PKC).

7.    All documents that formed the basis of the allegations contained in the following

Paragraphs of the Complaint entitled *Securities and Exchange Commission v. Scientific-Atlanta,*

*Inc.*, S.D.N.Y. No. 06 Civ. 4823 (PKC):

    (a) Paragraph 12

    (b) Paragraph 13

    (c) Paragraph 14

    (d) Paragraph 15

    (e) Paragraph 16

    (f) Paragraph 17

    (g) Paragraph 18

    (h) Paragraph 19

    (i) Paragraph 20

    (j) Paragraph 22

    (k) Paragraph 26

    (l) Paragraph 27

    (m) Paragraph 28

    (n) Paragraph 30

    (o) Paragraph 32

    (p) Paragraph 33

    (q) Paragraph 34

    (r) Paragraph 35

    (s) Paragraph 36

    (t) Paragraph 37

4

(u) Paragraph 38

(v) Paragraph 40

(w) Paragraph 41.

8.　　All documents concerning any transcripts of testimony or notes of interviews and proffers from any former or current employee of Scientific-Atlanta.

9.　　All documents Scientific-Atlanta or Mr. Haislip provided to you in connection with your investigation which resulted in the cease and desist order entitled *In the Matter of Wallace G. Haislip*, Administrative Proceeding File No. 3-12339.

10.　　All documents reflecting any communications between you and persons currently or formerly employed by or representing Scientific-Atlanta or Mr. Haislip in connection with your investigation which resulted in the cease and desist order entitled *In the Matter of Wallace G. Haislip*, Administrative Proceeding File No. 3-12339.

11.　　All documents Scientific-Atlanta or Mr. Eidson provided to you in connection with your investigation which resulted in the cease and desist order entitled *In the Matter of Julian W. Eidson*, Administrative Proceeding File No. 3-12340.

12.　　All documents reflecting any communications between you and persons currently or formerly employed by or representing Scientific-Atlanta or Mr. Eidson in connection with your investigation which resulted in the cease and desist order entitled *In the Matter of Julian W. Eidson*, Administrative Proceeding File No. 3-12340.

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
OFFICE OF THE GENERAL COUNSEL
100 F Street, N.E.
Washington, D.C.  20549-9612

RECEIVED

SEP 2 8 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

THIS FACSIMILE TRANSMISSION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM OR TO WHICH IT IS ADDRESSED. IT MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL OR OTHERWISE PROTECTED FROM DISCLOSURE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED AND MAY VIOLATE APPLICABLE LAW. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DESTROY THE ORIGINAL MESSAGE. THANK YOU.

September 21, 2006

Please deliver the following pages to:

Name:        Oscar N. Persons, Esq.
             Alston & Bird LLP

Fax Number:  404-881-7777

Subject:     in re Scientific-Atlanta, Inc. Securities Litigation

Total number of pages (including this cover sheet):

From:  Celia Jacoby

Telephone Number:  202-551-5158
Telecopier Number:  202-772-9263

Notes:
letter dated 9-21-06



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

OFFICE OF THE
GENERAL COUNSEL

Stop 9612                                                  September 21, 2006

<u>U.S. mail and facsimile</u>

Meryl W. Edelstein, Esq.
Chitwood Harley Harnes LLP
2300 Promenade II
1230 Peachtree Street N.E.
Atlanta, Georgia 30309

Oscar N. Persons, Esq.
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424

> Re:    *In re Scientific-Atlanta, Inc. Securities Litigation*, Case No. 1:01-CV-1950-RWS
>          (N.D. Georgia)

Dear Ms. Edelstein and Mr. Persons:

By a subpoena received on August 8, 2006, Ms. Edelstein sought copies of those documents which Scientific-Atlanta, Inc. had produced to the United States Securities and Exchange Commission in connection with the investigation that resulted in the complaint entitled *SEC v. Scientific-Atlanta, Inc.*, Case No. 06 Civ. 4823 (PKC) (S.D.N.Y.). For your information, the Commission normally follows certain processes to respond to such requests. Among these are obtaining authorization to release non-privileged documents; locating and reviewing the appropriate documents; and notifying any third-party whose documents may be responsive and who had requested confidential treatment or otherwise sought to limit access. A minimum of ten days' notice is given to such confidentiality requesters. On September 6, 2006, notice of this subpoena was given to counsel for Scientific-Atlanta, Inc.

By letter dated September 14, 2006, Mr. Persons informed the Commission that his client would move to quash this subpoena within 10 business days. You should both understand that generally the Commission tries to cooperate with third-party document requests to the extent feasible and to the extent that non-privileged materials are sought. Such cooperation is subject to

Meryl W. Edelstein, Esq.
Oscar N. Persons, Esq.
September 21, 2006
Page 2

the parameters of any administrative authorization or other constraint. It is also the
Commission's practice to avoid interfering with a court's orderly processes in resolving
discovery disputes. Accordingly, resolution of motions, disputes or other objections should
occur before any non-privileged documents are sought from the Commission. At this time the
Commission will suspend any response to this subpoena pending resolution of Mr. Persons'
motion to quash. Absent such filing within a reasonable period, responsive documents to which
the Commission does not hold a privilege may be made available.

Finally, while we note that Ms. Edelstein has limited her request to those records
produced by Scientific-Atlanta, Inc., by this letter, the Commission does not waive any
objections that it may have should discovery be permitted or the scope of the subpoena be
expanded.

If there are any questions, please call me at 202-551-5158.

Sincerely,

Celia L. Jacoby
Senior Counsel

MARK K. SCHONFELD (MS-2798)
REGIONAL DIRECTOR

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center, Suite 4300
New York, N.Y. 10281
(212) 336-1100

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

RECEIVED

SEP 2 8 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

———————————————————————

SECURITIES AND EXCHANGE COMMISSION,               :
                                                  :
                                  Plaintiff,:     :
                                                  :        06 Civ. 4823 (PKC)
                    -against-                      :
                                                  :        COMPLAINT
SCIENTIFIC-ATLANTA, INC.,                          :
                                                  :
                                 Defendant.        :
                                                  :

———————————————————————

        Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

defendant Scientific-Atlanta, Inc. ("Scientific-Atlanta" or the "Company"), alleges as follows:

### SUMMARY

        1.   In the fall of 2000, Adelphia Communications Corporation ("Adelphia"), a cable

television system owner and operator, asked Scientific-Atlanta, a vendor that provided digital cable

set-top boxes used by Adelphia, to enter into a marketing support transaction.  Following

negotiations between Adelphia and Scientific-Atlanta, the parties agreed that Scientific-Atlanta

would make marketing support payments for the stated purpose of helping Adelphia increase

demand for digital set-top boxes provided by Scientific-Atlanta and, in return, Scientific-Atlanta

would receive a corresponding increase in the price of digital set-top boxes it had supplied Adelphia

in the past and was contractually obligated to supply in the future pursuant to a long-term purchase contract that had been entered into in May 2000. Adelphia did not use the marketing support payments to help increase demand for digital set-top boxes. Adelphia recorded the price increases it paid Scientific-Atlanta as capital expenditures, and recognized the marketing support payments paid by Scientific-Atlanta as a contra marketing expense, thereby artificially reducing its marketing expense and increasing Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA"). In this manner, Adelphia was able to use the transaction to reduce improperly its operating costs and increase its earnings by approximately $16.8 million in 2000 and $26.2 million in 2001.

2. Scientific-Atlanta agreed to enter into the marketing support transaction as an accommodation to one of its largest clients, and a primary concern was to ensure that its profit margins under the long-term purchase contract would not be eroded by the transaction. Scientific-Atlanta was not concerned with the type or amount of marketing to be done by Adelphia with the marketing support payments at the time the marketing support transaction was entered into.

3. Against this backdrop, various officers and employees of Scientific-Atlanta were confronted with numerous facts that together demonstrated that the marketing support agreement was being misused by Adelphia. These facts included, among others: (i) a retroactive price increase on set-top boxes previously delivered to Adelphia; (ii) Adelphia's request for a commercially unreasonable high dollar amount in marketing support payments; (iii) repeated requests for higher levels of marketing support in later periods even though the major marketing push was to have occurred in earlier periods; (iv) knowledge that Adelphia's request for the marketing support agreement was driven by its desire to obtain an accounting benefit; and (v) the

2

inclusion of a false reason for the price increase in one of the contracts documenting the marketing support agreement.

## VIOLATIONS

4. By engaging in the conduct described in this Complaint, Scientific-Atlanta directly or indirectly, singly or in concert, has engaged in acts, practices, and courses of business that aided and abetted Adelphia's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B), and Rules 12b-20, 13a-1, and 13a-13 promulgated thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.

## JURISDICTION AND VENUE

5. The Commission brings this action pursuant to the authority conferred upon it by Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), seeking to restrain and enjoin permanently Scientific-Atlanta from engaging in the acts, practices and courses of business alleged herein. The Commission also seeks an order requiring Scientific-Atlanta to disgorge ill-gotten gains it received as a result of the conduct alleged herein.

5. This Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

6. Scientific-Atlanta, directly or indirectly, used the means and instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein. At the time of the wrongful conduct described herein, the common stock of Scientific-Atlanta and Adelphia was traded on the New York Stock Exchange located in New York, New York.

## DEFENDANT

7. **Scientific-Atlanta** is a Georgia corporation, with corporate headquarters in Lawrenceville, Georgia. Scientific-Atlanta sells end-to-end networks used by programmers and cable operators and provides customer service and support for the cable television industry. At all relevant times, Scientific-Atlanta's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and was publicly traded on the New York Stock Exchange.

## OTHER RELEVANT ENTITY

8. **Adelphia** is a Delaware corporation, headquartered in Greenwood Village, Colorado. During the relevant period, Adelphia was headquartered in Coudersport, Pennsylvania. Adelphia owns, operates, and manages cable television systems and other related telecommunications businesses. On March 27, 2002, Adelphia announced that it was liable for approximately $2.3 billion in debt that it had previously failed to disclose. In May 2002, certain members of the Rigas family, who controlled and held officer and director positions with Adelphia, resigned and Adelphia disclosed that it expected to restate its financial statements for the fiscal years 2000 and 2001. On July 18, 2002, the Commission filed *SEC v. Adelphia Communications Corporation, et al.*, 02 Civ. 5776 (PKC) (S.D.N.Y.), alleging that widespread, multifaceted financial fraud occurred at Adelphia. On May 31, 2005, the U.S. District Court for the Southern District of New York entered a consent order enjoining Adelphia from violating Section 17(a) of the Securities Act of 1933, Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, and 13a-13 under the Exchange Act.

4

### STATEMENT OF FACTS

#### *Background*

9.   In May 2000, Adelphia entered into a purchase contract for digital set-top boxes with Scientific-Atlanta.  The long-term purchase contract, which was to extend through December 31, 2001, required Adelphia to purchase digital set-top boxes at a price of approximately $350 per set-top box, as well as other equipment at prices fixed by the terms of the agreement.  The Adelphia agreement contained no provision regarding marketing.

10.   In June 2000, Adelphia realized that its second quarter reported EBITDA would fall below analysts' expectations.  Two senior Adelphia executives devised a plan to increase EBITDA by reducing operating costs through a marketing support agreement with Scientific-Atlanta.

11.   Adelphia's purported business rationale for the marketing support was to assist Adelphia in the roll-out of its digital cable service, which was in direct competition with satellite television.  Adelphia proposed structuring the transaction so that Scientific-Atlanta's payment obligation would be funded entirely by a price increase applied to digital set-top boxes it had supplied Adelphia in the past and was contractually obligated to supply in the future pursuant to the long-term purchase contract.  The transaction would thus have no economic impact on Scientific-Atlanta's net revenue or income from the sale of set-top boxes to Adelphia because, before Scientific-Atlanta would be required to make the marketing support payments, Adelphia would pay to Scientific-Atlanta an amount equal to the marketing support payments in the form of a price increase applied to each set-top box delivered to Adelphia.

### *The 2000 Transaction*

12.   In August 2000, Adelphia asked Scientific-Atlanta to consider entering into the marketing support agreement.  Adelphia requested marketing support retroactive to the beginning of 2000, and continuing throughout the life of its long-term purchase contract with Scientific-Atlanta.  In August 2000, Scientific-Atlanta's CFO (chief financial officer) and its CAO (chief accounting officer) approved the concept of entering into a marketing support agreement with Adelphia, although not on the terms as initially proposed by Adelphia.

13.   In October 2000, Adelphia and Scientific-Atlanta began negotiating the terms of the marketing support agreement.  Adelphia initially insisted that Scientific-Atlanta pay marketing support of $50 per set-top box, which equaled approximately 15% of the price of a set-top box.  Scientific-Atlanta rejected that percentage as commercially unreasonable, and the parties eventually agreed that Scientific-Atlanta would pay an average of approximately $20 per set-top box over the life of the contract, with Adelphia paying the same amount to Scientific-Atlanta in the form of price increases applied to Adelphia's orders.

14.   At Adelphia's request, Scientific-Atlanta agreed to invoice Adelphia a price increase of $31 per set-top box for deliveries from April through December 2000 and to invoice a price increase of $16 per set-top box ordered in 2001, resulting in an average price increase of approximately $20 per set-top box.  Adelphia's purported rationale for structuring the price increase in this way was that it would incur greater marketing costs in the early stages of the digital rollout.

15.   The contract documents consisted of two separate agreements.  The "Spot Telecast Agreement" set forth Scientific-Atlanta's payment obligations for advertising but did not specify the type or quantity of advertising to be provided by Adelphia.  The "Price Increase Letter" set

6

forth the price increases owed by Adelphia for set-top boxes. Although the parties understood that the sole reason for the price increase was to offset Scientific-Atlanta's payment obligations under the Spot Telecast Agreement, the Price Increase Letter stated falsely that the price increase was due to "increased costs on certain electronic components."

16.   Pursuant to the contracts, on May 10, 2001, Adelphia paid Scientific-Atlanta $16.8 million in price increases and Scientific-Atlanta immediately returned to Adelphia $16.8 million in marketing support payments.

### The 2001 Transaction

17.   The long-term purchase contract required that Adelphia purchase 350,000 set-top boxes per quarter in 2001. Scientific-Atlanta became aware in June 2001 that Adelphia was going to be ordering fewer set-top boxes than required under the contract due to decreased demand, and it appeared that Adelphia would not order sufficient set-top boxes to cover the $22.4 million in marketing support payments Scientific-Atlanta was obligated to make for calendar year 2001.

18.   Scientific-Atlanta agreed to expand coverage of the marketing support arrangement to cover all of Adelphia's purchases of transmission equipment (ancillary equipment used to transmit signal that is located outside of the home and is not visible to the end-user), in addition to set-top boxes, retroactive to 2000. By expanding the range of products covered by the marketing support agreement, Scientific-Atlanta was able to ensure that the overall price increase would maintain its margin on the sales due to the marketing support it was obligated to pay without exceeding what it viewed as a commercially reasonable ratio between marketing support and product price.

7

19.  In June 2001, when Adelphia advised Scientific-Atlanta that it would be ordering fewer set-top boxes, Scientific-Atlanta requested that Adelphia order 240,000 set-top boxes pursuant to the long-term purchase contract by the end of the fiscal quarter.  Scientific-Atlanta offered Adelphia a price reduction on the June order.  Adelphia agreed to purchase the 240,000 set-top boxes.

20.  In December 2001, Adelphia demanded an increase in the amount of marketing support to be paid by Scientific-Atlanta for 2001 from $22.4 million to between $28 to $29 million.  At or about the same time, Scientific-Atlanta also requested that Adelphia purchase 200,000 set-top boxes before the end of the quarter pursuant to the long-term purchase contract. Adelphia agreed to purchase the set-top boxes, and the parties ultimately agreed on $26.2 million in marketing support, which covered set-top boxes purchased in 2001 and transmission equipment purchased between July 2000 and December 31, 2001.

### Accounting Treatment For The Transaction

21.  At the time the transactions were entered into, GAAP (Generally Accepted Accounting Principles) required that the accounting for a transaction must reflect its substance.

22.  In internal journal entries, Scientific-Atlanta recorded the price increases as an increase in revenue and the marketing support payments to Adelphia as contra-revenue.  The net result was no change in the revenue line item reported in Scientific-Atlanta's publicly filed income statements.

23.  Adelphia, however, recorded the marketing support payments as a "contra-expense" to marketing costs even though it did not use the marketing support payments to market any products.  This accounting treatment lowered the amount of recorded marketing expenses and, in turn, artificially inflated Adelphia's EBITDA.  Adelphia recorded the price increases paid to

8

Scientific-Atlanta as capital expenditures, which are depreciated over time and, as such, have no impact on EBITDA and a minimal impact on earnings. In total, over seven quarters from April 2000 through December 2001, Adelphia recorded improperly approximately $43 million in marketing support payments as reductions in current operating expenses, with the intended effect of inflating improperly its reported EBITDA by $43 million over the course of those quarters. Adelphia's accounting treatment violated GAAP because it improperly reflected the transactions as decreasing its reported expenses and increasing its reported income when it did not have that effect.

### *Events In 2002*

24. On March 27, 2002, approximately one month after Scientific-Atlanta paid Adelphia a $26.2 million marketing support payment, Adelphia announced that the company was liable for $2.3 billion in off-balance sheet liabilities. -

25. On June 10, 2002, Adelphia filed a Form 8-K with the Commission, making downward revisions of its 2000 and 2001 reported EBITDA, citing marketing support agreements with two unnamed vendors (one of which was Scientific-Atlanta). Adelphia stated that properly accounting for the marketing support agreements would reduce EBITDA by approximately $54 million in 2001 and $37 million in 2000, of which $26.2 million and $16.8 million, respectively, is attributable to the transactions with Scientific-Atlanta.

### *SCIENTIFIC-ATLANTA ENTERED INTO THE MARKETING SUPPORT AGREEMENT TO SATISFY A LARGE CLIENT*

26. Despite the fact that Scientific-Atlanta was paying Adelphia over $4 million dollars in marketing support per quarter in 2000 and over $6 million per quarter in 2001, no one in the Company ever confirmed how Adelphia was spending the money. Scientific-Atlanta's

9

marketing department had no role or input into the transaction. Although the marketing support

transaction was supposed to be used to market Scientific-Atlanta set-top boxes, the Spot Telecast

Agreement did not specify the type or quantity of marketing to be done. The final

documentation also did not condition Scientific Atlanta's obligation to make multi-million dollar

marketing support payments on receipt of documentation of marketing done by Adelphia.

27.    An important motivation for Scientific-Atlanta in the transaction was to satisfy one

of its largest clients, and one of its primary concerns was that the marketing support agreement

not alter its profit margins. To ensure that it put no money at risk, Scientific-Atlanta made

marketing support payments only after it had received equivalent payments for the set-top box

price increases from Adelphia.

28.    The Adelphia marketing support transaction was a unique transaction for Scientific-

Atlanta, and many aspects of the transaction were outside of Scientific-Atlanta's ordinary course

of business. During the events leading up to and continuing throughout the life of the marketing

support transaction, various officers and employees of Scientific-Atlanta were aware of

significant facts that Scientific-Atlanta either ignored, or to which it gave limited attention.

These facts, taken together, indicated that Adelphia was misusing the transaction in a manner

that violated the reporting, books and records, and internal controls provisions of the federal

securities laws.

### Scientific-Atlanta Knew That The Transaction
### Provided No Direct Economic Benefit To Scientific-Atlanta

29.    Scientific-Atlanta knew that the marketing support transaction would have no

economic impact on its net revenue or income from the sales of set-top boxes to Adelphia and

that it was done as an accommodation to Adelphia, one of its largest customers.

30. All Scientific-Atlanta personnel involved in the marketing support transaction knew that it was structured so that the marketing support payments made by Scientific-Atlanta would be equal to Adelphia's payment of the price increases on the set-top boxes and that the sole purpose of the price increases was to offset the marketing support payments. To avoid any risk of loss, Scientific-Atlanta did not make its two marketing support payments until it had first received payment from Adelphia for the price increases.

### Scientific-Atlanta Believed That Adelphia Would Use The Marketing Support Payments To Improve EBITDA

31. Although Scientific-Atlanta did not have actual knowledge as to how Adelphia would account for the transaction, Scientific-Atlanta knew that Adelphia's request was driven by Adelphia's desire to obtain an accounting benefit.

32. In November 2000, a Scientific-Atlanta employee prepared a PowerPoint document for use by Scientific-Atlanta of "talking points" regarding the marketing support agreement. The document states that "$10M benefit generates 1.5 points of Operating Margin." The following year, in correspondence to an Adelphia executive dated September 28, 2001, seeking prompt payment of past due receivables, Scientific-Atlanta reminded Adelphia that Scientific-Atlanta's "finance team led the structuring of the joint marketing agreement that clearly provides operating expense benefits to Adelphia."

### Adelphia Asked Scientific-Atlanta To Add Unique Terms To A Previously-Documented Deal

33. Adelphia did not approach Scientific-Atlanta with the idea of entering into the marketing support agreement until approximately three months after the parties had documented their May 23, 2000 long-term purchase contract. In the ordinary course of Scientific-Atlanta's

business, requests for marketing support were dealt with during the course of negotiating the overall contract.

34.  It was also highly unusual for a customer to request, as Adelphia did, that marketing support be in the form of money payments as opposed to marketing credits that effectively reduced the price charged by Scientific-Atlanta for its products.

35.  Shortly before Adelphia approached Scientific-Atlanta with the idea of entering into the marketing support transaction, another cable operator also asked Scientific-Atlanta to enter into a marketing support transaction similar to the Adelphia transaction.  In September 2000, Scientific-Atlanta and the other cable operator consummated a marketing support transaction involving approximately $6 million that covered the fourth quarter of 2000.

36.  Prior to the transactions with the other cable operator and Adelphia, Scientific-Atlanta had never been asked to enter into a marketing support transaction involving a simultaneous price increase designed to fund its marketing support payment obligations.  Prior to the transaction with the other cable operator, Scientific-Atlanta had never been asked to enter into a marketing support arrangement involving millions of dollars.  The size of the transaction with the other cable operator was much smaller than the Adelphia transaction, which totaled approximately $43 million in marketing support.  The timing, the form, and the dollar amount of the Adelphia transaction were all outside of Scientific-Atlanta's ordinary course of business.

### Adelphia Demanded More Marketing
### Support, Even When Its Orders Of Set-Top Boxes Were Declining

37.  When negotiations over the terms of the marketing support agreement began in October 2000, Adelphia demanded marketing support in the amount of $50 per set-top box or approximately 15% of the set-top box price, an amount that Scientific-Atlanta deemed

12

commercially unreasonable. Scientific-Atlanta viewed 4%-7% of the set-top box price as a reasonable range of marketing support. The parties reached agreement on an average price increase and associated marketing support of approximately $20 per set-top box. Because Adelphia was supposed to incur higher marketing costs at the beginning of the digital rollout, at Adelphia's request Scientific-Atlanta agreed to a price increase and associated marketing support of $31 per set-top box for deliveries from April through December 2000, and of $16 per set-top box for deliveries in 2001.

38.  By June 2001, Adelphia's orders of set-top boxes had declined and it became clear to Scientific-Atlanta that Adelphia would order less than the 350,000 set-top boxes per quarter it was required to purchase pursuant to the long-term purchase contract. Even though Adelphia had ordered far fewer set-top boxes than its minimum purchase obligations under the long-term purchase contract and Adelphia had stated that it would incur higher marketing costs at the beginning of the digital rollout, Adelphia asked to increase the amount of marketing support from $22.4 million to $26 million.

39.  Although Scientific-Atlanta apparently did not agree to increase the amount of marketing support at that time, Adelphia again requested more marketing support at the end of 2001. Scientific-Atlanta then agreed to increase marketing support for 2001 from $22.4 million to $26.2 million.

### Adelphia Requested That The Marketing Support Apply Retroactively To Set-Top Boxes Delivered In The Past

40.  When Adelphia approached Scientific-Atlanta with the idea of entering into a marketing support agreement, it asked that the agreement apply retroactively to the beginning of 2000, despite the fact that the long-term purchase contract had not been finalized until May 23,

2000. Although the marketing support agreement was not finalized until at least the end of

calendar year 2000, Scientific-Atlanta agreed to make the marketing support agreement

retroactive to April 1, 2000, the first day of the quarter in which the May 23, 2000 agreement

took effect. During negotiations in June 2001, when Scientific-Atlanta agreed to expand the

coverage of marketing support to include transmission equipment, it again agreed to apply the

marketing support retroactively to all transmission equipment purchased by Adelphia from July

2000 through December 2001.

### *Scientific-Atlanta Employees Knew That The Price Increase Letter Was False*

41. The overall price increase was calculated to equal the total marketing support

payments so that Scientific-Atlanta's profit margin on the transactions would remain unaffected.

The Price Increase Letter, which was one of the two agreements documenting the marketing

support transaction, states falsely that the price increase was due to "increased costs on certain

electronic components," rather than the true reason which was to fund the marketing support

payments.

### FIRST CLAIM FOR RELIEF

#### Aiding and Abetting Violations of Section 13(a)
#### of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13

42. The Commission realleges and incorporates by reference herein each and every

allegation contained in Paragraphs 1 through 41.

43. Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder require

issuers of registered securities to file with the Commission factually accurate annual and

quarterly reports. Exchange Act Rule 12b-20 provides that in addition to the information

expressly required to be included in a statement or report, there shall be added such further

material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading.

44. By reason of the foregoing, Scientific-Atlanta knowingly provided substantial assistance to another who violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

45. By reason of the foregoing, Scientific-Atlanta aided and abetted, and unless enjoined will continue to aid and abet, violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act

46. The Commission realleges and incorporates by reference herein each and every allegation contained in Paragraphs 1 through 45.

47. Section 13(b)(2)(A) of the Exchange Act requires that issuers make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer. Section 13(b)(2)(B) of the Exchange Act requires, among other things, that issuers maintain a system of internal accounting controls that permit the preparation of financial statements in conformity with GAAP.

48. By reason of the foregoing, Scientific-Atlanta knowingly provided substantial assistance to another who violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

49. By reason of the foregoing, Scientific-Atlanta aided and abetted, and unless enjoined will continue to aid and abet, violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

15

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

**I.**

Permanently enjoining Scientific-Atlanta and its agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating and aiding and abetting any violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.

**II.**

Permanently enjoining Scientific-Atlanta and its agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating and aiding and abetting any violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B).

**III.**

Ordering Scientific-Atlanta to disgorge the ill-gotten gains it received as a result of its violations of the federal securities laws, and to pay interest on all such gains.

16

**IV.**

Granting such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
       June 22, 2006

                                  /s/ Mark K. Schonfeld
                                  Mark K. Schonfeld (MS-2798)
                                  Regional Director

                                  Attorney for Plaintiff
                                  SECURITIES AND EXCHANGE COMMISSION
                                  Northeast Regional Office
                                  3 World Financial Center, Suite 4300
                                  New York, New York 10281
                                  (212) 336-1100

Of Counsel:

      Helene Glotzer
      Alistaire Bambach
      Neal Jacobson
      Gwen A. Licardo

ORIGINAL

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

RECEIVED

ARGENT CLASSIC CONVERTIBLE ARBITRAGE          )
FUND L.P., ARGENT CLASSIC CONVERTIBLE         )
ARBITRAGE FUND (BERMUDA) LTD., ARGENT         )
LOWLEV CONVERTIBLE ARBITRAGE FUND             )
LTD., ARGENT LOWLEV CONVERTIBLE               )
ARBITRAGE FUND LLC, UBS O'CONNER LLC          )
F/B/O UBS GLOBAL EQUITY ARBITRAGE             )
MASTER LTD., UBS O'CONNER LLC F/B/O UBS       )
GLOBAL CONVERTIBLE PORTFOLIO and              )
EMINENCE CAPITAL, LLC,                        )
                                              )
Individually And On Behalf of All Others Similarly )
Situated,                                     )
                                              )
Lead Plaintiffs,                              )
                                              )
vs.                                           )
                                              )
SCIENTIFIC-ATLANTA, INC., MOTOROLA, INC.,     )
JULIAN EIDSON and WALLACE HAISLIP,            )
                                              )
Defendants.

CV No. 04 05759

**CLASS ACTION**
**COMPLAINT FOR**
**VIOLATIONS OF**
**FEDERAL SECURITIES**
**LAWS**

**JURY TRIAL DEMANDED**

2004 JUL 23   PH 2: 55
S.D. OF N.Y.
U.S. DISTRICT COURT
FILED

Lead Plaintiffs allege the following based upon the investigation of plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by defendants Scientific-Atlanta, Inc. and Motorola, Inc. and by non-party Adelphia Communications Corporation, transcripts of trial proceedings in *United States of America v. John J. Rigas et. al*, S.D.N.Y., 02 CR 1236 (LBS), as well as regulatory filings and reports, securities analysts' reports and advisories about Defendants Scientific Atlanta, Motorola and the Company, press releases and other public statements issued by Defendants Scientific Atlanta, Motorola and the Company. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a securities class action lawsuit on behalf of all persons who purchased or otherwise acquired the publicly traded securities (the "Class") of Adelphia Communications Corporation ("Adelphia" or "the Company") from October 1, 2000 through June 10, 2002, inclusive (the "Class Period"), against defendants Scientific Atlanta Inc. ("Scientific-Atlanta"), Motorola Inc. ("Motorola"), Wallace Haislip ("Haislip") and Julian Eidson ("Eidson") (collectively, "Defendants").

2.      Lead Plaintiffs allege violations of subsections (a), (b) and (c) of Rule 10b-5 in that, with *scienter*, defendants Motorola and Scientific-Atlanta fabricated bogus transactional documentation which artificially inflated Adelphia's earnings, and provided such documentation to Adelphia for incorporation into the Company's public financial statements in order to deceive investors. Motorola and Scientific-Atlanta thereby made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading and participated in a course of business, device, scheme or artifice which operated as a fraud on plaintiffs and the Class during the Class Period. Lead Plaintiffs and the Class were injured in connection with their purchases of Adelphia securities in that they relied on a market therefor which was artificially affected by the materially false statements and deceptive and manipulative conduct of Motorola and Scientific-Atlanta.

3.      This case, like *In re Adelphia Communications Corp. Sec. of Deriv. Litig.*, 03-MD-1529 (LMM), also pending in this Judicial District, arises out of the financial scandal at Adelphia Communications Corporation. From at least 1998 through March 2002, Adelphia – the nation's sixth largest cable television company – engaged in a multifaceted fraudulent scheme to artificially inflate its financial results.

2

4.      One aspect of the fraudulent scheme to inflate Adelphia's financial results involved the manipulation of the Company's earnings before interest, taxes, depreciation and amortization ("EBITDA"), a critical metric followed by investors. Throughout the Class Period, Adelphia would determine an EBITDA target and then go about justifying that number through various deceptive or manipulative devices and schemes. This included machinations concerning, *inter alia*, illicit agreements that Adelphia had with Defendants Motorola and Scientific-Atlanta.

5.      Prior to and during the Class Period, Motorola and Scientific Atlanta supplied Adelphia with digital converters (set-top cable boxes). Beginning in or about December 2000, Adelphia negotiated and entered into supplemental agreements with Motorola and Scientific-Atlanta to buy cable boxes at the original contract price plus a premium. At the same time, Adelphia entered into other agreements with Motorola and Scientific-Atlanta whereby Motorola and Scientific-Atlanta agreed to pay to Adelphia an amount equivalent to the premium as "marketing support payments."

6.      These deals were in essence "wash" transactions. Their only impact was to make Adelphia's financial performance look better from an accounting standpoint, by artificially inflating Adelphia's EBITDA throughout the Class Period.

7.      The extent of the involvement of Motorola and Scientific-Atlanta in the artificial inflation of Adelphia's EBITDA remained undisclosed until the criminal trial of certain former Adelphia executives commencing in March 2004 and in particular, the testimony of James Brown which commenced on April 29, 2004. Indeed, throughout 2003 and early 2004, Motorola and Scientific-Atlanta publicly insisted that they had done nothing improper in connection with their dealings with Adelphia. Moreover, financial commentators agreed that it was not apparent that

3

Motorola and Scientific-Atlanta had engaged in any wrongdoing, and the SEC, after conducting an investigation of Motorola and Scientific-Atlanta, took no action against them.

8.    The extent of the involvement of Motorola and Scientific-Atlanta in Adelphia's fraudulent scheme finally was revealed starting on April 29, 2004, at the criminal trial of former Adelphia executives before Judge Leonard B. Sand *United States of America v. John J. Rigas et. al*, 02 CR 1236 (LBS), also in this Judicial District. There, the prosecution's star witness, James Brown, Adelphia's former Vice President of Finance, gave an insider's account of the Motorola and Scientific-Atlanta transactions. In particular, Brown's extensive testimony revealed that:

a.    Motorola and Scientific-Atlanta *themselves* fabricated bogus transactional documentation which artificially inflated Adelphia's earnings, and provided such documentation to Adelphia for incorporation into the Company's public financial statements specifically in order to deceive the Company's auditors and investors.

b.    Adelphia executives *acknowledged* to their counterparts at Motorola and Scientific Atlanta that the "marketing support" transactions were a sham and intended solely for the purpose of artificially inflating Adelphia's publicly reported EBITDA;

c.    Motorola and Scientific-Atlanta initially resisted the "marketing support" idea, but then agreed to it on the *condition* that Adelphia purchase more new cable boxes from

4

them.    Motorola actually *threatened to halt* the wash transactions unless Adelphia purchased even more new cable boxes, in order to increase its own profits.

9.    In addition, Brown's testimony revealed the names of Scientific-Atlanta executives with whom Adelphia discussed the "marketing support" arrangements, including Scientific-Atlanta's then-chief financial officer, defendant Wallace Haislip and defendant Julian Eidson, Scientific-Atlanta's then vice president and controller.

10.    As alleged below, based on the information disclosed in the Brown testimony, it is now clear that Motorola and Scientific-Atlanta committed securities fraud in that they themselves, with *scienter*, fabricated bogus transactional documentation for incorporation into the financial statements of Adelphia and thereby engaged directly in Adelphia's fraudulent scheme to artificially inflate Adelphia's EBITDA. Indeed, this is not a case where the allegations show merely strong circumstantial evidence of conscious misbehavior or recklessness. Rather, as the Brown testimony revealed, Motorola and Scientific-Atlanta had *actual knowledge* of that they were making materially false and misleading statements that would be incorporated into Adelphia's financial results, thereby engaging in Adelphia's fraudulent scheme and deceiving investors. In addition, Motorola and Scientific-Atlanta possessed both motive and opportunity to commit fraud in that, by doing so, they were able to pressure Adelphia to purchase additional new cable boxes from Scientific-Atlanta and Motorola, thus increasing their own revenues and profits.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "1934 Act" or "Exchange Act"), 28 U.S.C. §§ 1331 and 1337.

5

The claims asserted herein arise under sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b), and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b). Many of the acts and transactions alleged herein occurred in substantial part in this Judicial District. Moreover, 28 U.S.C. §1407 confers jurisdiction in a related multi-district proceeding, *In re Adelphia Communs. Corp. Secs. & Derivative Litig.*, (No. II), 03 MD 1529 (LMM). The SEC's related civil action is pending in this Judicial District, *SEC v. Adelphia Communications Corp., et al.*, 02 Civ. 5776 (KMW) (S.D.N.Y.). In addition, the Justice Department's criminal action against several former executives of Adelphia is pending in this Judicial District, *United States of America v. John J. Rigas et. al*, 02 CR 1236 (LBS).

13.    In connection with the wrongs alleged herein, defendants used the instrumentalities of interstate commerce, including the United States mails, interstate wire and telephone facilities, and the facilities of the national securities markets.

**PARTIES**

14.    Lead Plaintiff Eminence Capital, LLC ("Eminence") purchased Adelphia securities during the Class Period and suffered damages as a result of the federal securities law violations alleged herein and were injured thereby, as attested to in the Certificate of Named Plaintiff previously filed with the Court in *In re Adelphia Communications Corp. Sec. & Deriv. Litig.*, 03-MD-1529 (LMM).

15.    Lead Plaintiffs Argent Classic Convertible Arbitrage Fund L.P., Argent Classic Convertible Arbitrage Fund (Bermuda) L.P., Argent Lowlev Convertible Arbitrage Fund Ltd., ("Argent"), UBS O'Conner LLC f/b/o UBS Global Equity Arbitrage Master Ltd. and UBS

O'Conner LLC f/b/o UBS Global Convertible Portfolio ("UBS") (collectively the "Argent/UBS Group") purchased Adelphia securities during the Class Period and suffered damages as a result of the federal securities law violations alleged herein and were injured thereby, as attested to in the Certificate of Named Plaintiff previously filed with the Court in *In re Adelphia Communications Corp. Sec. & Deriv. Litig.*, 03-MD-1529 (LMM).

16.     By order dated December 5, 2003, the Honorable Lawrence McKenna of this Judicial District, appointed Eminence and the Argent/UBS Group as Lead Plaintiffs, on behalf of a putative class of purchasers of publicly traded securities of Adelphia, in *In re Adelphia Communications Corp. Sec. & Deriv. Litig.*, 03-MD-1529 (LMM), in accordance with the provisions of the Private Securities Litigation Reform Act ("PSLRA"). A copy of such order is annexed, together with the aforementioned Certificates of Named Plaintiffs previously filed with the Court. On December 22, 2003, Lead Plaintiffs filed a Consolidated Class Action Complaint. Lead Plaintiffs have filed the instant action as a related case.

17.     Defendant Scientific-Atlanta is a corporation based in Atlanta, Georgia, and is one of the nation's leading manufacturers of electronic equipment, including digital set-top boxes for use in the cable television industry. A digital set-top cable box ("cable box") is equipment that is placed on a cable subscriber's television to enable it to receive and view digital television. Adelphia purchased cable boxes from Scientific-Atlanta and supplied them to its subscribers so they could view Adelphia cable television programming.

18.     Defendant Motorola is a corporation based in Schaumburg, Illinois, and is one of the nation's leading manufacturers of electronic equipment, including cable boxes for use in the

7

cable television industry. Adelphia purchased cable boxes from Motorola and supplied them to its subscribers.

19.     Defendant Haislip was chief financial officer, treasurer, and vice president of finance of defendant Scientific-Atlanta during the Class Period, and is now senior vice president of Finance and Operations of Scientific Atlanta.

20.     Defendant Eidson was vice president and controller of Scientific-Atlanta during the Class Period, and is now senior vice president, chief financial officer and treasurer of Scientific-Atlanta.

21.     Defendant Wallace Haislip and Julian Eidson are collectively referred to as the "Individual Defendants".

22.     Scientific-Atlanta, Motorola, Wallace Haislip and Julian Eidson are collectively referred to as "Defendants."

23.     Non-party Adelphia Communications Corporation ("Adelphia" or the "Company"), was, at all relevant times, the sixth largest cable provider in the United States. Adelphia is incorporated in the State of Delaware and maintains its corporate headquarters at 56919 DTC Parkway, Greenwood Village, CO 80111. During the Class Period (defined below), the Company owned and operated cable television systems located mainly in suburban areas of large and medium-sized cities throughout the United States. Adelphia also owned certain local telephone operations in the Eastern United States. Adelphia's operations consisted of providing telecommunication services, primarily over broadband networks which can transmit large quantities of voice, video and data by way of digital or analog signals. As a result of the June 25, 2002 Chapter

8

11 filing and the protections of the automatic stay, Adelphia is not named as a defendant in this complaint.

## CLASS ALLEGATIONS

24.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Adelphia securities (the "Class") from October 1, 2000 through June 10, 2002, inclusive (the "Class Period"). Excluded from the Class are defendants in this and the Consolidated Class Action, the officers and directors of such defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

25.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a minimum, hundreds, if not thousands of members of the Class. The Company had approximately 228 million shares of its Class A common stock outstanding as of June 1, 2002. The Company also had billions of dollars of publicly traded debt securities outstanding as of the close of the Class Period. Record owners and other members of the Class and subclasses may be identified from records maintained by Adelphia or its transfer agent and may be notified of the pendency of this action by mail or otherwise, using a form of notice similar to that customarily used in securities class actions.

26.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

27.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

28.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

    a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b.    whether Defendants acted with scienter in employing fraudulent devices, schemes and artifices or engaging in acts which operated as a fraud on investors;

    c.    whether the market prices of Adelphia's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

    d.    whether the members of the Class and subclasses have sustained damages and, if so, what is the proper measure of damages.

29.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

10

## SUBSTANTIVE ALLEGATIONS

### Background

30.    Like the related Consolidated Class Action, *In re Adelphia Communications Corp. Sec. of Deriv. Litig.*, 03-MD-1529 (LMM), this case arises out of one of the most extensive financial frauds at a public company. From at least 1998 through March 2002, Adelphia – the nation's sixth largest cable television company – engaged in a multifaceted fraudulent scheme to artificially inflate its financial results. The company failed to report billions of dollars in off-balance sheet debt and manipulated earnings through a series of fraudulent devices. Various members of the Rigas family, who controlled the Company, engaged in rampant undisclosed self-dealing.

31.    One aspect of the fraud involved the manipulation of the Company's earnings before interest, taxes, depreciation and amortization ("EBITDA"), a critical metric followed by Wall Street analysts and investors. Throughout the Class Period, Adelphia would determine an EBITDA target and then go about justifying that number through various deceptive or manipulative devices and schemes. This included machinations concerning, *inter alia*, illicit agreements that Adelphia had with defendants Motorola and Scientific Atlanta.

### The "Marketing Support" Transactions

32.    Prior to and during the Class Period, Motorola and Scientific-Atlanta supplied Adelphia with digital converters (set-top cable boxes). Adelphia was a substantial customer of each Motorola and Scientific Atlanta. For example, sales to Adelphia accounted for from 2% to 18% of Scientific-Atlanta's revenue in 2001, and 4% of Motorola's Broadband Communications Segment sales in 2002.

11

33.    Beginning in or about October through December 2000, Adelphia supplemented its contractual arrangements with Motorola and Scientific-Atlanta. Specifically, Adelphia negotiated and entered into agreements with Motorola and Scientific-Atlanta to buy cable boxes at the original contract price plus a premium of approximately $26 per box. At the same time, Adelphia entered into other agreements with Motorola and Scientific-Atlanta whereby Motorola and Scientific-Atlanta agreed to pay to Adelphia an amount equivalent to the approximately $26 premium as "marketing support payments."

34.    These deals were in essence "wash" transactions. Their only impact was to make Adelphia's financial performance look better from an accounting standpoint, by artificially inflating Adelphia's EBITDA. Adelphia recorded the premiums per box it paid to Motorola and Scientific-Atlanta as capital expenses to be amortized over time and recognized the $26 paid to Adelphia as current income.

35.    Specifically, Adelphia treated the "marketing support" payments from Motorola and Scientific-Atlanta as a "contra-expense" to Adelphia's marketing costs. This artificially lowered Adelphia's marketing expenses and increased Adelphia's publicly reported EBITDA, as marketing expenses are deducted from revenues in calculating EBITDA. Meanwhile, the payments that Adelphia made to Motorola and Scientific-Atlanta for the price increases on the cable boxes were accounted for as capital expenditures, i.e., recorded as charges over a period of years rather than a reduction in EBITDA for one year.

36.    Thus, throughout the Class Period, Adelphia reported fraudulently inflated EBITDA. Adelphia's EBITDA was artificially inflated by tens of millions of dollars each quarter

12

during the Class Period. EBITDA was inflated by approximately $37 million in 2000 and approximately $54 million in 2001.

**Partial Disclosure of the Involvement of Motorola and Scientific-Atlanta**

37.    Partial disclosures concerning the marketing support transactions began trickling out in the summer of 2002, in the wake of the news concerning the widespread fraud at Adelphia. Nevertheless, the extent of the involvement of Motorola and Scientific-Atlanta in the artificial inflation of Adelphia's EBITDA, remained undisclosed at all times prior to Brown's testimony in April 2004. (Indeed, Motorola and Scientific-Atlanta publicly insisted throughout this period that they had done nothing improper, financial commentators agreed that it was not apparent that Motorola and Scientific-Atlanta had engaged in any wrongdoing, and the SEC, after conducting an investigation of Motorola and Scientific-Atlanta, took no action against them.)

38.    In particular, on June 10, 2002, Adelphia filed an 8-K with the SEC announcing, *inter alia*, that based on preliminary results of an investigation by a special board committee, it was making downward revision of its 2000 and 2001 financial results and management's guidance for 2002 EBITDA. The Company reduced its 2001 revenue to $3.51 billion from $3.58 billion as reported in March and its 2001 EBITDA to $1.19 billion from $1.41 billion. For 2000, Adelphia lowered revenue to $ 2.54 billion from $2.6 billion and EBITDA to $1.04 billion from $1.2 billion.

39.    The 8-K revealed that one way that the Company's revenue figures had been inflated was through agreements with two unnamed vendors of cable boxes. As the 8-K stated:

13

MARKETING SUPPORT AGREEMENTS.

> Beginning at least as early as the year 2000, the Company entered into agreements with its two main vendors of digital converter boxes to raise the price paid by the Company for "set-tops" by $26 per set-top and to separately receive the same amount from the vendors for "marketing support". The Company did not provide a material amount of marketing support in exchange for such payment. The marketing support payments were improperly treated as a reduction of the Company's operating expenses, and the payments for the boxes were treated as capital expenditures. Current management expects that properly accounting for these marketing support arrangements will reduce EBITDA by approximately $54 million in 2001 and $37 million in 2000.

40.    The same day, June 10, 2002, Scientific-Atlanta issued a press release acknowledging that it was one of the cable box manufacturers referred to in Adelphia's 8-K, but specifically disclaiming any improper conduct in connection with its dealings with Adelphia. As the release stated:

> Adelphia has been a good customer of ours for over 20 years, and we have been surprised and saddened to learn of the recent events surrounding the company. *We believe that our dealings with Adelphia over the years have been legal in all respects* and were properly accounted for by us in the financial statements of Scientific-Atlanta. Marketing payments or credits we provided to Adelphia were deducted from, or netted against gross sales. Therefore these amounts do not appear as sales in our financial statements. Beyond that, we cannot comment on specific transactions with customers.

41.    On July 24, 2002, the SEC filed a complaint against Adelphia and various executives of the Company. The SEC complaint cited the phony "marketing support" transactions among a litany of deceptive schemes and devices that artificially inflated Adelphia's financial results, but did not identify Motorola or Scientific-Atlanta or name them as defendants.

14

42.    On August 8, 2002, Motorola acknowledged that it was the second vendor. It confirmed that in late June it had received demands for information concerning its transactions with Adelphia from the Justice Department and the SEC. It stated that it was cooperating with the investigation. Motorola spokesperson Jennifer Weyrauch also stated,"[t]he Company is convinced that these transactions have been recorded on Motorola's books in accordance with generally accepted accounting principles."

43.    On August 9, 2002, Scientific-Atlanta also acknowledged having been contacted by the Justice Department and SEC concerning Adelphia. Scientific-Atlanta spokesperson Peggy Ballard deflected speculation that the SEC might suspect Scientific-Atlanta of wrongdoing. "They're investigating Adelphia, *not us*," she said, according to news reports. "How we did our accounting is appropriate."

44.    On August 10, 2002, the Chicago Tribune published a story analyzing Adelphia's "marketing support" transactions. The story said that a cable industry analysts deemed the conduct of Motorola and Scientific-Atlanta "common" in the industry and quoted one analyst as stating that Motorola and Scientific-Atlanta were "probably as much a victim of Adelphia as anyone." As the Tribune reported, in pertinent part:

> Analysts said such financial arrangements [Adelphia's marketing support transactions] were common in the cable industry and not illegal if accounted for properly. At Adelphia, the issue apparently is whether the company used the transactions to mislead investors about its earnings.
>
> "I suspect that Scientific-Atlanta and Motorola probably did nothing wrong," said H.C. Wainwright & Co. analyst Lawrence Harris. "They were probably as much a victim of Adelphia as anyone." . . . .

15

45.    On August 14, 2002, the Financial Times reported that the SEC and Justice Department had expanded their investigation to include Motorola and Scientific-Atlanta. The focus of such investigation, according to the *Financial Times*, was "whether the electronics manufacturers *knew* of a scheme by Adelphia allegedly to inflate its earnings when they agreed to revise supply contracts with the company." As the Financial Times reported:

> Motorola Linked with Adelphia Probe
>
> US authorities are examining the roles of Motorola and Scientific-Atlanta as part of an inquiry into alleged fraud at Adelphia, the bankrupt cable operator.
>
> *The Securities and Exchange Commission is looking into whether the electronics manufacturers knew of a scheme by Adelphia allegedly designed to inflate its earnings when they agreed to revise supply contracts with the company.* In particular, it is investigating marketing support payments made by Motorola and Scientific-Atlanta as part of a deal to supply digital cable decoders.
>
> *            *            *
>
> Motorola and Scientific-Atlanta said they had accounted for the payments properly. *But they will have to satisfy investigators that they did not know Adelphia planned to book the deals in an improper manner.*
>
> The SEC, which declined to comment, has brought one action this year against Amazon, the internet retailer, because it "knew or should have known" it was contributing to an accounting violation by another company. Amazon, without admitting or denying wrong-doing, consented to an order banning future violations.
>
> *            *            *
>
> A Motorola spokeswoman said the company did not comment on investigations involving current or former customers, but said it was "fully co-operating with the SEC and the Justice Department". Scientific-Atlanta said it would not comment on investigations.

16

46.    Thereafter, no material information concerning the marketing support transactions publicly emerged until the Brown testimony at the criminal trial of the Rigases in April 2004.

47.    To date, the SEC has not taken any action against Motorola or Scientfic-Atlanta in connection with their dealings with Adelphia.

**Disclosure of Motorola and Scientific-Atlanta's Fraudulent Conduct**

48.    The extent of the involvement of Motorola and Scientific-Atlanta in Adelphia's fraudulent scheme finally was revealed at the end of April 2004, at the criminal trial of former Adelphia executives before Judge Leonard B. Sand in the Southern District of New York, *United States of America v. John J. Rigas et. al*, 02 CR 1236 (LBS). There, on April 29, 2004, James Brown, Adelphia's former vice president of finance, gave an insider's account of the Motorola and Scientific-Atlanta transactions. In particular, Brown's extensive testimony revealed that:

a.    Motorola and Scientific-Atlanta *themselves* fabricated bogus transactional documentation which artificially inflated Adelphia's earnings, and provided such documentation to Adelphia for incorporation into the Company's public financial statements specifically in order to deceive the Company's auditors and investors.

b.    Adelphia executives *acknowledged* to their counterparts at Motorola and Scientific Atlanta that the "marketing support" transactions were a sham and intended solely for the purpose of artificially inflating Adelphia's publicly reported EBITDA;

17

      c.      Motorola and Scientific-Atlanta initially resisted the "marketing support" idea, but then agreed to it on the *condition* that Adelphia purchase more new cable boxes from them. Motorola actually *threatened to halt* the wash transactions unless Adelphia purchased even more new cable boxes, in order to increase its own profits.

49.    In addition, Brown's testimony revealed the names of Scientific-Atlanta executives with whom Adelphia discussed the "marketing support" arrangements, including defendant Wallace Haislip.

50.    According to Brown's testimony, Adelphia in mid-2000 realized it was going to miss its earnings targets, in part because of higher-than-expected expenses related to the rollout of new cable boxes that it had purchased from Motorola and Scientific-Atlanta. Brown testified that Timothy Rigas, one of the former Adelphia executives on trial, suggested capitalizing the marketing and advertising expenses associated with the rollout of the equipment to stretch out the expenses and boost Adelphia's earnings.

51.    Brown said the two discussed that the scheme would require Motorola's and Scientific-Atlanta's creation of phony documentation necessary to deceive the Company's auditors:

> I explained to him the details of what we were going to eventually call marketing support and how this scheme would work to do a wash transaction between Adelphia and Scientific Atlanta that would inflate our EBITDA but would have no economic impact on Adelphia or Scientific Atlanta, and told him that the auditors would be wary of this if they saw documents that made it look like a wash transaction. *So I told him that we would need Scientific Atlanta's cooperation in getting an agreement that would make this appear to be something other than it really was, which was an uneconomic wash transaction.*

52. Brown testified that he first introduced the idea to Scientific-Atlanta at a meeting in October 2000. Brown testified that he and his colleagues explicitly informed their Scientific-Atlanta counterparts that the transaction they were proposing had no economic substance, but was intended solely for fraudulent purposes:

> Q. What, if anything, did you explain to the people from Scientific Atlanta about this proposed marketing support transaction?
>
> A. We were clearly trying to impress on him that this would have no economic impact on what they were getting paid for converters and *that it was just a way they could help us out in inflating our numbers.*

53. Shortly thereafter Brown had a follow-up conference call with executives of Scientific-Atlanta which included defendant Haislip, according to Brown's testimony. Brown testified that the Scientific-Atlanta executives said they were unwilling to inflate the prices of the cable boxes to the extent that Adelphia wanted (by $50) because they feared the transaction would not "pass muster" with the company's accountants and lawyers. As Brown testified:

> Q. Didn't you get angry because you were asking Scientific Atlanta to pay Adelphia $50 a box in exchange for a $50-a-box increase in cost, and they declined to do that?
>
> A. I don't remember the $50, but I know we wanted to have a bigger marketing support credit booked to us than they were willing to do. They actually had a specific percentage that I recall of something like 6 1/2 percent of the purchase price that was the most they were willing to sort of mark up the boxes and wash out all the marketing support.
>
>        \*      \*      \*
>
> Q. Do you recall them telling you that they would not provide marketing support of more than 5 to 6 percent because they were going to submit the documents to their lawyers and accountants and it would not pass muster unless it was within a reasonable range. Do you recall that, sir?

A. They mentioned their accountants, who I think were Ernst & Young. I don't remember them mentioning their lawyers.

54.    Brown also testified that Motorola and Scientific-Atlanta finally agreed to the "marketing support" idea on the condition that Adelphia purchase more cable boxes from them. He also testified that, thereafter, Motorola threatened to halt the wash transactions unless Adelphia ordered even more new equipment. As Brown testified:

Q. Did you have any difficulty in getting either Scientific Atlanta or Motorola to agree to once again engage in these [market support] transactions in 2001?

A. Yes, we did, a little bit.

Q. Can you explain to us the nature of the difficulty?

A. *In order to continue to go along with our scheme, Motorola wanted us to buy more converters than we had previously contracted with them to buy, was one difficulty.*

55.    Referring to a discussion he had with his boss, Tim Rigas, regarding Motorola's demands, Brown also testified:

I explained to him that Motorola wanted us to buy more converters and that I thought they really just wanted to accomplish booking [the extra converters] in the current quarter for their own results and that they probably would carry us on them and not make us pay for them if we agreed to pay for them eventually, *and that in exchange for doing so they would continue with the marketing support scheme.*

56.    Brown also detailed the process of obtaining Scientific-Atlanta's agreement to participate. As Brown testified:

Q. Mr. Brown, did you have any difficulties of a similar sort with Scientific Atlanta engaging in the marketing support transactions in 2001?

20

A. The difficulty I recall having with them is we wanted to artificially increase the dollar amount and the percentages that we were artificially assigning to marketing support, and SA [Scientific Atlanta] was having some objections to the increase in the percentage that we were going to report as marketing support dollars.

Q. Did you ever meet with SA to speak with them about that?

A. Yes, we did.

\*         \*         \*

Q. What, if anything, did you explain to SA about increasing the percentage of the marketing support that got paid?

A. Pretty plainly explained that there's no real economic impact to this deal anyway, so I was asking why they were hung up on limiting the percentage that they would assign to this category.

Q. What if anything, did Scientific Atlanta eventually conclude?

A. I think that they, they concluded after we agreed to buy more converters from them that they would increase the percentage.

57.    During the trial, on June 7, 2004, prosecutors sought to introduce an internal Scientific-Atlanta email, dated August 11, 2000, concerning the wash transactions. The email, read aloud in court, indicated that Scientific-Atlanta executives, including Individual Defendants Haislip and Eidson, approved the transactions. Specifically, the email, from Scientific-Atlanta executive Ward Dixon, stated: "I received the go ahead to do the Charter-like marketing credit for Adelphia from Wally and Julien." Prosecutors identified "Wally" as defendant Wallace Haislip,"Julien", as defendant Julian Eidson, and the "Charter-like marketing credit" as the "Marketing Support" contracts.

58.    Brown also testified that Motorola and Scientific-Atlanta concocted phony documentation for the deals. This was necessary, he testified, in order to deceive the Company's

auditors that the marketing support payments and cable box price increases represented legitimate,

unrelated transactions.

59.    In particular, Brown testified that Motorola and Scientific-Atlanta *themselves*

fabricated and provided to Adelphia bogus letter agreements setting forth fictitious rationales for the

cable box price increases.  Motorola's letter agreement to Adelphia falsely claimed that "Motorola

has incurred additional costs in order to secure incremental component volumes and factory capacity

to meet your [Adelphia's] increased needs for DCT Set-Tops."  As Brown testified, the letter was

provided at Adelphia's request for the purpose of "fool[ing] the auditors" with respect to the

Motorola and Scientific-Atlanta transactions.

> Q. Do you know why that false statement was included in this letter?
>
> A. Because Tim Werth [Adelphia's accounting director] asked
> Motorola to give us this letter to support the false marketing support
> payments, and this was a necessary component to fool the auditors.
>
> Q. Do you know what the real reason for this price increase was?
>
> A. There is really no price increase because we had an offsetting
> payment back to the company, so there is really — there is no reason.

60.    Scientific Atlanta provided Adelphia with a similar letter, dated January 2,

2001, which falsely claimed:

> . . . SA has continued to encounter increased costs on certain
> electronic components incorporated into the E2000 set-tops and the
> set tops.  As a result, the prices for E2000 set-tops and the set-tops
> were increased by $31 per E2000 set-top and per set-top, effective as
> of April 1, 2000.

61.    Brown also testified about the phony "marketing support" contracts, which

he explained were necessary "[t]o create a paper trail to support the payment of the marketing

support fees that we talked about in the wash transaction I described earlier." The parties, Brown

testified, even concocted a fictitious rationale for the contracts by labeling these fabricated contracts

"spot-telecasting" agreements. As Brown explained, "We had to make up a reason for Motorola to

be sending us money in order for the auditors to agree to allow us to book it as something."

62.    He said that he and his colleagues explicitly discussed with Motorola upon

entering into such "spot-telecasting" agreement that no marketing support actually would be

provided -- "that that's what we were going to purport, not that we were going to offer those

services." Similarly, Brown testified, the Scientific-Atlanta "spot-telecasting" contract was

"misleading" because "there were no spot telecasting services delivered to Scientific Atlanta and

because it was made in conjunction with the other letter about the price increase, for no real

economic benefits."

**ADDITIONAL SCIENTER ALLEGATIONS**

63.    During the Class Period Motorola and Scientific-Atlanta made untrue

statements of material fact and/or omitted to state material facts necessary to make the statements

not misleading and participated in a course of business, device, scheme or artifice which operated

as a fraud on plaintiffs and the Class, with *scienter*. In particular, Motorola and Scientific-Atlanta

knowingly and/or recklessly fabricated bogus transactional documentation which artificially inflated

the Company's EBITDA for incorporation into the Company's publicly reported financial statements

in order to deceive investors. Indeed, this is not a case where the allegations show merely strong

circumstantial evidence of conscious misbehavior or recklessness. Rather, as the Brown testimony

revealed, Motorola and Scientific-Atlanta had *actual knowledge* that they were making materially

23

false and misleading statements and engaging in manipulative and deceptive conduct to inflate Adelphia's EBITDA.

      64.    The Brown testimony revealed that the Individual Defendants *also* had actual knowledge in that they specifically approved the bogus transactions, as evidenced by the internal Scientific-Atlanta email of August 11, 2000, sought to be introduced by prosecutors in the criminal proceeding, as alleged above.

      65.    In addition, Motorola and Scientific-Atlanta and each of them possessed both motive and opportunity to commit fraud in that, by doing so, they were able to pressure Adelphia to purchase additional new cable boxes from Scientific-Atlanta and Motorola, thus increasing their own revenues and profits, as alleged above. Indeed, Motorola actually threatened to halt the transactions unless Adelphia purchased even more new cable boxes. *Id.*

<strong>PLAINTIFFS LACKED INQUIRY NOTICE PRIOR TO BROWN'S TESTIMONY</strong>

      66.    Prior to Brown's testimony on April 29, 2004, plaintiffs did not obtain and could not have obtained actual knowledge of the facts giving rise to this action against Defendants. Nor did plaintiffs have notice of facts which, in the exercise of reasonable diligence, would have led to discovery of the facts underlying Defendants' fraud. Indeed, prior to such time, the extent of the involvement of Motorola and Scientific-Atlanta in Adelphia's fraudulent scheme to artificially inflate the Company's EBITDA, remained undisclosed. Motorola and Scientific-Atlanta publicly insisted throughout this period that they had done nothing improper. Moreover, financial commentators agreed that it was not apparent that Motorola and Scientific-Atlanta had engaged in any wrongdoing. The SEC, after conducting an investigation of Motorola and Scientific-Atlanta, took no action against them.

24

67.    It was only through the trial testimony of Brown that plaintiffs learned or were

on inquiry notice of the facts underlying Defendants' fraud, including the essential fact that

defendants *themselves* prepared materially false and misleading statements in the form of phony

contracts and invoices which artificially inflated Adelphia's EBITDA for incorporation into

Adelphia's financial statements. At a minimum, no reasonable amount of investigation on the part

of investors, prior to the Brown testimony, could have discovered facts sufficient to allege securities

fraud claims against Defendants with the particularity necessary to meet the stringent *scienter*

pleading requirements of Rule 9(b) and the PSLRA.

### DEFENDANTS' MATERIALLY FALSE STATEMENTS AND MANIPULATIVE AND DECEPTIVE CONDUCT PROXIMATELY CAUSED PLAINTIFFS' LOSSES THROUGH A FRAUD ON AN EFFICIENT MARKET

68.    The market for Adelphia's securities was open, well-developed and efficient

at all relevant times. As a result of the materially false and misleading statements and manipulative

and deceptive conduct alleged herein, Adelphia's securities traded at artificially inflated prices

during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired

Adelphia securities relying upon the integrity of the market price of Adelphia's securities and have

been damaged thereby. Plaintiffs and the class were entitled to and did rely during the Class Period

on the financial statements of Adelphia and the integrity of the market for Adelphia securities and

the supposition that the market price for Adelphia securities was validly set and that no unsuspected

fraud was affecting the prices of such securities.

69.    At all relevant times, the materially false statements and manipulative and

deceptive conduct particularized in this Complaint directly or proximately caused or was a

substantial contributing cause of the damages sustained by plaintiffs and other members of the Class.

As described herein, during the Class Period, Defendants made materially false statements and engaged in manipulative and deceptive conduct that artificially inflated Adelphia's publicly reported EBITDA, a critical metric followed by investors, which had the cause and effect of creating in the market an unrealistically positive assessment of Adelphia and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.

70.     Defendants' materially false statements and manipulative and deceptive conduct during the Class Period resulted in plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

71.     At all relevant times, the market for Adelphia's securities was an efficient market for the following reasons, among others:

a.     Adelphia's stock met the requirements for listing, and was listed and actively traded on the NASDAQ;

b.     As a regulated issuer, Adelphia filed periodic public reports with the SEC;

c.     Adelphia regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.     Adelphia was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to

the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

72.    As a result of the foregoing, the market for Adelphia's securities promptly digested current information regarding Adelphia from all publicly available sources and reflected such information in Adelphia's securities prices. Under these circumstances, all purchasers of Adelphia's securities during the Class Period suffered similar injury through their purchase of Adelphia's securities at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

73.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

74.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein and (ii) cause plaintiffs and other members of the Class to purchase Adelphia's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

75.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Adelphia's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

76.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Adelphia as specified herein.

77.    Defendants made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading and employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to mislead investors in Adelphia's securities as to the value and performance of Adelphia, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Adelphia, its financial performance and its business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in manipulative and deceptive transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Adelphia securities during the Class Period.

78.    The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) they were high-level executives and/or directors of Scientific-Atlanta during the Class Period and members of or Scientific-Atlanta's management teams or had

28

control thereof; (ii) each of them, by virtue of their responsibilities and activities as senior officers and/or directors was privy to and engaged in the fraudulent scheme to artificially inflate Adelphia's EBITDA; (iii) each one of them enjoyed significant personal contact and familiarity with each other and the executives of Adelphia involved in the fraudulent scheme alleged herein; and (iv) they were aware of the dissemination of artificially inflated EBITDA information to the investing public which they knew or recklessly disregarded was materially false and misleading.

79.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of inflating Adelphia's publicly reported EBIDTA, and thereby causing the Company's securities to be overvalued and artificially inflated at all relevant times. At all relevant times, Defendants were aware of the dissemination of artificially inflated EBITDA information to the investing public which they knew or recklessly disregarded was materially false and misleading. As demonstrated by Defendants' materially false statements and manipulative and deceptive conduct throughout the Class Period, Defendants, if they did not have actual knowledge of the manipulative and deceptive conduct alleged, were reckless in failing to obtain such knowledge by refraining from taking the steps necessary to discover whether those statements were false and misleading or to discovery Defendants' fraudulent scheme.

80.    As a result of the dissemination of the materially false and misleading information, failure to disclose material facts and manipulative and deceptive conduct, as set forth above, the market price of Adelphia's securities was artificially inflated during the Class Period. In

ignorance of the fact that market prices of Adelphia's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in statements by Defendants during the Class Period, plaintiffs and the other members of the Class acquired Adelphia securities during the Class Period at artificially high prices and were damaged thereby.

81.    At the time of said misrepresentations and omissions and manipulative and deceptive conduct, plaintiffs and other members of the Class were ignorant of the falsity of the material misrepresentations and omissions, and believed them to be true, and were entitled to and did rely during the Class Period on the integrity of the market for Adelphia securities and the supposition that the market price for Adelphia securities was validly set and that no unsuspected fraud was affecting the prices of such securities. Had plaintiffs and the other members of the Class and the marketplace known the truth regarding Defendants' materially false statements and deceptive and manipulative conduct and Adelphia's true financial condition, which were not disclosed during the Class Period, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Adelphia securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

82.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

83.    As a direct and proximate result of Defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of Adelphia's securities during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of
### The Exchange Act Against The Individual Defendants

84.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

85.    The Individual Defendants acted as controlling persons of defendant Scientific-Atlanta and within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, participation in and/or awareness of defendant Scientific-Atlanta's operations and/or intimate knowledge of Scientific-Atlanta's dealings with Adelphia, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of defendant Scientific-Atlanta, including such company's making of materially false and misleading statements for incorporation into Adelphia's financial statements and participation in the fraudulent scheme to artificially inflate Adelphia's EBITDA. The Individual Defendants were provided with or had unlimited access to all information concerning Scientific-Atlanta's dealings with Adelphia, including the fraudulent scheme alleged herein, and had the ability to prevent Scientific-Atlanta from making the materially false and misleading statements and engaging in the manipulative and deceptive conduct alleged herein.

86.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of defendant Scientific-Atlanta and, therefore, is presumed

31

to have had the power to control or influence the particular transactions giving rise to the securities

violations as alleged herein, and exercised the same.

        87.    As set forth above, defendant Scientific-Atlanta and the Individual Defendants

each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to

Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants'

wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with

their purchases of Adelphia's securities during the Class Period.

        **WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

        A.    Determining that this action is a proper class action, designating plaintiffs as

class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as

Class Counsel;

        B.    Awarding compensatory damages in favor of plaintiffs and the other Class

members against all Defendants, jointly and severally, for all damages sustained as a result of

defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

        C.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred

in this action, including counsel fees and expert fees; and

        D.    Such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

        Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand

a trial by jury as to all issues so triable.

Dated: July 27, 2004

**KIRBY McINERNEY & SQUIRE, LLP**

By: _____

    Jeffrey H. Squire (JHS-8910)
    Richard L. Stone (RS-5324)
    Mark A. Strauss (MS-2288)
830 Third Avenue
New York, NY 10022
Tel.: (212) 371-6600
Fax: (212) 751-2540

*Attorneys for Lead Plaintiffs Argent Classic Convertible Arbitrage Fund L.P., Argent Classic Convertible Arbitrage Fund (Bermuda) Ltd., and Argent Lowlev Convertible Arbitrage Fund Ltd., and UBS O'Connor LLC F/B/O UBS Global Equity Arbitrage Master Ltd. and UBS O'Connor LLC F/B/O UBS Global Convertible Portfolio*

- and -

**ABBEY GARDY, LLP**

By: _____

    Arthur N. Abbey (AA-8079)
    Judith L. Spanier(JS-5065)
    Stephen T. Rodd (SR-8228)
    Richard B. Margolies(RM-9311)
212 East 39th Street
New York, NY 10016
Tel.: 212-889-3700
Fax: 212-684-5191

*Attorneys for Lead Plaintiff Eminence Capital LLC*

- and -

33

**Additional Named Plaintiffs' Counsel**

**ABRAHAM & ASSOCIATES**
Jeffrey Abraham
One Pennsylvania Plaza, Suite 1910
New York, NY 10119-0165
Tel.: (212) 714-2444
Fax: (212) 279-3655

*Attorneys for Additional Named Plaintiff Robert Lowinger*

**BERGER & MONTAGUE, P.C.**
Sherrie Savett
Robin B. Switzenbaum
1622 Locust Street
Philadelphia, PA 19103
Tel.:    215.875.3071
Fax:    215.875.4604

*Attorneys for Additional Named Plaintiffs Alan Garner and PAX World High Yield Fund Inc.*

**BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO LLP**
Norman Berman
N. Nancy Ghabai
One Liberty Square
Boston, MA 02109
Tel.: (617) 542-8300
Fax: (617) 542-1194

- and -

34

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Max W. Berger
J. Erik Sandstedt
1285 Avenue of the Americas
New York, New York 10019
Tel.: (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Additional Named Plaintiffs the Louisiana State Employees' Retirement System, the Fresno County Employees' Retirement Association and the Louisiana Sheriffs' Pension and Relief Fund*

**CHIMICLES & TIKELLIS, LLP**
Nicholas E. Chimicles
Denise D. Schwartzman
361 West Lancaster Avenue
Haverford, PA 19063
Tel.:(610) 642-8500
Fax: (610) 649-3633

*Attorneys for Additional Named Plaintiffs Alvin Victor and Harriet G. Victor and William D. Huhn*

**CHITWOOD & HARLEY LLP**
Martin D. Chitwood
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel.: (404) 873-3900
Fax: (404) 876-4476

*Attorneys for Additional Named Plaintiff Charles Seebacher*

**FARUQI & FARUQI LLP**
Nadeem Faruqi
320 East 39th Street
New York, NY 10016
Tel: (212) 983-9330
Fax (212) 983-9331

35

**GOLD BENNETT CERA & SIDENER LLP**
Solomon B. Cera
Joseph M. Barton
595 Market Street, Suite 2300
San Francisco, CA 94105-2835
Tel.: (415) 777.-230
Fax: (415) 777-5189

*Attorneys for Additional Named Plaintiff Ardsley Partner's*

**JOHNSON & PERKINSON**
Dennis J. Johnson
1690 Williston Road
South Burlington, VT 05403
Tel.: (802) 862-0030
Fax: (802) 862-0060

*Attorneys for Additional Named Plaintiff Richard I. Burstein*

**THE LAW OFFICES BERNARD M. GROSS, P.C.**
Deborah R. Gross
1515 Locust St.
Philadelphia, PA 19102
Tel.: (215) 561-3600
Fax: (215) 561-3600

*Attorneys for Additional Named Plaintiff Maud Eichel*

**SCHATZ & NOBEL, P.C.**
Andrew M. Schatz
Seth R. Klein
330 Main Street
Hartford, CT 06106
Tel.: (860) 493-6292
Fax: (860) 493-6290

*Attorneys for Additional Named Plaintiff Lewis Thomas Hardin*

36

ZWERLING, SCHACHTER & ZWERLING, LLP
Robert S. Schachter
Richard A. Speirs
845 Third Avenue
New York, NY 10022
Tel.: (212) 223-3900
Fax: (212) 371-5969

12-08-'03 20:45  FROM-Abbey Gardy LLP #4   +212-983-9652        T-957  P07/19  U-690

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE ADELPHIA COMMUNICATIONS          03MD 1529 (LMM)
CORP. SECURITIES & DERIV. LITIG.       Applies To All Actions

                                       ORDER

**RECEIVED**

SEP 2 8 2006

WASHINGTON, CLERK
U.S. DISTRICT COURT

WHEREAS, in accordance with the orders of the Judicial Panel on Multidistrict

Litigation dated July 23, 2003 and October 1, 2003, the order of Judge Harold Baer dated August

27, 2003, the directions given by Judge Baer at a pretrial conference held on September 15, 2003

during which Judge Baer addressed issues pertaining to consolidation, the appointment of lead

plaintiffs and lead counsel, the appointment of liaison counsel and scheduling matters and Judge

Baer's order dated September 24, 2003, it is hereby ORDERED:

## I.   CONSOLIDATION

1.     The Class Actions and Derivative Actions transferred to the Court by the Judicial

Panel on Multidistrict Litigation pursuant to its order dated July 23, 2003, involve common

questions of law and fact and the consolidation of these actions for pretrial proceedings is

necessary to achieve economies for the parties and the Court and to achieve substantial justice

for the parties. The Class Actions (listed on the annexed Schedule A) are consolidated for all

purposes including, but not limited to, discovery, pretrial proceedings and trial proceedings,   *LMM*

pursuant to Rule 42(a) of the Federal Rules of Civil Procedure (the "Class Actions"). The

Derivative Actions (listed on the annexed Schedule B) are consolidated for all purposes with the

Class Actions and are stayed pursuant to Section 362 of the Bankruptcy Code, 11 U.S.C. § 362

(the "Derivative Actions"). The Class Actions and the Derivative Actions are hereinafter

referred to as the "Consolidated Actions." The Consolidated Actions and the Individual Actions

(defined herein) shall be referred to collectively as In re Adelphia Communications Corp.,

Securities & Deriv. Litig., Master File No. 03 MD 1529 (LMM).

2.    No action taken hereunder shall have the effect of making any person, firm or

corporation a party to any action in which the person or entity has not been named, served, or

properly added as such in accordance with the Federal Rules of Civil Procedure.

## II.    MASTER FILE AND SEPARATE ACTION FILES

3.    A Master File is hereby established for the Consolidated Actions and the

Individual Actions (all collectively, "the Actions"). The Master File shall be Civil Action No. 03

Civ. 5755 (LMM). The original of this Order shall be filed by the Clerk in the Master File herein

established. The Clerk shall maintain a separate file for each of the Actions and filings shall be

made therein in accordance with the regular procedures of the Clerk of this Court except as

modified by future order of this Court. The Clerk shall file a copy of this Order in each such

separate file. The Clerk shall mail a copy of this Order to counsel of record in each of the

Actions.

## III.    NEWLY FILED OR TRANSFERRED ACTIONS

4.    When a class or derivative action that relates to the same subject matter as the

Consolidated Actions is hereafter filed in or transferred to this Court and assigned to the

undersigned, it shall be consolidated with these actions in the same manner as the cases

identified in Section I above and the Clerk of Court shall:

a.    File a copy of this Order in the separate file for such action.

b.    Mail a copy of this Order of assignment to counsel for plaintiffs and

counsel for each defendant in the Consolidated Actions.

c.    Make an appropriate entry in the Master Docket.

    d.    Mail to the attorneys for the plaintiff(s) in the newly filed or transferred case a copy of this Order.

    e.    Upon the first appearance of any new defendant(s), mail to the attorneys for such defendant(s) in such newly filed or transferred case a copy of this Order.

    5.    The Court requests the assistance of counsel in calling to the attention of the Clerk the filing or transfer of any case which might properly be consolidated with these actions.

## IV.    APPLICATION OF THIS ORDER TO SUBSEQUENT CASES

    6.    This Order shall apply to each Class Action, Derivative Action and Individual Action assigned to the undersigned alleging claims similar to those set forth in these actions, whether brought on behalf of present or former holders of Adelphia securities. This Order shall apply to each such case which is subsequently filed in or transferred to this Court, and which is assigned to the undersigned unless a party objecting to the consolidation of that case or to any other provision of this Order serves an application for relief from this Order or from any of its provisions within ten (10) days after the date on which the Clerk mails a copy of this Order to counsel for that party. The provisions of this Order shall apply to such action pending the Court's ruling on the application. Unless a plaintiff in a subsequently filed or transferred case is permitted by the Court to use a separate complaint, defendants shall not be required to answer, plead or otherwise move with respect to the complaint in any such case. If a plaintiff in any such case is permitted to use a separate complaint, each defendant shall have thirty days from the date of entry of an order issued by the Court granting such permission within which to answer, plead or otherwise move with respect to any such complaint. In the event a defendant moves to dismiss any such complaint, and such motion does not result in the dismissal of such action, defendant shall have until thirty days after the entry of an order resolving such motion within which to answer any such complaint.

3

## V.    CAPTIONS

7.    Every pleading filed in these Actions shall bear the following caption:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
IN RE ADELPHIA COMMUNICATIONS          :          03MD 1529 (LMM)
CORP. SECURITIES & DERIV. LITIG.           :
                                                               :
This Document Relates To:                         :
                                                               :
------------------------------------------------X

8.    When a pleading is intended to be applicable to all actions to which this Order applies, the words "All Actions" shall appear immediately after the words "This Document Relates To:" in the caption.  When a pleading is intended to apply only to less than All Actions, the docket number for each individual action to which it is intended to apply and the name of the plaintiff in said action shall appear immediately after the words "This Document Relates To:" in the caption.

## VI.    FILING AND DOCKETING

9.    When a paper is filed and the caption shows that it is applicable to All Actions, the Clerk shall file it in the Master File and note such filing in the Master Docket.  No other docket entries need be made nor copies filed in other files.

10.    When a paper is filed and the caption shows that it is applicable to less than All Actions, the Clerk shall file the original of the paper in the Master File and a copy in the file of each separate action to which it applies and shall note such filing in the Master Docket and in the docket of each such action.  The party filing such paper shall supply the Clerk with sufficient copies of any paper to permit compliance with this paragraph.

4

### VII.  LEAD PLAINTIFFS; LEAD PLAINTIFFS' COUNSEL

11.    Eminence Capital, LLC ("Eminence"), and Argent Classic Convertible Arbitrage Fund L.P., Argent Classic Convertible Arbitrage Fund (Bermuda) L.P., Argent Lowlev Convertible Arbitrage Fund Ltd., UBS O'Conner LLC f/b/o UBS Global Equity Arbitrage Master Ltd. and UBS O'Conner LLC f/b/o UBS Global Convertible Portfolio (collectively the "Argent/UBS Group") are appointed Lead Plaintiffs in the Consolidated Actions pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934, 15 U.S.C. 78n-4(a)(3)(B).

12.    Abbey Gardy, LLP, and Kirby McInerney & Squire, LLP, shall serve as co-Lead Counsel for all plaintiffs in the Consolidated Actions ("Lead Counsel").

13.    Lead Counsel are hereby vested by the Court with the following responsibilities and duties in the Consolidated Actions:

a.    Sign any consolidated complaint, motions, briefs, discovery requests, objections, or notices on behalf of all plaintiffs or those plaintiffs filing the particular papers.

b.    Conduct all pretrial proceedings on behalf of plaintiffs.

c.    Brief and argue motions.

d.    Initiate and conduct discovery.

e.    Speak on behalf of plaintiffs at any pretrial conference.

f.    Employ and consult with experts.

g.    Conduct settlement negotiations with defense counsel on behalf of plaintiffs in the Consolidated Actions.

h.    Call meetings of plaintiffs' counsel.

i.    Direct the preparation for a trial of this matter and delegate work responsibilities to selected counsel as may be required in such a manner as to lead to the orderly and efficient prosecution of this litigation and to avoid duplicative or unproductive effort.

5

    j. Distribute to all plaintiffs' counsel copies of all notices, orders, and decisions of the Court; maintain an up-to-date list of counsel available to all plaintiffs' counsel on request; keep a complete file of all papers and discovery materials filed or generated in the Consolidated Actions which (subject to any confidentiality agreements) shall be available to all plaintiffs' counsel at reasonable hours.

    k. Keep Liaison Counsel in the Individual Actions (Section VIII below) informed about discovery matters and other issues and proceedings of common interest in the Consolidated Actions.

    l. Consult with Liaison Counsel in the Individual Actions to obtain their views on proposed document requests, interrogatories, requests for admissions, depositions, and litigation strategy, and incorporate those views wherever it is appropriate to do so.

    m. Perform such other duties as may be expressly authorized by further order of the Court.

VIII. THE INDIVIDUAL ACTIONS AND APPOINTMENT OF LIAISON COUNSEL

    14. In addition to the Consolidated Actions, eleven individual actions denominated Stocke, et al. v. John J. Rigas, et al. (03-CV-5754) (E.D. Pa.); New York City Employees' Retirement System, et a). v. Adelphia Communications Corp., et al. (03-CV-5789) (E.D. Pa.); New York City Employees' Retirement System. et al v. John J. Rigas, et al. (02-.CV-9804) (S.D.N.Y.); W.R. Huff Asset Management Co. L.L.C. v. Deloitte & Touche. LLP, et al. (03-CV-5752) (W.D.N.Y.); W.R. Huff Asset Management Co., LL.C. v. Deloitte & Touche. LLP, et al. (03-CV-5753) (W.D.N.Y.); Appaloosa Investment LP et al. v. Deloitte & Touche. LLP, et al. (03-CV-7301) (W.D.N.Y.); Los Angeles County Employees' Retirement Association v. John J. Rigas, et al. (03-CV-5750) (C.D. Ca.); Franklin Strategic Income Fund, et al. v. John J. Rigas, et al. (03-CV-5751) (C.D. Ca.); Lee P. Bent, et al. v. John J. Rigas, et al. (03-CV-5793)

(W.D. Pa.); Elkmont Capital, Ltd. v. Deloitte & Touche, LLP, et al. (03-CV-5794) (N.D. Tex.); and Division of Investment of the New Jersey Department of the Treasury v. John S. Rigas, et al. (No docket number assigned as of 9/11/03) (D.N.J.) (the "Individual Actions"), have been assigned to this Court for coordinated or consolidated pretrial proceedings.[1]

15.    Goodkind Labaton Rudolf & Sucharow LLP, counsel for New York City Employees' Retirement System and the Division of Investment of the New Jersey Department of the Treasury, and Lowenstein Sandler P.C., counsel for W.R. Huff Asset Management Co., L.L.C., shall serve as co-liaison counsel for the plaintiffs in the Individual Actions ("Liaison Counsel").

16.    Liaison Counsel shall have the following responsibilities:

a.    Distribute to all counsel in the Individual Actions those materials that they need to review to form and to communicate their views regarding discovery, motion practice and settlement.

b.    Confer with all counsel in the Individual Actions to obtain their views regarding discovery and any issues that need to be communicated to Lead Counsel or to the Court.

c.    Communicate with Lead Counsel regarding any discovery that plaintiffs in the Individual Actions wish to take and regarding litigation strategy and motion practice.

d.    Communicate with the Court regarding any issues common to the Individual Actions.

e.    Coordinate the taking of any discovery unique to the Individual Actions.

---

[1]    The transfer of a twelfth individual action denominated Gary L. Williams, et al. v. John J. Rigas, et al. (No docket number assigned as of 9/11/03) (D.S.C.) has not yet been accomplished.

IX.    APPOINTMENT OF DEFENDANTS' LIAISON COUNSEL

17.    Cleary, Gottlieb, Steen & Hamilton and Cravath, Swaine & Moore, shall serve as Defendants' Liaison Counsel for the Defense Liaison Group, which shall consist of all defendants except John J. Rigas, Michael J. Rigas, Timothy J. Rigas, James P. Rigas, Highland Holdings, Highland 2000 L.P., and Highland Holdings II, represented by Dilworth Paxson LLP, and Peter Venetis, represented by Golenbock Eiseman Assor Bell and Peskoe LLP.

18.    Defendants' Liaison Counsel shall have the following responsibilities:

a.    Defendants' Liaison Counsel shall be authorized to receive all notices from the Court on behalf of all parties within the Defense Liaison Group and shall be responsible for the preparation and transmittal of copies of such orders and notices to the parties in such Group.

b.    Defendants' Liaison Counsel shall be required to maintain complete files with copies of all documents served upon them and shall make such files available (subject to any confidentiality agreements) to parties within the Defense Liaison Group upon request.

c.    Defendants' Liaison Counsel are also authorized to receive orders and notices from the Judicial Panel on Multidistrict Litigation pursuant to Rule 8(e) of the Panel's Rules of Procedure on behalf of all parties within the Defense Liaison Group and shall be responsible for the preparation and transmittal of copies of such orders and notices to the parties in the Defense Liaison Group.

X.    SERVICE

19.    Service by defendants of pleadings and all other papers on Lead Counsel shall be deemed sufficient service in the Consolidated Actions.

## XI.    RIGHT TO BE HEARD BY THE COURT

20.    All counsel in the Consolidated Actions and the Individual Actions shall use their best efforts to avoid duplication, inefficiency and inconvenience to the Court, other parties, other counsel and witnesses. Nothing stated herein, however, shall be construed to diminish the right of any party to be heard by the Court on matters that are not susceptible to joint or common action, or as to which there is a genuine disagreement among counsel.

## XII.    SCHEDULE

21.    Lead Counsel shall file a Consolidated Amended Complaint for the Consolidated Actions and any actions subsequently consolidated with them on or before December 12, 2003 (the "CAC Date"). Plaintiffs in each of the Individual Actions may file separate complaints or amended complaints on or before the CAC Date.

22.    On or before December 22, 2003, Liaison Counsel will designate one complaint in the Individual Actions (the "Designated Individual Complaint"). Liaison Counsel may also designate any counts contained in any other complaint in an Individual Action that are unique counts (i.e., counts that are not otherwise encompassed in the Designated Individual Complaint) (the "Unique Counts").

23.    Defendants will move with respect to, or answer, the Consolidated Amended Complaint, the Designated Individual Complaint and the Unique Counts on or before February 9, 2004 (the "Defense Response Date"). At that same time, defendants may move with respect to some, or all, of the counts in any other Individual Action as to which defendants (or any one of them) have a separate or additional ground for dismissal. In the event defendants choose not to move against any count in an Individual Action, they shall not rely on any subsequent motion to dismiss said count as a basis for delaying discovery in the Consolidated Actions or in any of the Individual Actions. Any person named as a defendant for the first time

9

in the Consolidated Amended Complaint or in any Individual Complaint shall move with respect

to or answer such complaint within the longer of the Defense Response Date or the time

provided by the Federal Rules of Civil Procedure and the rules of this Court.

24.    Plaintiffs' opposition to any motions to dismiss will be submitted on or

before March 29, 2004 (the "Opposition Date").

25.    Defendants' reply papers in further support of any motions to dismiss will

be submitted on or before April 26, 2004.

26.    Within two weeks of the entry of this Order, any plaintiff in an Individual
Action who does not consent to the Court's jurisdiction over its action shall move to remand.
Where that plaintiff has previously submitted a motion to remand, it shall supply the Court with
a full set of the motion papers and any additional authorities it wishes the Court to consider.
Within fourteen days thereafter, parties opposing any such motion shall (a) where a motion to
remand was previously briefed, submit any additional authorities they wish the Court to
consider, or (b) in all other cases, submit an opposition brief. Within seven days of the
submission of an opposition brief pursuant to clause "b" of the prior sentence, any plaintiff
moving to remand shall submit a reply memorandum.

27.    In the event Defendants elect to move to dismiss pursuant to the first two

sentences of paragraph 23, they shall have no obligation to answer any of the complaints in the

Consolidated Action or the Individual Actions until further order of the Court. The parties in the

Consolidated Actions and the Individual Actions agree not to present arguments or raise issues in

subsequent motions to dismiss in this action that the Court resolves against them in its

disposition of the motions to dismiss made pursuant to paragraph 23 of this Order. However,

nothing in this paragraph shall prevent any party from litigating previously resolved arguments

12-08-'03 20:47  FROM-Abbey Gardy LLP #4   +212-983-9652        T-957  P17/19  U-698

or issues if the party has a good faith basis for (i) distinguishing the Court's prior decision, (ii) seeking reconsideration of the prior decision based on newly discovered, overlooked or intervening facts or law, (iii) an extension of existing law, or (iv) arguing newly applicable law. After the Court's resolution of any motions to dismiss made pursuant to paragraph 23, the parties shall meet and confer to discuss the impact of the Court's decision on any count in any complaint not specifically included in any such motion. The parties shall promptly report to the Court regarding the outcome of such meet and confer (the "Post-Motion Conference"). Absent further Order of the Court, there shall be no discovery.

SO ORDERED

Dated:  New York, New York
        December  5, 2003


LAWRENCE M. MCKENNA
United States District Judge

11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARGENT CLASSIC CONVERTIBLE
ARBITRAGE FUND L.P., ARGENT CLASSIC
CONVERTIBLE ARBITRAGE FUND
(BERMUDA) LTD., ARGENT LOWLEV
CONVERTIBLE ARBITRAGE FUND LTD.,
ARGENT LOWLEV CONVERTIBLE
ARBITRAGE FUND LLC, UBS O'CONNER
LLC F/B/O UBS GLOBAL EQUITY
ARBITRAGE MASTER LTD., UBS
O'CONNER LLC F/B/O UBS GLOBAL
CONVERTIBLE PORTFOLIO and EMINENCE
CAPITAL, LLC,

Individually And On Behalf of All Others
Similarly Situated,

        Lead Plaintiffs,

    vs.

SCIENTIFIC-ATLANTA, INC., MOTOROLA,
INC., JULIAN EIDSON, and WALLACE
HAISLIP,

        Defendants.

04 CV 05759 (LMM)

**RECEIVED**
**SEP 2 8 2006**
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

NOTICE OF DEFENDANTS
SCIENTIFIC-ATLANTA, INC.,
JULIAN EIDSON, and WALLACE
HAISLIP'S MOTION TO DISMISS
PLAINTIFFS' CLASS ACTION
COMPLAINT

    PLEASE TAKE NOTICE that, upon the attached Declaration of Robyn E. Ice, dated

October 12, 2004, the exhibits attached thereto, and the accompanying Memorandum of Law,

Defendants Scientific-Atlanta, Inc. ("S-A"), Julian Eidson, and Wallace Haislip will move this

Court at the United States Courthouse, 500 Pearl Street, New York, New York, for an order

pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private

Securities Litigation Reform Act (the "Reform Act") dismissing with prejudice Plaintiffs' claims

against S-A, Eidson, and Haislip found in its Class Action Complaint for Violations of Federal Securities Laws (the "Complaint").

As set forth in Defendants' Memorandum of Law submitted herewith, all of Plaintiffs' claims against Defendants must be dismissed for the following reasons:

(1)    Plaintiffs' claims against Defendants are barred by (a) the applicable statute of limitations because these claims were not filed within one year of inquiry notice as required under Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991), and (b) the applicable statute of repose began to run on the date of the underlying transaction and, thus, all of Plaintiffs' claims are independently time-barred on that basis as well;

(2)    Plaintiffs' claims similarly fail because they constitute a misguided attempt to state a claim for "aiding and abetting" liability against Defendants, which is improper under the Supreme Court's decision in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994);

(3)    Plaintiffs cannot state a claim as to Defendants because they (a) have not pled all of the necessary elements of a claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and (b) have failed to satisfy the heightened pleading requirements for such claims under Rule 9(b) and the Reform Act;

(4)    Plaintiffs' claims further fail to satisfy the heightened scienter pleading requirements of the Reform Act because the conclusory allegations in their Complaint fail to give rise to a strong inference of scienter as to each Defendant, which necessitates dismissal; and

(5)    Plaintiffs have also failed to state a claim against Defendants Eidson and Haislip for "control person" liability under Section 20(a) of the Exchange Act because (a) Plaintiffs have

not pled a primary violation of the Exchange Act and (b) Plaintiffs have not pled sufficient facts

to establish the necessary control relationship or culpable participation by Eidson or Haislip.

WHEREFORE, Defendants respectfully request that their Motion be granted.

Respectfully submitted, this 12th day of October, 2004.

ALSTON & BIRD LLP


   s/ Robyn E. Ice
Robyn E. Ice (RI-4243)
John Cambria (JC-4098)
90 Park Avenue
New York, NY 10016-1387
(212) 210-9400 Telephone
(212) 210-9444 Facsimile


Oscar N. Persons (OP-5246)
Susan E. Hurd (SH-9348)
1201 West Peachtree Street
Atlanta, GA 30309-3424
(404) 881-7000 Telephone
(404) 881-7777 Facsimile


Attorneys for Defendants Scientific-Atlanta, Inc.,
Julian Eidson, and Wallace Haislip

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARGENT CLASSIC CONVERTIBLE ARBITRAGE FUND L.P., ARGENT CLASSIC CONVERTIBLE ARBITRAGE FUND (BERMUDA) LTD., ARGENT LOWLEV CONVERTIBLE ARBITRAGE FUND LTD., ARGENT LOWLEV CONVERTIBLE ARBITRAGE FUND LLC, UBS O'CONNER LLC F/B/O UBS GLOBAL EQUITY ARBITRAGE MASTER LTD., UBS O'CONNER LLC F/B/O UBS GLOBAL CONVERTIBLE PORTFOLIO and EMINENCE CAPITAL, LLC,<br><br>Individually And On Behalf of All Others Similarly Situated,<br>            Lead Plaintiffs,<br>       vs.<br>SCIENTIFIC-ATLANTA, INC., MOTOROLA, INC., JULIAN EIDSON, and WALLACE HAISLIP,<br>            Defendants. | 04 CV 05759 (LLM) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS**
**SCIENTIFIC-ATLANTA, INC., JULIAN EIDSON, and WALLACE HAISLIP'S**
**MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT**

Oscar N. Persons (OP-5246)          Robyn E. Ice (RI-4234)
Susan E. Hurd (SH-9348)              John Cambria (JC-4098)
ALSTON & BIRD LLP                    ALSTON & BIRD LLP
1201 West Peachtree Street           90 Park Avenue
Atlanta, GA  30309-3424              New York, NY  10016-1387
(404) 881-7000 Telephone             (212) 210-9400 Telephone
(404) 881-7777 Facsimile             (212) 210-9444 Facsimile


Attorneys for Defendants Scientific-Atlanta, Inc.,
Julian Eidson, and Wallace Haislip

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION AND SUMMARY OF PLAINTIFFS'
    ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

    A.  Plaintiffs' Claims Are Barred By The Statute of Limitations . . . . .   2
    B.  No Aiding And Abetting Liability . . . . . . . . . . . . . . . . . . . . . . . . .   2
    C.  Failure To State A Claim And No Particularity . . . . . . . . . . . . . .   3
    D.  No Strong Inference Of Scienter . . . . . . . . . . . . . . . . . . . . . . . . . .   3
    E.  No Control Person Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

II. ARGUMENT AND CITATION OF AUTHORITY . . . . . . . . . . . . . . .   4

    A.  The Statute Of Limitations Requires Dismissal Of Plaintiffs'
        Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
    B.  Central Bank Bars Plaintiffs' "Aiding and Abetting" Claims . . . . .   6
        1.  Defendants Made No Statements To Plaintiffs Or Any Other
            Adelphia Investors And Were Under No Duty To Do So . .   7
        2.  Plaintiffs' Attempted Reliance On Subparts (a) And (c)
            Of Rule 10b-5 Does Not Save Their Claims From Dismissal
            Under Central Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
            (a)  Plaintiffs Have Not Pled That Defendants Committed Any
                 Deceptive Or Fraudulent Acts . . . . . . . . . . . . . . . . . . . .   12
            (b)  Defendants' Alleged Conduct Was Not "In
                 Connection With The Purchase Or Sale Of Any
                 [Adelphia] Security" . . . . . . . . . . . . . . . . . . . . . . . . . .   14
            (c)  Plaintiffs Have Failed To Plead All The Necessary
                 Elements Of A Section 10(b) Claim Under Any
                 Subpart Of Rule 10b-5 . . . . . . . . . . . . . . . . . . . . . . . . .   15
    C.  Plaintiffs' Complaint Fails To Give Rise To A Strong Inference
        Of Scienter As To Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17
        1.  Plaintiffs' Scienter Allegations As To Defendants Eidson
            And Haislip Are Deficient And, Thus, Must Be Dismissed . .   20
        2.  Plaintiffs' Reliance On Brown's Testimony Cannot Salvage
            Their Scienter Claims As To Defendant S-A . . . . . . . . . . . .   21
            (a)  Plaintiffs Cannot Prevail Based On Self-Serving
                 Excerpts From Brown's Testimony . . . . . . . . . . . . . . . . .   22
            (b)  Allegations Contradicted By The Matter Deemed To Be
                 Incorporated Are Not Presumed To Be True For Purposes
                 Of A Motion To Dismiss . . . . . . . . . . . . . . . . . . . . . . . . .   23
            (c)  If It Is To Be Given Any Consideration At All, The Court
                 Should Consider Brown's Testimony As A Whole . . . . .   23

D.  Plaintiffs' Complaint Fails To Sufficiently Plead Control Person
    Liability As To Eidson and Haislip . . . . . . . . . . . . . . . . . . . . . . . . . . .    25
    1.  The Complaint Does Not Adequately Allege Control Over
        S-A By The Individual Defendants . . . . . . . . . . . . . . . . . . . .    26
    2.  Plaintiffs Fail To Sufficiently Allege Culpable Participation
        By The Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . .    27

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29

## I.    INTRODUCTION AND SUMMARY OF PLAINTIFFS' ALLEGATIONS

As an afterthought some two years after filing a putative class action involving

Adelphia Communications Corporation ("Adelphia"), Plaintiff Argent Classic Convertible

Arbitrage Fund L.P. and related entities (collectively "Plaintiffs") have now purported to file a

separate lawsuit against Defendant Scientific-Atlanta, Inc. ("S-A") -- an independent public

company that did business with Adelphia -- and two of its officers, Julian Eidson ("Eidson")

and Wallace Haislip ("Haislip").  Plaintiffs assert claims against these Defendants under

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and

seek to represent a potential class of persons who purchased Adelphia securities from October

1, 2000 through June 10, 2002.[1]  Plaintiffs, however, have already filed one putative class

action lawsuit that supposedly raised all of their claims arising out of the revelations made by

Adelphia beginning in March 2002, including allegations related to Adelphia's accounting of

marketing support it received from S-A.[2]

This case involves the same basic allegations regarding the marketing support

agreement between S-A and Adelphia that were at issue in the prior complaint brought by

these same Plaintiffs and other similar complaints presently before this Court.[3]  As set forth

---

[1]    Plaintiffs' Class Action Complaint for Violations of Federal Securities Laws (the "Complaint" or "Compl.") ¶ 1, attached as Exhibit A to the Declaration of Robyn E. Ice ("Ice Declaration"), filed this day in support of Defendants' Motion to Dismiss.

[2]    As this Court is aware, Plaintiffs have been named Lead Plaintiffs in the consolidated securities class action against Adelphia (the "Consolidated Class Action"), which is proceeding as a part of the multi-district securities litigation (the "MDL") arising from the collapse of Adelphia, In re Adelphia Communications Corp. Sec. & Deriv. Litig., No. 03MD 1529 (LMM) (S.D.N.Y.).  The first of the class actions consolidated therein was filed on April 2, 2002.

[3]    For example, Defendant S-A has been named as a defendant in W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche, LLP, No. 1:03-CV-05752 (S.D.N.Y. filed Aug. 1, 2003), which is also part of the MDL Proceedings.  Defendants incorporate by reference the arguments raised by S-A in that case in its Memorandum of Law in Support of its Motion to Dismiss Plaintiff Huff's Second Amended Complaint (Count X), filed on March 8, 2004 ("Huff Mem.").

below, Plaintiffs' allegations here suffer from the same defects that exist in these other cases and similarly should be dismissed on the following grounds:

### A.    Plaintiffs' Claims Are Barred By The Statute Of Limitations.

Plaintiffs' claims would have been timely only if Plaintiffs commenced litigation against Defendants "within one year after the discovery of the facts constituting the violation and within three years after such violation." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991). Plaintiffs filed their Complaint against Defendants on July 23, 2004. Plaintiffs, however, had notice of their potential claims against Defendants long before July 23, 2003, as set out hereafter. Accordingly, because Plaintiffs failed to bring their claims within one year of inquiry notice, these claims regarding Defendants are untimely and must be dismissed. See LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 154 (2d Cir. 2003). Moreover, because Plaintiffs have asserted their claims more than three years after the underlying transaction at issue, Plaintiffs' claims are independently time-barred under the three-year repose period for Section 10(b) claims. Lampf, 501 U.S. at 364.

### B.    No Aiding And Abetting Liability.

At most, Plaintiffs have attempted to assert claims against Defendants for aiding and abetting liability under Section 10(b) of the Exchange Act and Rule 10b-5. Under any subsection of those provisions, Plaintiffs' claims are barred by the Supreme Court's decision in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994). In Central Bank, the Supreme Court held that "there is no private aiding and abetting liability under § 10(b)" of the Exchange Act. Id. at 191.

**C.    Failure To State A Claim And No Particularity.**

Independently, the Complaint must also be dismissed because it (a) fails to state the required elements of a claim against Defendants under Section 10(b) or any subpart of Rule 10b-5, and (b) fails to satisfy the mandatory and heightened pleading requirements for such claims under Rule 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. §§ 78u-4 et seq. (the "Reform Act"). For example, Plaintiffs have failed to specify: (1) each statement attributed to Defendants that is alleged to have been misleading and (2) the reason or reasons why the statement is misleading. See 15 U.S.C. § 78u-4(b)(1). Indeed, the Complaint does not reference a single misstatement or omission in Adelphia's public statements that is or can be attributed to Defendants, and Plaintiffs have not alleged that Defendants made any statements to Adelphia's investors. In addition, because all of the allegations concerning Defendants are necessarily based on "information and belief,"[4] Plaintiffs are obligated under the Reform Act to "state with particularity all facts" supporting their belief that Defendants allegedly engaged in a "scheme" to defraud Adelphia's investors. See id. Because they have not done so, the statute mandates dismissal. See 15 U.S.C. § 78u-4(b)(3)(A).

**D.    No Strong Inference Of Scienter.**

The Reform Act also requires that Plaintiffs plead with particularity facts that give rise to a "strong inference" that each Defendant intended "to deceive, manipulate or defraud" Adelphia's investors. See 15 U.S.C. § 78u-4(b)(2); see also Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001). Plaintiffs have not. Instead, they assert their conclusory speculation that

---

[4]    Plaintiffs plead that the allegations in the Complaint are based on the "investigation" of their counsel. (See Compl. at 1.) Allegations purportedly based on such an investigation are necessarily based "on information and belief," and subject to the Reform Act's heightened pleading requirements for such allegations. See, e.g., Feasby v. Industri-Matematik Int'l Corp., No. 99 Civ. 8761 LTS JCF, 2003 WL 22976327, at *4 (S.D.N.Y. Dec. 19, 2003).

Defendants "acted with scienter" and "knowingly" participated in a scheme to conceal adverse information about Adelphia. (See, e.g., Compl. ¶ 10; see also id. ¶¶ 8, 48, 63-64, 79.) Plaintiffs' professed reliance on the testimony of a former Adelphia employee, James Brown, fails to rectify the fatal defects in their Complaint.

> **E.    No Control Person Liability.**

Because Plaintiffs have failed to plead a primary violation under Section 10(b) of the Exchange Act, they cannot maintain their claims for "control person" liability under Section 20(a). See 15 U.S.C. § 78t(a). Moreover, even if such claims were possible, Plaintiffs have failed to plead the necessary facts to establish that Defendants Eidson or Haislip (1) controlled the management of S-A or its policies or (2) were "culpable participants" in the alleged primary violation.

## II.    ARGUMENT AND CITATION OF AUTHORITY

> **A.    The Statute Of Limitations Requires Dismissal Of Plaintiffs' Claims.**

The one-year/three-year statute of limitations scheme provided by the Supreme Court in Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991), applies to all of the present claims against Defendants.[5] Under Lampf, these claims would have been timely only if Plaintiffs commenced litigation against the Defendants "within one year after the discovery of the facts constituting the violation and within three years after such violation." Id. Plaintiffs filed their Complaint on July 23, 2004. Plaintiffs, however, had notice of their potential claims against Defendants long before July 23, 2003.

---

[5]    Defendants specifically incorporate by reference the arguments on the statute of limitations and statute of repose made by Defendant Motorola, Inc. in its Memorandum in Support of its Motion to Dismiss the Argent Complaint, filed on October 12, 2004 ("Motorola Mem."). (See Motorola Mem. at §I.)

The one-year discovery period begins when a plaintiff has actual or constructive notice of the facts underlying the violation. See Menowitz v. Brown, 991 F.2d 36, 41 (2d Cir. 1993). If the complaint and public documents show that a plaintiff had actual or constructive knowledge more than one year before the claims were asserted, the claims are untimely. LC Capital Partners, 318 F.3d at 156-57. Plaintiffs here are charged with notice of relevant facts that were disclosed in Adelphia's and S-A's public filings. See Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co., No. 02 Civ. 1230 (LMM), 2003 WL 21088506, at *4 (S.D.N.Y. May 14, 2003); de la Fuente v. DCI Telecomms., Inc., 206 F.R.D. 369, 382-85 (S.D.N.Y. 2002). Moreover, Plaintiffs themselves acknowledge that they have reviewed and relied upon Securities and Exchange Commission ("SEC") filings, press releases, and other public statements by S-A and Adelphia. (See Compl. at 1.)

As the face of the Complaint reveals, Plaintiffs had constructive notice of the purported potential claims against Defendants by June 10, 2002. That day Adelphia filed a Form 8-K with the SEC disclosing certain alleged accounting irregularities by Adelphia that affected Adelphia's EBITDA, including a discussion of the marketing support agreements that Adelphia had entered into with "its two main vendors of digital converter boxes." (See id. ¶¶ 38-39.) On that same day, S-A issued a press release acknowledging that it had entered into the marketing support transaction with Adelphia, which press release Plaintiffs cite and rely upon in the Complaint. (See id. ¶ 40.) Plaintiffs also cite news articles, which reference Defendants S-A and Motorola with respect to the investigation of Adelphia and its accounting treatment of the marketing

-5-

support agreements.  (See id. ¶¶ 44-45 (citing articles dated August 10 and August 14, 2002, respectively).)[6]

Despite their awareness of these "facts," Plaintiffs waited over two years, until July 23, 2004, to assert any claim against any box manufacturer, including S-A.  Plaintiffs had sued Timothy Rigas, Michael Rigas, and others regarding the marketing support agreements referencing the same provisions of the federal securities law cited in the Complaint.  Because Plaintiffs were clearly aware of the "facts" constituting Defendants' alleged violation of the securities laws more than one year before July 23, 2004, Plaintiffs' allegations are untimely and must be dismissed.  See LC Capital Partners, 318 F.3d at 154.[7]

**B.    Central Bank Bars Plaintiffs' "Aiding and Abetting" Claims.**

Plaintiffs allege that Defendants violated Rule 10b-5 (see, e.g., Compl. ¶¶ 2, 75, 77), which makes it unlawful for any person:

    (a)    To employ any device, scheme, or artifice to defraud,

    (b)    To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person

in connection with the purchase or sale of any security.

---

[6]    Plaintiffs obviously had prior notice of the facts they contend support the present allegations.  Indeed, on December 22, 2003, Plaintiffs filed the complaint in the Consolidated Class Action ("CCA"), which includes allegations based on Adelphia's allegedly improper transactions with its "two main vendors of digital converter boxes." (CCA Compl. ¶¶ 158-62.)  Although this Court's Order of December 5, 2003 required all Plaintiffs involved in the Adelphia MDL Proceedings to file by December 22, 2003 any amended pleadings they wished the Court to consider, Plaintiffs did not name Defendants in the CCA or even attempt to state a claim against the box manufacturers as "John Does."  Plaintiffs should not be allowed to do so now at this late date.

[7]    Moreover, the claims based on the marketing support transactions that allegedly occurred "beginning in or about October through December 2000" (Compl. ¶¶ 5, 33) are independently time-barred under the three-year repose period for Section 10(b) claims.  Defendants incorporate by reference the arguments on this issue set forth by Defendant Motorola in its Memorandum of Law.  (See Motorola Mem. at §I(B).)

17 C.F.R. § 240.10b-5. Plaintiffs, however, have not identified a <u>single</u> statement or omission

regarding Adelphia that is attributable to Defendants, which precludes any possible claim under

subpart (b) of Rule 10b-5. <u>See, e.g.</u>, <u>Wright v. Ernst & Young LLP</u>, 152 F.3d 169, 178 (2d Cir.

1998); <u>Shapiro v. Cantor</u>, 123 F.3d 717, 720-21 (2d Cir. 1997).

Similarly, Plaintiffs cannot plead a primary violation by Defendants of subparts (a) or (c)

of Rule 10b-5 because they have not identified any deceptive or fraudulent acts employed by

these Defendants in connection with the purchase or sale of Adelphia securities. Moreover, any

attempt to plead liability under any subpart of Rule 10b-5 likewise requires a plaintiff to plead all

the necessary elements of a Section 10(b) claim, including but not limited to, reliance, causation,

and scienter -- none of which have been pled adequately here. <u>See</u> <u>Central Bank</u>, 511 U.S. at

191. These defects expose Plaintiffs' claims for what they really are: an attempt to plead "aiding

and abetting" liability under a different name. <u>Central Bank</u>, <u>Wright</u>, <u>Shapiro</u>, and the other

well-reasoned decisions discussed below require dismissal of these claims.[8]

### 1.     *Defendants Made No Statements To Plaintiffs Or Any Other Adelphia Investors And Were Under No Duty To Do So.*

The heightened pleading standards of the Reform Act require that a plaintiff

> <u>shall specify each statement</u> alleged to have been misleading, <u>the reason or reasons why the statement is misleading</u>, and, if an allegation regarding the statement or omission is made on information and belief, the complaint <u>shall state with particularity all facts</u> on which that belief is formed.

15 U.S.C. § 78u-4(b)(1) (emphasis added). Plaintiffs here have failed to specify in their

Complaint <u>any</u> statements attributable to Defendants (as opposed to Adelphia) that they believe

were false or misleading.

---

[8]     Defendants also incorporate by reference as if fully restated herein the brief previously filed by S-A on this subject. (<u>See</u> <u>Huff</u> Mem. at 9-15.)

Instead, Plaintiffs' Complaint is based <u>exclusively</u> on public statements attributed <u>only to</u> <u>Adelphia</u> regarding that company's reported financial results. (<u>See, e.g.</u>, Compl. ¶¶ 4, 31.) Plaintiffs, for example, assert that, "throughout the Class Period, <u>Adelphia</u> reported fraudulently inflated EBITDA [and that] <u>Adelphia's EBITDA</u> was artificially inflated by tens of millions of dollars each quarter . . . ." (<u>Id.</u> ¶ 36 (emphasis added).) Plaintiffs do not and cannot allege that Defendants drafted any of these purportedly misleading statements nor are they alleged to have had any involvement in or control over their circulation. Also, nowhere do Plaintiffs allege that these Defendants owed any duty to Plaintiffs or other individuals or entities who chose to invest in the stock of this entirely separate company.[9] Plaintiffs' allegations, thus, boil down to nothing more than a claim that Defendants "aided and abetted" an alleged violation of Section 10(b) by Adelphia. That claim must be dismissed. <u>See In re Homestore.com, Inc. Sec. Litig.</u>, 252 F. Supp. 2d 1018, 1041 (C.D. Cal. 2003) (rejecting under <u>Central Bank</u> plaintiffs' theory that outside business partners or vendors could be liable under Rule 10b-5 for alleged "scheme" to assist another company in making misstatements or omissions to its investors).

The Supreme Court unequivocally held in <u>Central Bank</u> that there is no private right of action for aiding and abetting a violation of Section 10(b). 511 U.S. at 191. Accordingly, the Second Circuit has consistently rejected efforts like those here to evade the <u>Central Bank</u> holding. In <u>Wright v. Ernst & Young LLP</u>, the Second Circuit concluded that the plaintiff's attempt to hold accountants primarily liable under Section 10(b), "'in spite of [the accountants']

---

[9]    Silence cannot give rise to liability under Section 10(b) absent a duty to speak to investors. <u>See</u> <u>Chiarella v.</u> <u>United States</u>, 445 U.S. 222, 228 (1980) ("[T]he duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'"); <u>see also</u> <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").

clearly tangential role in the alleged fraud would effectively revive aiding and abetting liability

under a different name, and would therefore run afoul of the Supreme Court's holding in Central

Bank.'" 152 F.3d at 175 (internal citations omitted). In Wright, the court made clear that "a

secondary actor [like S-A] cannot incur primary liability under [Section 10(b) and Rule 10b-5]

for a statement not attributed to that actor at the time of its dissemination." Id. (emphasis added);

see also Shapiro, 123 F.3d at 721-22 (rejecting allegations that accountants "participated" in a

"fraudulent scheme" where they did not make any supposedly misleading statements to investors

nor did they have a duty to speak to investors). "'[I]f Central Bank is to have any real meaning,

a defendant must actually make a false or misleading statement in order to be held liable under

Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how

substantial that aid may be, it is not enough to trigger liability under Section 10(b).'" Wright,

152 F.3d at 175 (quoting Shapiro, 123 F.2d at 720). Any other result "would circumvent the

reliance requirements of the [Exchange] Act, as 'reliance only on representations made by others

cannot itself form the basis of liability.'" Id. (internal citations omitted).

     Plaintiffs cannot state a claim under Section 10(b) against Defendants for any of the

statements regarding Adelphia's financial condition referenced in their Complaint because none

of these statements were ever publicly attributed to Defendants -- a fact which these Plaintiffs do

not dispute. There were no statements by Defendants concerning Adelphia that could have

possibly formed the basis of Plaintiffs' investment decision. Similarly, Defendants cannot be

held liable for any purported omissions regarding Adelphia because, as noted above, Plaintiffs

have not, and cannot, allege that Defendants had any duty to speak to Adelphia's investors.

     Further, nothing in Section 10(b) or Rule 10b-5 requires a third-party corporation to

ensure that a public company with which it transacts business speaks truthfully to its own

investors.  <u>See, e.g.</u>, <u>In re Bristol-Myers Squibb Sec. Litig.</u>, 312 F. Supp. 2d 549, 554-55, 559

(S.D.N.Y. 2004) (rejecting under <u>Central Bank</u> plaintiffs' attempt to hold Bristol-Myers liable

for statements made by its business partner, ImClone Systems, because "that complaint is

addressed to the wrong defendant."); <u>Homestore.com</u>, 252 F. Supp. 2d at 1038 (third-party

vendor and other business partners not liable under Section 10(b) where plaintiffs failed to allege

that they relied on any statements made by those defendants or on the purported "scheme" in

which the defendants were alleged to have participated).  In sum,

> the language of [<u>Central Bank</u>] does not suggest, and the subsequent case law
> does not support, the notion that a business partner with no special relationship
> with a corporation, let alone its shareholders, can be held liable for the material
> misstatements or omissions of that corporation or its officers, no matter how
> much it assisted or participated in transactions that led to that statement or
> omission.  <u>Such a holding would broaden the scope of the securities acts so as to
> haul into court anyone doing business with a publicly traded company.</u>

<u>Homestore.com</u>, 252 F. Supp. 2d at 1039 (emphasis added).

Contrary to Plaintiffs' representations, there are no documents identified in the Complaint

(nor do any exist) that Defendants drafted that were disclosed to the public or otherwise

"incorporated" into Adelphia's public statements.[10]  The only alleged documents Plaintiffs

reference are non-public agreements supposedly entered into between S-A and Adelphia that

purportedly established the price for set-top boxes and the terms of the market support

agreement.  (Compl. ¶ 2; <u>see also id.</u> ¶¶ 8(a), 10, 48(a), 58-59, 63.)  No statements from or

concerning these documents were publicly attributed to Defendants, and Plaintiffs have not

alleged that they knew of or relied on these documents.  This is fatal to their Complaint.  <u>See,</u>

---

[10]    Moreover, under the Reform Act, any belief by Plaintiffs that statements contained in Adelphia's financial statements originally came from S-A (which Defendants deny) would have to be accompanied by sufficient particularized facts to corroborate or support such a belief, which is lacking here.  <u>See</u> 15 U.S.C. § 78u-4(b)(1). Similarly, the Reform Act would require that Plaintiffs identify the specific statements allegedly contained within Adelphia's financial statements that they contend could be traced to S-A.  <u>Id.</u>  No such allegations can or do exist.

-10-

e.g., Wright, 152 F.3d at 175; see also Dinsmore v. Squadron, Ellenoff, Plesant, Sheinfeld &

Sorkin, 135 F.3d 837, 839, 843-44 (2d Cir. 1998) (alleged conspiracy claims barred by Central

Bank where plaintiffs could not plead that law firm made any representations directly to them

and plaintiffs admitted they knew nothing of supposed false statements firm allegedly made to

SEC and other non-class member investors).

    2.    *Plaintiffs' Attempted Reliance On Subparts (a) And (c) Of Rule*
          *10b-5 Does Not Save Their Claims From Dismissal Under*
          *Central Bank.*

    "Central Bank applies with equal force to subsections (a), (b), and (c) of Rule 10b-5."

Wenneman v. Brown, 49 F. Supp. 2d 1283, 1288 (D. Utah 1999). When the Supreme Court

rejected aiding and abetting liability, it did not confine its analysis to claims asserted under

subsection (b) of Rule 10b-5. Id. at 1288 n.2. Indeed, the Supreme Court expressly recognized

that plaintiffs "may not bring a 10b-5 suit against a defendant for acts not prohibited by the text

of § 10(b)." Central Bank, 511 U.S. at 173; see also United States v. O'Hagan, 521 U.S. 642,

651 (1997) ("Liability under Rule 10b-5, our precedent indicates, does not extend beyond

conduct encompassed by § 10(b)'s prohibition.").

    Courts have rejected attempts, like here, to broaden liability under Section 10(b) and

avoid the impact of Central Bank by characterizing a secondary actor's alleged conduct as

participation in a "scheme" or practice which operates as a fraud in violation of subsections (a)

or (c) of Rule 10b-5. See, e.g., Homestore.com, 252 F. Supp. 2d at 1038 ("[N]o matter how a

'scheme' is defined, Central Bank dictates that only those participants who commit 'primary

violations' of the securities laws may be held liable; those who merely facilitate or participate

-11-

cannot.").[11]  Plaintiffs' attempt here to avoid <u>Central Bank</u> through reliance on subparts (a) and

(c) fails for the further reason that they have not and cannot plead all of the necessary elements

of a claim for primary liability under these provisions.  This is further evidence that, in reality,

their claims are misplaced aiding and abetting claims.

> (a)  <u>Plaintiffs Have Not Pled That Defendants Committed Any Deceptive Or Fraudulent Acts.</u>

Subparts (a) and (c) of Rule 10b-5 prohibit "a device, scheme or artifice to defraud" or an

"act, practice or course of business which operates or would operate as a fraud or deceit."  17

C.F.R. § 240.10b-5 (1993).  The only alleged deceptive act, device, scheme, or course of

business that Plaintiffs assert with respect to Defendants is the existence of a marketing support

agreement.  (<u>See, e.g.</u>, Compl. ¶¶ 4, 31.)  Plaintiffs, however, allege that this type of agreement

was common in the cable industry during the relevant time period and is not illegal as to either

participant if properly accounted for -- as S-A did on its books.  (<u>See id.</u> ¶ 44.)

Here, the alleged fraudulent act or conduct at issue, if any, was Adelphia's alone through

that company's alleged failure to account properly for the marketing support transaction with S-

A.  (<u>See Huff</u> Mem. at 9-16.)  Plaintiffs have failed to plead <u>any</u> deceptive or fraudulent acts or

schemes <u>committed by these Defendants</u>, which is a necessary prerequisite to claims under

subparts (a) & (c).  <u>See</u> <u>Central Bank</u>, 511 U.S. at 177-78 ("We cannot amend [Section 10(b)] to

create liability for acts that are not themselves manipulative or deceptive within the meaning of

---

[11]    <u>See also</u> <u>In re Valence Tech. Sec. Litig.</u>, No. C 95-20459 JW, 1996 WL 37788, at *11 (N.D. Cal. Jan. 23, 1996); <u>Stack v. Lobo</u>, 903 F. Supp. 1361, 1374 (N.D. Cal. 1995) (plaintiffs' "scheme" allegations were "no more than a thinly disguised attempt to avoid the impact of the <u>Central Bank</u> decision"); <u>Fidel v. Farley</u>, No. 1:00-CV-48-M, 2001 U.S. Dist. LEXIS 9461, at *29 n.19 (W.D. Ky. June 22, 2001); <u>Pegasus Holdings v. Veterinary Ctrs. of Am., Inc.</u>, 38 F. Supp. 2d 1158, 1164 (C.D. Cal. 1998); <u>Benedict v. Cooperstock</u>, 23 F. Supp. 2d 754, 758 (E.D. Mich. 1998); <u>Krieger v. Gast</u>, No. 98 C 3182, 1998 WL 677161, at *9 (N.D. Ill. Sept. 22, 1998); <u>In re Silicon Graphics, Inc. Sec. Litig.</u>, 970 F. Supp. 746, 762 (N.D. Cal. 1997); <u>Lycan v. Walters</u>, 904 F. Supp. 884, 901 n.12 (S.D. Ind. 1995); <u>In re Gupta Corp. Sec. Litig.</u>, 900 F. Supp. 1217, 1243-44 (N.D. Cal. 1994).

the statute."). Aiding and abetting claims are designed to "reach[] persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." Id. at 176. Because the only conduct alleged against Defendants is not prohibited by the statute, the claim asserted is one of "aiding and abetting" the allegedly prohibited conduct of other parties, which cannot be sustained under Central Bank. Id.

Plaintiffs' allegations that Defendants "knew" Adelphia intended to use the marketing support to artificially inflate its reported EBITDA do not save their Complaint. (See, e.g., Compl. ¶¶ 8, 10, 48, 52, 63.) These allegations confuse "the distinction drawn in Central Bank between primary violators and aiders/abettors based on conduct with the separate issue of scienter." S.E.C. v. U.S. Environmental, Inc., 155 F.3d 107, 111 (2d Cir. 1998). Whether the defendant "was a primary violator rather than an aider and abettor turns on the nature of his acts, not on his state of mind when he performed them." Id. Conclusory allegations of a shared intent by Defendants and Adelphia to mislead Adelphia's investors cannot create a cause of action where none exists. See Dinsmore, 135 F.3d at 844 ("[E]ven aiding and abetting claims premised upon a showing of intent are barred . . . [because] [t]he statutory text, not the level of scienter, was the determinative issue in Central Bank . . . ."); Hart v. Internet Wire, Inc., 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001) ("[U]nder Central Bank, a party cannot be held liable under Section 10(b) even for knowingly aiding and abetting securities fraud.") (emphasis added).

In re Livent, Inc. Noteholders Sec. Litig., 174 F. Supp. 2d 144, 149 (S.D.N.Y. 2001), is instructive on this point. The plaintiffs in that case brought claims against a bank that had been involved in a transaction with Livent that Livent allegedly failed to report properly on its books and in its public statements. Id. The plaintiffs argued that the bank "knew" Livent intended to commit accounting fraud using this transaction due to the existence of "secret side letters"

-13-

exchanged between the parties. Id. Relying on Central Bank, the Livent Court held that "such

assistance and participation in a securities law violation [of another party, in this instance,

Livent's alleged violation], without more, would not suffice to establish primary liability under §

10(b)." Id. Thus, the fact that the bank supposedly "knew" of the fraudulent intent of Livent

could not convert the bank's "assistance" into a cognizable claim under Section 10(b).  See id.[12]

(b)  Defendants' Alleged Conduct Was Not "In Connection With The
Purchase Or Sale Of Any [Adelphia] Security."

Section 10(b) and all of the subparts of Rule 10b-5 likewise require that the alleged

wrongful conduct must be "in connection with the purchase or sale of any security."  17 C.F.R. §

240.10b-5; 15 U.S.C. § 78j.  Indeed, Central Bank observed that Section 10(b) "imposes private

civil liability on those who commit a manipulative or deceptive act in connection with the

purchase or sale of securities."  511 U.S. at 166 (emphasis added).  Here, Defendants neither

bought nor sold Adelphia securities and are not alleged to have had any connection or

involvement with the transactions by which Plaintiffs or other putative class members became

investors in Adelphia.  The marketing support agreement involved the sale of digital set-tops, not

the sale of stock.

A commercial transaction unconnected to the purchase or sale of a security cannot fall

within Section 10(b) simply because the party standing on the other side of the transaction was a

public company whose stock was purchased and sold by investors from time to time.  Such a

result would extend the scope of liability far beyond the text of the statute.  Section 10(b) was

---

[12]    The court ultimately found that the bank could be held liable under Section 10(b), but only because it had
made separate public misrepresentations of its own to Livent investors "in connection with" the purchase or sale of
Livent securities.  Livent, 174 F. Supp. 2d at 150-51.  The bank had solicited class members to purchase Livent
notes without disclosing what it knew about Livent's accounting practices.  Id.  The bank, thus, unlike here, made its
own misrepresentations or omissions on which Livent investors were entitled to rely and that was why it was
possible to state a claim against it under Section 10(b).  Id. at 154-55.

not designed to nor should be interpreted so broadly as to convert every allegation of common-law fraud that happens to involve securities into a putative Section 10(b) claim. See, e.g., S.E.C. v. Zandford, 535 U.S. 813, 820 (2002); see also Marine Bank v. Weaver, 455 U.S. 551, 556 (1982) ("Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud.").

      (c)  Plaintiffs Have Failed To Plead All The Necessary Elements Of A
           Section 10(b) Claim Under Any Subpart Of Rule 10b-5.

Also fatal to Plaintiffs' claims under any subpart of Rule 10b-5 is their failure to adequately plead reliance, causation, or scienter.[13] Under Central Bank, a secondary actor, like an accountant, lawyer, or banker, may be primarily liable under Rule 10b-5 only if he or she "employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies . . . assuming all of the [other] requirements for primary liability under Rule 10b-5 are met." 511 U.S. at 191 (emphasis added and in original). "[B]ecause § 10(b) and Rule 10b-5 focus on fraud made in connection with the sale or purchase of securities, a defendant must 'know or should know' that his representation would be communicated to investors." Wright, 152 F.3d at 175 (emphasis in original; internal citations omitted).

As noted above, Plaintiffs have not identified any statement made by Defendants and publicly attributed to Defendants on which they could have possibly relied in making their decision to purchase Adelphia securities. Plaintiffs also have not and cannot plead that they relied on anything these Defendants did or did not do. For example, Plaintiffs do not allege that they were aware of or relied on any aspect of the business dealings between Adelphia and S-A in

---

[13]   Plaintiffs' inability to plead a strong inference of scienter as to each Defendant is discussed infra at § II(C).

making their purchase decision, including but not limited to, the existence of the marketing

support agreement. This is fatal to their claims. See Dinsmore, 135 F.3d at 839, 843 (investors'

conspiracy claims barred by Central Bank where they did not allege they relied on, and admitted

they "were entirely unaware" of, law firm's alleged misstatements to others that supposedly

delayed the revelation of another defendant's "Ponzi scheme").

General reliance on the market price for Adelphia securities (see Compl. ¶¶ 2, 68-72, 80-

81), which might be relevant to establishing reliance on statements made by Adelphia, is

insufficient to demonstrate reliance as to a separate company and its officers who made no public

statements regarding Adelphia. "Were we to allow the aiding and abetting action proposed in

this case, the defendant could be liable without any showing that the plaintiff relied upon the

aider and abettor's statements or actions . . . . Allowing plaintiff to circumvent the reliance

requirement would disregard the careful limits on 10b-5 recovery mandated by our earlier cases."

Central Bank, 511 U.S. at 180.

Plaintiffs also have failed to allege facts to show causation. "[P]laintiff[s], in stating a

prima facie case, must allege two types of causation [linked to Defendants], 'both loss causation

-- that the misrepresentations or omission [by Defendants] caused the economic harm -- and

transaction causation -- that the violations in question caused the plaintiff to engage in the

transaction in question.'" Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1494 (2d Cir. 1992).

Plaintiffs have done neither.

Loss causation "cannot be found if an intervening cause was responsible for the

plaintiff's economic loss." Unterberg Harris Private Equity Partners, L.P. v. Xerox Corp., 995 F.

Supp. 437, 441 (S.D.N.Y. 1998); see also AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202,

227 (2d Cir. 2000). Plaintiffs allege no facts to show that the marketing support transaction itself

-16-

(and not Adelphia's intervening alleged improper accounting) caused the purported inflation of the price of Adelphia securities. Had Adelphia accounted for the transaction properly, there would have been no purported artificial inflation and Plaintiffs allege that such transactions are not illegal, can be accounted for properly, and, in fact, were common in the industry. (See Compl. ¶ 44.) Plaintiffs also have not pled transaction causation. Plaintiffs' Complaint makes clear that their decision to invest was based exclusively on Adelphia's public statements and its alleged accounting decisions, which did not involve Defendants. (See, e.g., Compl. ¶ 68 ("Plaintiffs and the class were entitled to and did rely during the Class Period on the financial statements of Adelphia and the integrity of the market for Adelphia securities . . . .").)

In sum, as demonstrated above, (1) Defendants committed no fraudulent or deceptive act (2) on which Plaintiffs could have or did rely (3) in connection with the purchase or sale of Adelphia securities. These three fatal defects, among others, make it impossible for Plaintiffs to state a claim for a primary violation under subparts (a) and (c) of Rule 10b-5 as to these Defendants. All Plaintiffs have alleged, at best, is that Defendants "aided and abetted" another company's purportedly false statements to its investors. Such a claim is impermissible under Central Bank, Shapiro, Wright, and Dinsmore and must be dismissed.

### C. Plaintiffs' Complaint Fails To Give Rise To A Strong Inference Of Scienter As To Defendants.

In order to survive a motion to dismiss, the Reform Act requires that

> the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2) (emphasis added). Thus, Plaintiffs must plead particularized facts as to each alleged act or omission of S-A, Eidson, and Haislip that gives rise to a "strong inference" that S-A, Eidson, and Haislip each acted with an intent to deceive, manipulate, or defraud

-17-

Adelphia's investors. Id.; see also In re Cross Media Mktg. Corp. Sec. Litig., 314 F. Supp. 2d

256, 262-63 (S.D.N.Y. 2004) (dismissing complaint, in part, because plaintiffs failed to plead

fraudulent acts as to each defendant separately and did not "adequately plead that each

Defendant acted with 'the required state of mind.'"); In re Citigroup, Inc. Sec. Litig., 330 F.

Supp. 2d 367, 381 (S.D.N.Y. 2004) (same).

        To plead scienter, Plaintiffs must either "'(1) allege facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that

defendants had both motive and opportunity to commit fraud.'" Rombach v. Chang, 355 F.3d

164, 176 (2d Cir. 2004). Plaintiffs purport to rely on Defendants' supposed "actual knowledge []

that they were making materially false and misleading statements that would be incorporated into

Adelphia's financial results"[14] and their alleged motive to "commit fraud in that, by doing so,

they were able to pressure Adelphia to purchase additional new cable boxes from Scientific-

Atlanta and Motorola, thus increasing their own revenues and profits." (Compl. ¶ 10; see also id.

¶¶ 8, 48, 63-65, 79.)[15]

        These scienter allegations suffer from the same deficiencies that require dismissal of

other similar complaints against S-A that are also before this Court in the Adelphia MDL

Proceedings. Accordingly, Defendants incorporate by reference S-A's prior brief on this

---

[14]     As noted previously, this allegation is wholly unsupported. Plaintiffs have not pled with particularity that any "statements" allegedly made by Defendants were "incorporated into Adelphia's financial results" and, thus, it is impossible for them to have made such statements with "actual knowledge" of their falsity. (See supra at § II(B)(1).)

[15]     Nowhere in the Complaint do Plaintiffs explain how any of the Defendants had the "opportunity" to defraud Adelphia's investors. It is, for example, not alleged that Defendants had the means or the ability to know of or control Adelphia's internal accounting practices or the disclosure of Adelphia's financial information to Adelphia's investors. Accordingly, in addition to pleading insufficient motive allegations, Plaintiffs have also failed to adequately plead opportunity on the part of each Defendant.

subject.[16] Plaintiffs' scienter theory, adopted from these other pending cases, is fundamentally

flawed for the following reasons:

- In order to adequately allege "motive," a plaintiff must show that the defendant benefited in some concrete and personal way from the purported fraud. <u>See, e.g.,</u> <u>Novak v. Kasaks,</u> 216 F.3d 300, 307-08 (2d Cir. 2000); <u>Shields v. Citytrust</u> <u>Bancorp, Inc.,</u> 25 F.3d 1124, 1130 (2d Cir. 1994).

- Plaintiffs admit that the marketing support transaction did not result in any "real economic benefit" to Defendants (<u>see</u> Compl. ¶ 62; <u>see also</u> <u>id.</u> ¶¶ 5, 33), and, thus, Plaintiffs fail to demonstrate that each Defendant received the type of concrete financial benefit necessary to plead motive. <u>See, e.g., Shields,</u> 25 F.3d at 1130; <u>see also</u> <u>Novak,</u> 216 F.3d at 307-08.

- Reliance on S-A's general desire to sell more product to Adelphia is the kind of generic, non-specific motive that would exist for any product manufacturer. Such putative motives have been consistently rejected in this Circuit as insufficient to plead any inference of scienter, much less the required strong inference. <u>See, e.g.,</u> <u>Chill v. Gen. Elec. Co.,</u> 101 F.3d 263, 270 (2d Cir. 1996); <u>In re Crystal Brands</u> <u>Sec. Litig.,</u> 862 F. Supp. 745, 749 (D. Conn. 1994).

- There is nothing per se wrong with "wash" or "round trip" transactions. <u>See, e.g.,</u> <u>In re Duke Energy Corp. Sec. Litig.,</u> 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003); <u>In re Elan Corp. Sec. Litig.,</u> No. 02 Civ. 865, 2004 WL 1305845, at *21 (S.D.N.Y. May 18, 2004); <u>Homestore.com,</u> 252 F. Supp. 2d at 1038-40; <u>see also</u> Compl. ¶ 44.

- Conclusory allegations of "actual knowledge" are insufficient to satisfy a plaintiff's "significant burden" of attempting to state a claim based on a theory of conscious misbehavior. <u>See Chill,</u> 101 F.3d at 270.

- Plaintiffs cannot, therefore, prevail based on their theory that each Defendant "knew" of Adelphia's intent to defraud its investors. Plaintiffs have not pled the "who, what, when, where, and how" for each allegation specific to each Defendant. <u>See Cross Media,</u> 314 F. Supp. 2d at 262-63; <u>Citigroup,</u> 330 F. Supp. 2d at 381.

For these and other reasons set forth in S-A's prior brief on this subject, Plaintiffs' scienter

allegations must be dismissed because they suffer from the same basic inadequacies as the other

complaints filed previously.

---

[16]    <u>See, e.g., Huff</u> Mem. at 19-23.

1.    *Plaintiffs' Scienter Allegations As To Defendants Eidson and Haislip Are Deficient And, Thus, Must Be Dismissed.*

Plaintiffs' scienter allegations with respect to Defendants Eidson and Haislip are essentially non-existent. The Complaint does not allege that either knew of Adelphia's alleged wrongdoing or that either took any steps to further the supposed scheme to defraud Adelphia's investors. The only action allegedly taken by these individuals about which Plaintiffs now complain is that they purportedly "approved" generally the idea of providing marketing support to Adelphia. (See Compl. ¶ 57.) However, as noted previously, Plaintiffs have alleged that these marketing support transactions were commonly used in the cable industry and are not illegal if accounted for properly. (See id. ¶ 44.)[17] There are no allegations in this case that S-A failed to account for the transaction properly. In fact, Plaintiffs' Complaint assumes just the opposite. (See id. ¶¶ 7, 37, 44, 66.) Similarly, several courts, including courts in this District, have held that "round trip" or "wash" transactions are not per se improper or illegal. See, e.g., Duke Energy, 282 F. Supp. 2d at 161; Elan, 2004 WL 1305845, at *21; Homestore.com, 252 F. Supp. 2d at 1038-40. Accordingly, Eidson's and Haislip's alleged willingness to approve in concept some form of marketing support with Adelphia -- a transaction that is not improper on its face -- cannot possibly meet the standard of pleading a strong inference of "actual knowledge" of wrongdoing as to these two individuals, or to S-A.

The only other allegation that Plaintiffs have pled as to Eidson and Haislip collectively is that they supposedly discussed at some point in time the possibility of S-A entering into the marketing support agreement with unidentified Adelphia personnel. (See Compl. ¶ 57.) As to

---

[17]    The testimony of James Brown, on which Plaintiffs rely in support of their scienter allegations, confirms that marketing support agreements are not per se improper or illegal and such agreements can have legitimate purposes. (See Brown Tr. Trans. at 7418-19, 8210.) The relevant excerpts from Brown's testimony cited herein are attached as Exhibit B to the Ice Declaration.

-20-

Defendant Eidson, the Complaint is devoid of any particularized facts as to when this supposed

discussion took place, who the participants were, what was supposedly said, and any explanation

of how or why the substance of this alleged conversation is supposedly of assistance to Plaintiffs

in pleading scienter as to Mr. Eidson. These allegations cannot give rise to a strong inference as

to Defendant Eidson because they lack the necessary detail required by the Reform Act.[18]  See,

e.g., In re Capstead Mortgage Corp. Sec. Litig., 258 F. Supp. 2d 533, 562 (N.D. Tex. 2003); In re

Peerless Sys. Corp. Sec. Litig., 182 F. Supp. 2d 982, 993-94 (S.D. Cal. 2002); In re Splash Tech.

Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1079-81 (N.D. Cal. 2001); In re Newbridge

Networks Sec. Litig., 962 F. Supp. 166, 172-73 (D.D.C. 1997); Jubran v. Musikahn Corp., 673 F.

Supp. 108, 116 (E.D.N.Y. 1987).

Similarly, the only conversation alleged in the Complaint between Adelphia and

Defendant Haislip is one in which Haislip allegedly refused to accept Adelphia's proposal to

mark-up the price of the product by $50. (See Compl. ¶ 53.) According to the allegations in the

Complaint, Haislip would only agree to marketing support that had some reasonable basis in or

connection with the purchase price of the product. (See id.) No inference of scienter is possible

from this allegation. Rather, it raises a strong inference of no scienter.

> **2.      Plaintiffs' Reliance On Brown's Testimony Cannot Salvage
> Their Scienter Claims As To Defendant S-A.**

Plaintiffs cherry-pick selections from James Brown's testimony -- the transcripts of

which amount to approximately 2300 pages of testimony over a fifteen-day period. Plaintiffs'

purported summary of Brown's testimony is fundamentally contradicted by and taken out of

context when compared to the full record of Brown's actual testimony. Plaintiffs' references to

---

[18]    Moreover, Brown's testimony does not discuss or describe any conversations that Eidson supposedly had
with Adelphia personnel.

Brown's testimony, thus, (1) should either not be considered at all or accorded any presumption of truthfulness under Fed. R. Civ. P. 12(b)(6) standards, or (2) should only be considered in the proper context -- by examining his testimony as a whole -- with all possible inferences adverse to Plaintiffs being equally considered. Either option requires dismissal.

        (a)   Plaintiffs Cannot Prevail Based On Self-Serving Excerpts
              From Brown's Testimony.

Because Plaintiffs rely on certain testimony of Brown, Brown's testimony should be deemed to be incorporated by reference in its entirety. See, e.g., Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991), cert. denied, 503 U.S. 960 (1992); see also Salichs v. Tortorelli, No. 01 Civ. 7288 (DAB) THK, 2004 WL 602784, at *2-*3 (S.D.N.Y. Mar. 29, 2004); Rapoport v. Asia Elecs. Holding Co., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000). On a motion to dismiss, courts in the Second Circuit consider the full contents of matter deemed "integral" to the complaint and do not consider only the plaintiffs' self-serving excerpts. See, e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 808-09 (2d Cir. 1996); I. Meyer Pincus & Assocs. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991); Cortec Indus., 949 F.2d at 48; see also Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991); Rapoport, 88 F. Supp. 2d at 184. Indeed, the Reform Act contemplates that the district courts will act as gatekeepers at the motion to dismiss stage of securities fraud cases, which necessarily entails an examination of whether the documents on which plaintiffs purportedly rely actually support their claims. See, e.g., Sturm v. Marriott Marquis Corp., 85 F. Supp. 2d 1356, 1366 (N.D. Ga. 2000).

-22-

(b)  Allegations Contradicted By The Matter Deemed To Be
     Incorporated Are Not Presumed To Be True For Purposes Of
     A Motion To Dismiss.

It is well settled "that the Court need not accept any averments of a complaint which are contradicted by documents incorporated by reference therein." Elan, 2004 WL 1305845, at *12; see also Endovasc LTD, Inc. v. J.P. Turner & Co., 02 Civ. 7313 (LAP), 2004 U.S. Dist. LEXIS 5075, at *9-*11 (S.D.N.Y. Mar. 30, 2004); Bristol-Myers, 312 F. Supp. 2d at 555; Kaempe v. Myers, 367 F.3d 958, 963 (D.C. Cir. 2004); Rapoport, 88 F. Supp. 2d at 184; In re Verity, Inc. Sec. Litig., No. C99-5337 CRB, 2000 WL 1175580, at *3 (N.D. Cal. Aug. 11, 2000). Brown's testimony is internally inconsistent and contradicts or undercuts itself and several of Plaintiffs' critical allegations. Plaintiffs should not be allowed to rely on the passages of their choosing and altogether ignore other passages that conflict with or undercut their theory of the case. This Court should, therefore, decline to consider the Brown testimony altogether and accord it no presumption of truth, which necessarily requires dismissal of Plaintiffs' Complaint. "[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely." In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001); see also Hirsch v. Arthur Andersen & Co., 72 F. 3d 1085, 1095 (2d Cir. 1995); Bristol-Myers, 312 F. Supp. 2d at 555; Kaempe, 367 F.3d at 963.

(c)  If It Is To Be Given Any Consideration At All, The Court
     Should Consider Brown's Testimony As A Whole.

Courts must consider all relevant inferences, including those unfavorable to plaintiffs, when testing whether a strong inference has been pled. See, e.g., Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1134 (9th Cir. 2004); Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002); In re K-tel Int'l, Inc. Sec. Litig., 300

-23-

F.3d 881, 889 (8th Cir. 2002); In re Read-Rite Corp., No. C-03-03148 RMW, 2004 WL
2125883, at *3 (N.D. Cal. Sept. 22, 2004); In re Syncor Int'l Corp. Sec. Litig., 327 F. Supp. 2d
1149, 1155 (C.D. Cal. 2004); Coble v. Broadvision, Inc., No. C 01-01969 CRB, 2002 WL
31093589, at *3 (N.D. Cal. Sept. 11, 2002).[19]  In addition, where "allegations of fraud are
internally self-contradictory, [] the inconsistencies defeat a reasonable inference that the requisite
scienter standard . . . has been satisfied."  Livent, 151 F. Supp. 2d at 407.

When read in its entirety, Brown's testimony flatly contradicts, among other things,
Plaintiffs' allegation that Defendants were told or knew that Adelphia would improperly account
for the marketing support transaction with S-A.  (See Compl. ¶¶ 8, 10, 48, 51-52, 56, 58-59, 62-
64, 67, 78-79, 85.)  For example, Plaintiffs allege (purportedly based on Brown's testimony) that
"Adelphia executives acknowledged to their counterparts at . . . Scientific-Atlanta that the
'marketing support' transactions were a sham and intended solely for the purpose of artificially
inflating Adelphia's publicly reported EBITDA."  (Compl. ¶ 48; see also id. ¶¶ 8, 52.)  Brown,
however, testified that, at a meeting in October 2000 where representatives of Adelphia and S-A
supposedly discussed the marketing support agreement, he never described the marketing
support transaction to anyone at S-A as being a "sham."  (See, e.g., Brown Tr. Trans. at 7426-28,
8242.)  He also testified that the transaction was never characterized by himself or anyone else at
that meeting as "fraudulent," "illegal," "criminal," "bogus," or as a "wash transaction."  (Id.)

---

[19]    The Second Circuit has not squarely addressed the issue of whether a court must consider all inferences,
including ones unfavorable to plaintiffs, in deciding whether the requisite strong inference has been pled.  One
district court in this Circuit, In re Philip Servs. Corp. Sec. Litig., No. 98 Civ. 0835 (MBM), 2004 WL 1152501, at *9
n.6 (S.D.N.Y. May 24, 2004), stated in dicta that the Second Circuit had reached this issue and rejected the line of
cases holding that all inferences have to be considered on a motion to dismiss.  Defendants respectfully disagree
with the notion that the Second Circuit opinion cited by the Philip Servs. Court addressed this issue.  See Kalnit v.
Eichler, 264 F.3d 131, 137-38 (2d Cir. 2001).  An examination of Kalnit reveals that this specific issue was never
argued to or ruled upon by the court.

Indeed, he further testified that he discussed Adelphia's improper accounting for the marketing

support agreements only with other Adelphia personnel. (See id. at 8123-25.)

Other examples of the critical ways in which Brown's testimony undercuts Plaintiffs'

scienter allegations include:

- **Brown Agrees That There Is Nothing Inherently Wrong With Marketing Support Agreements.** Brown testified that there is nothing inherently wrong with marketing support agreements and he confirmed that such agreements can have legitimate purposes. (See id. at 7418-19, 8210.)

- **Brown Never Identifies Anyone From S-A Whom He Told About The Improper Accounting Of The Marketing Support Agreements.** During the course of his testimony, Brown never identified a single person at S-A by name to whom he purportedly told this information.

- **Adelphia In Fact Spent Money On Marketing Digital Set-Top Boxes.** Brown testified that a "great deal" of money was spent on marketing and installation of the "digital rollout" in 2000, and that S-A "benefit[ed] from that marketing." (Id. at 8211-12.)

- **Adelphia Improperly Recorded The Marketing Support Payments On Its Books Before Approaching S-A.** Brown testified that Adelphia improperly recorded marketing support payments on its books before it even approached S-A about entering into an agreement on that subject and well before any payments were ever made. (Id. at 6122-23, 6127-28, 6130-31.)

This testimony undercuts the allegations that there is a strong inference of scienter as to

S-A, Eidson, or Haislip.[20]

**D.    Plaintiffs' Complaint Fails To Sufficiently Plead Control Person Liability As To Eidson and Haislip.**

To establish a prima facie case for Section 20(a) "control person" liability in the Second

Circuit, a plaintiff must plead: (1) an underlying primary violation of Section 10(b) by the

---

[20]     In addition, Brown's testimony also lacks credibility and reliability. Brown repeatedly admitted during his testimony that he is a "skillful" and "practiced" liar. (See, e.g., Brown Tr. Trans. at 7158.) Also, his testimony is inadmissible hearsay, which Plaintiffs should not be able to use against Defendants in this proceeding. See Patterson v. County of Oneida, N.Y., 375 F.3d 206, 219-20 (2d Cir. 2004) ("Testimony of a nonparty witness that was given at a prior hearing is, when offered for its truth, hearsay.").

controlled person; (2) the defendant's control over that controlled person; and (3) that the

controlling person was, in some meaningful sense, a culpable participant in the controlled

person's primary violation. See, e.g., In re Deutsche Telekom AG Sec. Litig., No. 00 Civ 9475

SHS, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002); Boguslavsky v. Kaplan, 159 F.3d 715,

720 (2d Cir. 1998). Because Plaintiffs have failed to plead a primary violation under Section

10(b) as explained above, they cannot maintain their claim of control person liability under

Section 20(a).[21] However, even if Plaintiffs had pled a cognizable claim for a primary violation

(which Defendants deny), they have also failed to satisfy the remaining elements of control

person liability because they have failed to plead the necessary facts to establish that Eidson or

Haislip (1) controlled S-A, the purported primary violator here, or (2) were culpable participants

in the alleged fraud by Adelphia.

### 1. The Complaint Does Not Adequately Allege Control Over S-A By The Individual Defendants.

A control person is one who has the power, directly or indirectly, "to direct or cause the

direction of the management and policies of a person, whether through the ownership of voting

securities, by contract, or otherwise." 17 C.F.R. § 230.405; Deutsche Telekom, 2002 WL

244597, at *6. Even under traditional Rule 12(b)(6) standards, "a plaintiff must plead facts

which 'support a reasonable inference that they had the potential power to influence and direct

the activities of the primary violator.'" Id. at *7; In re Blech Sec. Litig., 961 F. Supp. 569, 586-

87 (S.D.N.Y. 1997). Conclusory allegations of control that masquerade as "facts" are

---

[21] Plaintiffs seek to hold Eidson and Haislip liable simultaneously as both controlled and controlling persons for the same alleged violations. (See Compl. ¶¶ 78, 85-87.) However, "'[c]ontrolling-person liability' under § 20 of the Securities Exchange Act is a separate inquiry from that of primary liability and provides an alternative basis of culpability." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001). Thus, for a given statement or omission, a person cannot be liable concurrently as both a primary violator of the securities laws and as a controlling person with respect to that same primary violation.

insufficient under Rule 12(b)(6) and are entitled to no presumption of truthfulness whatsoever.

See, e.g., In re Digital Island Sec. Litig., 223 F. Supp. 2d 546, 560-61 (D. Del. 2002), aff'd, 357

F.3d 322 (3d Cir. 2004) ("[T]he plaintiffs' legal conclusions that the individual defendants

qualify as 'controlling persons' under Section 20(a) may not be accepted as true absent factual

support."). The Complaint is devoid of any facts to support the notion that either Eidson or

Haislip possessed the necessary control relationship.

Indeed, the Complaint merely states, in conclusory fashion, that "[t]he Individual

Defendants had direct and supervisory involvement in the day-to-day operations of [S-A] and,

therefore, is [sic] presumed to have had the power to control or influence the particular

transactions giving rise to the securities violations as alleged herein, and exercised same."

(Compl. ¶ 86 (emphasis added).) Such generic allegations and "presumptions" of control are

inadequate. See, e.g., Deutsche Telekom, 2002 WL 244597, at *6-*7 (rejecting conclusory

allegations of control that merely restate the legal standard); see also Blech, 961 F. Supp. at 587.

Rather, actual control (not presumed or possible control) over the primary violator is required,

and Plaintiffs' allegations fail to allege any facts to support such an inference. See id.; Ellison v.

Am. Image Motor Co., 36 F. Supp. 2d 628, 642 (S.D.N.Y. 1999) ("Aside from the naked

assertion that the . . . Defendants were 'officers' . . . the complaint is devoid of any allegation as

to how these [defendants] 'controlled' these companies.").

 2.    **Plaintiffs Fail To Sufficiently Allege Culpable Participation By
       The Individual Defendants.**

Even if, arguendo, Plaintiffs had adequately alleged the other elements necessary to

satisfy Section 20(a), their control person claims still fail because Plaintiffs cannot establish the

final element -- culpable participation. Post-Reform Act, "[d]istrict courts, in attempting to

determine how to properly allege culpable participation . . . have looked to the scienter

-27-

requirement for section 10-b and have arrived at divergent formulations." <u>Deutsche Telekom,</u>

2002 WL 244597, at *7. The courts have held variously that the culpable participation element

requires the pleading of (1) "particularized facts of the controlling person's conscious

misbehavior as a culpable participant in the fraud," <u>Mishkin v. Ageloff,</u> No. 97 Civ. 2690, 1998

WL 651065, at *25 (S.D.N.Y. Sept. 23, 1998); (2) "facts giving rise to a strong inference that the

controlling person knew or should have known that the primary violator, over whom the person

had control, was engaging in fraudulent conduct," <u>Deutsche Telekom,</u> 2002 WL 244597, at *7;

and (3) "fraudulent conduct and a culpable state of mind . . . either conscious misbehavior or

recklessness," <u>Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,</u> No. 00 Civ. 8058, 2001 WL 1111508,

at *10 (S.D.N.Y. Sept. 20, 2000).

Whichever standard applies, the Complaint here fails because it contains <u>no</u> details

probative of the state of mind of the alleged "control person." <u>See</u> <u>Deutsche Telekom,</u> 2002 WL

244597, at *7 (dismissing Section 20(a) claim where complaint appeared to include no facts to

support plaintiff's bald assertion that defendant "knew or should have known that the controlled

person was engaging in fraudulent conduct"); <u>Mishkin,</u> 1998 WL 651065, at *26 (dismissing

Section 20(a) claim where plaintiff did not provide any detail as to what putative control person

did to commit fraud and when he did engage in such conduct). Allegations that one or both of

these individuals "approved" of or may have discussed marketing support agreements with

Adelphia (<u>see</u> Compl. ¶¶ 9, 49, 53, 57) does not satisfy this requirement. Plaintiffs have alleged

that marketing support agreements were common and are not illegal if accounted for properly.

(<u>See id.</u> ¶ 44.) No inference of culpability is, thus, possible from allegations of general approval

of such transactions based on the face of Plaintiffs' Complaint. Unremarkable allegations that

Defendants "discussed" giving marketing support to Adelphia are also insufficient to establish

culpable participation. See Mishkin, 1998 WL 651065, at *21 (rejecting as insufficiently detailed allegations that defendant participated in meetings, where complaint contained no detail regarding what defendant was alleged to have said and how it related to the alleged fraud).

Thus, the Complaint is devoid of any detail with respect to the Individual Defendants' particular states of mind and "culpable participation" has not been pled. Plaintiffs' Section 20(a) claims must fail.

## III.    CONCLUSION

For the foregoing reasons, Defendants Scientific-Atlanta, Inc., Julian Eidson, and Wallace Haislip respectfully request that the Court grant their Motion to Dismiss and dismiss with prejudice Plaintiffs' claims against them.

Respectfully submitted, this 12th day of October, 2004.

ALSTON & BIRD LLP

    s/ Robyn E. Ice
Robyn E. Ice (RI-4234)
John Cambria (JC-4098)
90 Park Avenue
New York, NY 10016-1387
(212) 210-9400 Telephone
(212) 210-9444 Facsimile

Oscar Persons (OP-5246)
Susan E. Hurd (SH-9348)
1201 West Peachtree Street
Atlanta, GA 30309-3424
(404) 881-7000 Telephone
(404) 881-7777 Facsimile

Attorneys for Defendants Scientific-Atlanta, Inc.,
Julian Eidson, and Wallace Haislip

-29-

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| IN RE SCIENTIFIC-ATLANTA, INC. SECURITIES LITIGATION | ) ) ) ) ) | CIVIL ACTION FILE NO. 1:01-CV-1950-RWS |



NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**DEFENDANTS' RESPONSES TO PLAINTIFFS'
THIRD REQUEST FOR THE PRODUCTION OF DOCUMENTS**

## I.    INTRODUCTORY STATEMENT

The document requests included in Plaintiffs' Third Request for the

Production of Documents (hereinafter "Plaintiffs' Requests") are

objectionable because, among other reasons, they are overly broad, seek

documents irrelevant to the claims and/or defenses in this case, and

expressly seek documents subject to various privileges or protections that

prohibit the requested disclosure.

Subject to, and without waiver of, the General Objections set forth

below and the specific objections lodged as to the individual requests,

Defendants Scientific-Atlanta, Inc. ("S-A" or the "Company"), James F.

McDonald and Wallace G. Haislip (collectively, "Defendants"), hereby

respond and object to Plaintiffs' Requests as follows.

## II.    RESPONSES AND OBJECTIONS TO PLAINTIFFS' DOCUMENT REQUESTS

### Request No. 1:

All documents given to the Securities and Exchange Commission ("SEC") and/or Department of Justice ("DOJ") relating to their investigations into the agreement between you and Adelphia Communications Corp. ("Adelphia") and the agreement between you and Charter Communications, Inc. ("Charter") as referenced in your 2005 Form 10-K filed on August 26, 2005.

### Response to Request No. 1:

In addition to their General Objections set forth below, Defendants object to Request No. 1 on the grounds that the items to be inspected are overly broad, would impose undue burdens and expense on Defendants, have not been described with reasonable particularity, and are not reasonably calculated to lead to the discovery of admissible evidence. This Request is further objectionable because the information it seeks is protected from disclosure by various recognized privileges and protections, including but not limited to the work product doctrine and the settlement privilege, as described infra. (See First General Objection at 12.)

The requested production is also prohibited because the information sought relates to other claims pending against S-A in the United States

- 2 -

District Court for the Southern District of New York: In re Adelphia Communications Corporation Securities and Derivative Litigation, Case No. 03-MD-1529 (LMM) (the "Adelphia MDL"). S-A has filed several motions to dismiss in the Adelphia MDL based on the Private Securities Litigation Reform Act of 1995 (the "Reform Act"), which are still pending. Accordingly, any discovery concerning the subject matter of the allegations in those cases is stayed in the Adelphia MDL and in any other pending proceeding also involving S-A, such as the present litigation, by the Reform Act's discovery stay provision. See 15 U.S.C. § 78u-4(b)(3)(B).

Defendants also object to this Request as being duplicative of other requests previously propounded by Plaintiffs. In response to Plaintiffs' prior document requests, Defendants have already agreed to produce copies of all non-privileged documents produced by S-A to the SEC in response to its subpoena relating to events that occurred during the "Relevant Time Period" as defined by Plaintiffs, including documents concerning both Adelphia and Charter. Thus, to the extent that non-privileged information exists that is potentially responsive to Plaintiffs' Requests, Defendants have already agreed to make such production.



**Request No. 2:**

All documents received by you from the SEC and/or DOJ relating to
their investigations into the agreement between you and Adelphia and the
agreement between you and Charter as referenced in your 2005 Form 10-K
filed on August 26, 2005.

**Response to Request No. 2:**

In addition to their General Objections set forth below, Defendants
object to Request No. 2 on the grounds that the items to be inspected are
overly broad, would impose undue burdens and expense on Defendants,
have not been described with reasonable particularity, and are not reasonably
calculated to lead to the discovery of admissible evidence. This Request is
further objectionable because the information it seeks is protected from
disclosure by various recognized privileges and protections, including but
not limited to the work product doctrine and the settlement privilege, as
described _infra_. (See First General Objection at 12.)

The requested production is also prohibited because, as discussed
above, the information sought relates to other claims pending against S-A in
the Adelphia MDL. Because S-A has filed several motions to dismiss in the
Adelphia MDL under the Reform Act, any discovery concerning the subject
matter of the allegations in those cases is stayed in the Adelphia MDL and in

- 4 -



any other pending proceeding also involving S-A, such as the present litigation, by the Reform Act's discovery stay provision. <u>See</u> 15 U.S.C. § 78u-4(b)(3)(B).

Defendants also object to this Request as being duplicative of other requests previously propounded by Plaintiffs. In response to Plaintiffs' prior document requests, Defendants have already agreed to produce copies of all non-privileged documents produced by S-A to the SEC in response to its subpoena relating to events that occurred during the "Relevant Time Period" as defined by Plaintiffs, including documents concerning both Adelphia and Charter. Thus, to the extent that non-privileged information exists that is potentially responsive to Plaintiffs' Requests, Defendants have already agreed to make such production.

**Request No. 3:**

All documents referring or relating to any communications between and/or among you, the SEC and DOJ relating to their investigations into the agreement between you and Adelphia and the agreement between you and Charter as referenced in your 2005 Form 10-K filed on August 26, 2005.

**Response to Request No. 3:**

In addition to their General Objections set forth below, Defendants object to Request No. 3 on the grounds that the items to be inspected are

- 5 -

overly broad, would impose undue burdens and expense on Defendants, have not been described with reasonable particularity, and are not reasonably calculated to lead to the discovery of admissible evidence. This Request is further objectionable because the information it seeks is protected from disclosure by various recognized privileges and protections, including but not limited to the attorney-client privilege, the work product doctrine and the settlement privilege, as described infra. (See First General Objection at 12.)

The requested production is also prohibited because the information sought relates to other claims pending against S-A in the Adelphia MDL. Because S-A has filed several motions to dismiss in the Adelphia MDL under the Reform Act, any discovery concerning the subject matter of the allegations in those cases is stayed in the Adelphia MDL and in any other pending proceeding also involving S-A, such as the present litigation, by the Reform Act's discovery stay provision. See 15 U.S.C. § 78u-4(b)(3)(B).

Defendants also object to this Request as being duplicative of other requests previously propounded by Plaintiffs. In response to Plaintiffs' prior document requests, Defendants have already agreed to produce copies of all non-privileged documents produced by S-A to the SEC in response to its subpoena relating to events that occurred during the "Relevant Time Period" as defined by Plaintiffs, including documents concerning both Adelphia and

Charter. Thus, to the extent that non-privileged information exists that is potentially responsive to Plaintiffs' Requests, Defendants have already agreed to make such production.

**Request No. 4:**

All documents referring or relating to any settlement between you and the SEC relating to its investigations into the agreement between you and Adelphia and the agreement between you and Charter as referenced in your 2005 Form 10-K filed on August 26, 2005, including but not limited to any agreement and/or stipulation of settlement.

**Response to Request No. 4:**

In addition to their General Objections set forth below, Defendants object to Request No. 4 on the grounds that the items to be inspected are overly broad, would impose undue burdens and expense on Defendants, have not been described with reasonable particularity, and are not reasonably calculated to lead to the discovery of admissible evidence. This Request is further objectionable because the information it seeks is protected from disclosure by various recognized privileges and protections, including but not limited to the attorney-client privilege, the work product doctrine, and the settlement privilege, as described infra. (See First General Objection at 12.)

The requested production is also prohibited because the information sought relates to other claims pending against S-A in the Adelphia MDL. Because S-A has filed several motions to dismiss in the Adelphia MDL under the Reform Act, any discovery concerning the subject matter of the allegations in those cases is stayed in the Adelphia MDL and in any other pending proceeding also involving S-A, such as the present litigation, by the Reform Act's discovery stay provision. See 15 U.S.C. § 78u-4(b)(3)(B).

Defendants also object to this Request as being duplicative of other requests previously propounded by Plaintiffs. In response to Plaintiffs' prior document requests, Defendants have already agreed to produce copies of all non-privileged documents produced by S-A to the SEC in response to its subpoena relating to events that occurred during the "Relevant Time Period" as defined by Plaintiffs, including documents concerning both Adelphia and Charter. Thus, to the extent that non-privileged information exists that is potentially responsive to Plaintiffs' Requests, Defendants have already agreed to make such production.

**Request No. 5:**

All documents referring or relating to the $20 million reserve that was recorded in the fourth quarter of fiscal year 2005 relating to the SEC's

- 8 -

investigations into the agreement between you and Adelphia and the

agreement between you and Charter as referenced in your 2005 Form 10-K

filed on August 26, 2005.

**Response to Request No. 5:**

In addition to their General Objections set forth below, Defendants

object to Request No. 5 on the grounds that the items to be inspected are

overly broad, would impose undue burdens and expense on Defendants,

have not been described with reasonable particularity, and are not reasonably

calculated to lead to the discovery of admissible evidence. This Request is

further objectionable because the information it seeks is protected from

disclosure by various recognized privileges and protections, including but

not limited to the attorney-client privilege, the work product doctrine, and

the settlement privilege, as described infra. (See First General Objection at

12.)

The requested production is also prohibited because the information

sought relates to other claims pending against S-A in the Adelphia MDL.

Because S-A has filed several motions to dismiss in the Adelphia MDL

under the Reform Act, any discovery concerning the subject matter of the

allegations in those cases is stayed in the Adelphia MDL and in any other

pending proceeding also involving S-A, such as the present litigation, by the Reform Act's discovery stay provision. See 15 U.S.C. § 78u-4(b)(3)(B).

Defendants also object to this Request as being duplicative of other requests previously propounded by Plaintiffs. In response to Plaintiffs' prior document requests, Defendants have already agreed to produce copies of all non-privileged documents produced by S-A to the SEC in response to its subpoena relating to events that occurred during the "Relevant Time Period" as defined by Plaintiffs, including documents concerning both Adelphia and Charter. Thus, to the extent that non-privileged information exists that is potentially responsive to Plaintiffs' Requests, Defendants have already agreed to make such production.

**Request No. 6:**

All documents referring or relating to any interviews or testimony of Scientific-Atlanta officers and/or employees relating to the SEC's and/or DOJ's investigations into the agreement between you and Adelphia and the agreement between you and Charter as referenced in your 2005 Form 10-K filed on August 26, 2005, including but not limited to transcripts, memoranda and handwritten notes.

**<u>Response to Request No. 6</u>:**

In addition to their General Objections set forth below, Defendants

object to Request No. 6 on the grounds that the items to be inspected are

overly broad, would impose undue burdens and expense on Defendants,

have not been described with reasonable particularity, and are not reasonably

calculated to lead to the discovery of admissible evidence. This Request is

further objectionable because the information it seeks is protected from

disclosure by various recognized privileges and protections, including but

not limited to the attorney-client privilege, the work product doctrine, and

the settlement privilege, as described <u>infra</u>. (See First General Objection at

12.)

The requested production is also prohibited because the information

sought relates to other claims pending against S-A in the Adelphia MDL.

Because S-A has filed several motions to dismiss in the Adelphia MDL

under the Reform Act, any discovery concerning the subject matter of the

allegations in those cases is stayed in the Adelphia MDL and in any other

pending proceeding also involving S-A, such as the present litigation, by the

Reform Act's discovery stay provision. <u>See</u> 15 U.S.C. § 78u-4(b)(3)(B).

Defendants also object to this Request as being duplicative of other

requests previously propounded by Plaintiffs. In response to Plaintiffs' prior

- 11 -

document requests, Defendants have already agreed to produce copies of all non-privileged documents produced by S-A to the SEC in response to its subpoena relating to events that occurred during the "Relevant Time Period" as defined by Plaintiffs, including documents concerning both Adelphia and Charter. Thus, to the extent that non-privileged information exists that is potentially responsive to Plaintiffs' Requests, Defendants have already agreed to make such production.

## III.    GENERAL OBJECTIONS

### FIRST GENERAL OBJECTION

Defendants object to Plaintiffs' Requests to the extent that they seek information or documents subject to the attorney-client privilege, the joint defense/common interest privilege, the settlement privilege, the work product doctrine, or other applicable privileges or immunities, or call for a response that would require the disclosure of mental impressions, conclusions, or legal theories of Defendants' attorneys and other representatives concerning pending or anticipated litigation or disputes and/or the possible settlement of same.

### SECOND GENERAL OBJECTION

Defendants object to undertaking a privilege review of documents that they have objected to producing and expressly reserve their right to withhold

- 12 -

privileged documents in the event Defendants produce such documents in the future for any reason.

## THIRD GENERAL OBJECTION

Defendants object to Plaintiffs' Requests to the extent that they seek the disclosure of trade secrets, proprietary, confidential, or commercially sensitive information or other protectable information of Defendants.

## FOURTH GENERAL OBJECTION

Defendants object to Plaintiffs' Requests to the extent they require Defendants to produce documents "to the law offices of Chitwood Harley Harnes LLP, 2300 Promenade II, 1230 Peachtree Street, NE, Atlanta, Georgia 30309 . . . ." Any production associated with these Requests will be consistent with normal practices and customs.

## FIFTH GENERAL OBJECTION

Defendants object to Plaintiffs' Requests to the extent they purport to require that produced documents be organized in a manner not required by Fed. R. Civ. P. 34(b).

## SIXTH GENERAL OBJECTION

Defendants object to the Instructions and Definitions used in connection with Plaintiffs' Requests on the basis that their wording is overly broad, vague, and inconsistent with the normal usage and meaning of such

- 13 -

words so as to constitute an unreasonable expansion of the Requests and to

impose undue burdens on Defendants. Subject to and without waiving these

objections, Defendants state that they will interpret Plaintiffs' Requests in a

manner consistent with the normal understanding and usage of the language

employed therein to the extent necessary to fairly and fully answer this

discovery in compliance with the Federal Rules of Civil Procedure.

## SEVENTH GENERAL OBJECTION

Defendants object to the Instructions and Definitions used in

connection with Plaintiffs' Requests to the extent they purport to impose

burdensome duties and obligations upon Defendants that are in addition to,

different from, and/or inconsistent with those imposed by the Federal Rules

of Civil Procedure.

## EIGHTH GENERAL OBJECTION

Defendants object to Plaintiffs' "Relevant Time Period" for these

Requests as being overly broad, unduly burdensome, and not reasonably

calculated to lead to the discovery of admissible evidence.

## NINTH GENERAL OBJECTION

Defendants object to Instruction 2 as seeking documents subject to the

attorney-client privilege, the settlement privilege, the joint defense/common

interest privilege, the work product doctrine, or other applicable privileges

- 14 -

or immunities, and as attempting to impose burdensome obligations on Defendants in addition to, different from, and/or inconsistent with those required under the Federal Rules of Civil Procedure.

## TENTH GENERAL OBJECTION

Defendants object to Instructions 4 and 5 as unduly burdensome and as imposing upon Defendants tasks in addition to those required by the Federal Rules of Civil Procedure.

## ELEVENTH GENERAL OBJECTION

Defendants object to Instructions 7 and 8 as unduly burdensome and as imposing upon Defendants tasks in addition to those required by the Federal Rules of Civil Procedure. Defendants will comply with Fed. R. Civ. P. 26(b)(5).

## TWELFTH GENERAL OBJECTION

Defendants object to Instructions 6, 9, and 10 as unduly burdensome and as seeking to impose upon Defendants tasks in addition to those required by the Federal Rules of Civil Procedure.

## THIRTEENTH GENERAL OBJECTION

Defendants object to Definitions 1 and 3 of the term "Document(s)" and "All Documents" used in Plaintiffs' Requests as being overbroad to the extent that they include documents in the custody, possession, or control of



attorneys or other persons subject to the attorney-client privilege, joint

defense/common interest privilege, the settlement privilege, and/or the work

product doctrine, and to the extent that it includes documents outside of

Defendants' possession, custody, or control including, but not limited to,

documents in the custody of S-A's former employees, agents, consultants,

officers, or directors. Defendants further object to Definitions 1 and 3 to the

extent that they seek to impose on Defendants burdensome obligations and

duties that are in addition to, different from, and inconsistent with those

required under the Federal Rules of Civil Procedure.

## FOURTEENTH GENERAL OBJECTION

Defendants object to Definition 2 of the term "electronic data" on the

grounds that the definition does not comport with a normal understanding

and usage of the English language. Defendants further object to Definition 2

to the extent that it seeks to impose on Defendants burdensome obligations

and duties that are in addition to, different from, and inconsistent with those

required under the Federal Rules of Civil Procedure. Subject to and without

waiving these objections, Defendants state that they will interpret Plaintiffs'

Requests in a manner consistent with the normal understanding and usage of

the language employed therein to the extent necessary to fairly and fully

- 16 -

answer this discovery in compliance with the Federal Rules of Civil Procedure.

## FIFTEENTH GENERAL OBJECTION

Defendants object to Definition 4 of the terms "Discuss," "Refer," "Relate," "Regard," and/or "Concern" or any variation thereof used in conjunction with Plaintiffs' Requests on the grounds that the definition is vague, does not comport with a normal understanding and usage of the English language, and seeks to impose on Defendants burdensome obligations inconsistent with and/or in addition to the Federal Rules of Civil Procedure. Subject to and without waiving these objections, Defendants state that they will interpret Plaintiffs' Requests in a manner consistent with the normal understanding and usage of the language employed therein to the extent necessary to fairly and fully answer this discovery in compliance with the Federal Rules of Civil Procedure.

## SIXTEENTH GENERAL OBJECTION

Defendants object to Definition 5 of "Person(s)" on the grounds that the definition is vague, does not comport with a normal understanding and usage of the English language, and seeks to impose on Defendants burdensome obligations inconsistent with and/or in addition to the Federal Rules of Civil Procedure. Subject to and without waiving these objections,

- 17 -

Defendants state that they will interpret Plaintiffs' Requests in a manner consistent with the normal understanding and usage of the language employed therein to the extent necessary to fairly and fully answer this discovery in compliance with the Federal Rules of Civil Procedure.

## SEVENTEENTH GENERAL OBJECTION

Defendants object to Definition 7 of "Agreement" on the grounds that the definition given does not comport with a normal understanding and usage of the English language and seeks to impose on Defendants burdensome obligations inconsistent with and/or in addition to the Federal Rules of Civil Procedure. Subject to and without waiving these objections, Defendants state that they will interpret Plaintiffs' Requests in a manner consistent with the normal understanding and usage of the language employed therein to the extent necessary to fairly and fully answer this discovery in compliance with the Federal Rules of Civil Procedure.

## EIGHTEENTH GENERAL OBJECTION

Defendants object to Definitions 8 and 9 of "Communicate," "communication(s)" and "Correspondence" on the grounds that the definition given does not comport with a normal understanding and usage of the English language and seeks to impose on Defendants burdensome obligations inconsistent with and/or in addition to the Federal Rules of Civil

- 18 -

Procedure. Subject to and without waiving these objections, Defendants

state that they will interpret Plaintiffs' Requests in a manner consistent with

the normal understanding and usage of the language employed therein to the

extent necessary to fairly and fully answer this discovery in compliance with

the Federal Rules of Civil Procedure.

## NINETEENTH GENERAL OBJECTION

Defendants object to Plaintiffs' Requests on the grounds that they

exceed the permissible scope of discovery under the Federal Rules of Civil

Procedure to the extent they require Defendants to respond by acquiring or

supplying information which is neither relevant to a claim or defense in this

case nor reasonably calculated to lead to the discovery of admissible

evidence.

## TWENTIETH GENERAL OBJECTION

Defendants object to Plaintiffs' Requests as a whole on the above

grounds. Defendants hereby incorporate each of the foregoing General

Objections into each one of their responses set forth above as if the

objections were set forth in their entirety in each response.

- 19 -

Respectfully submitted, this 17th day of October, 2005.

_____
Oscar N. Persons
Georgia Bar No. 573500
Susan E. Hurd
Georgia Bar No. 379628
Kelly C. Wilcove
Georgia Bar No. 185682

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA  30309-3424
Tel:  (404) 881-7000
Fax:  (404) 881-7777

Counsel for Defendants Scientific-
Atlanta, Inc., James F. McDonald,
and Wallace G. Haislip

ATL01/12051825v1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ———————————————— ) | |
| IN RE SCIENTIFIC-ATLANTA, INC. ) | CIVIL ACTION FILE |
| SECURITIES LITIGATION ) | NO. 1:01-CV-1950-RWS |
| ———————————————— ) | |

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the within and

foregoing **DEFENDANTS' RESPONSE TO PLAINTIFFS' THIRD**

**REQUEST FOR THE PRODUCTION OF DOCUMENTS** via facsimile

and by depositing same in the U.S. Mail, addressed as follows:

Craig G. Harley
David A. Bain
Meryl W. Edelstein
CHITWOOD HARLEY HARNES LLP
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309

Lynn L. Sarko
Juli Farris Desper
Elizabeth A. Leland
KELLER ROHRBACK LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052

Maya Saxena
Robert R. Adler
MILBERG WEISS BERSHAD
  &amp; SCHULMAN LLP
Tower One, Suite 600
5200 Town Center Circle
Boca Raton, Florida 33486

This 17th day of October, 2005.

_____
Susan E. Hurd
Georgia Bar No. 379628

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE SCIENTIFIC-ATLANTA, INC. SECURITIES LITIGATION | Civil Action No. 1:01-CV-1950-RWS |

) ) ) ) ) ) ) ) ) )

CONSOLIDATED CLASS ACTION COMPLAINT

RECEIVED

SEP 2 8 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Lead Plaintiffs, individually and on behalf of all other persons similarly situated, by their undersigned counsel, make the following allegations against Scientific-Atlanta, Inc. ("Scientific-Atlanta," "SFA" or the "Company"), James F. McDonald ("McDonald") and Wallace G. Haislip ("Haislip") (collectively, "Defendants"). Except as to allegations specifically pertaining to the named plaintiffs and their counsel, which are based upon personal knowledge, Lead Plaintiffs' allegations are based upon Plaintiffs' counsel's investigation, which included inter alia, a review of the public announcements made by Defendants, Securities and Exchange Commission ("SEC") filings, press releases, reports by securities industry analysts and media concerning Scientific-Atlanta, and interviews with former Scientific-Atlanta employees and Scientific-Atlanta customers.

## NATURE OF THE ACTION

1.     This is a securities class action lawsuit that arises out of the Defendants' dissemination of materially false and misleading information and omissions of material information to the investing public concerning the business,

operations and financial performance of Scientific-Atlanta during the period January 18, 2001 through August 16, 2001 (the "Class Period"). This lawsuit is brought on behalf of all persons who purchased or otherwise acquired securities of SFA or who sold put options of SFA during the Class Period, except for Defendants, the officers and directors of the Company, members of their immediate families and each of their legal representatives, heirs, successors or assigns and any entity in which any defendant has or had a controlling interest (the "Class").

2.      Scientific-Atlanta's is a cable equipment manufacturer headquarters in Sugarloaf, Georgia.  Defendants McDonald and Haislip are Scientific-Atlanta's CEO and CFO, respectively, During the Class Period, Defendants prepared for and celebrated Scientific-Atlanta's well-publicized fiftieth anniversary.   Yet, unbeknownst to Scientific-Atlanta's investing public, Defendants engaged in a fraudulent scheme during this time to falsely portray Scientific-Atlanta's financial performance and the demand for its products, so that Scientific-Atlanta could continue to report consecutive quarters of growth and sequential "records" in key measurements such as sales, net earnings, bookings, backlog and number of set-tops shipped.

3.      Defendants' fraudulent scheme included a practice known as "channel stuffing." Also known as "trade loading," channel stuffing is a practice whereby manufacturers induce customers to purchase larger volumes of product than ordinarily purchased, even though the customers do not need the larger volume. This practice has the effect of pulling orders forward into present quarters that otherwise would be properly placed in future quarters.

2

4.    Defendants engaged in pervasive channel stuffing throughout the third and fourth quarters of fiscal year 2001 (January 1 through June 29, 2001) while facing a slowing economy, the cancellation or postponement of orders from two of their largest customers, and the discovery that the number of rolling orders from Scientific-Atlanta's customers was declining, as shown in Defendants' forecast reports and Business Analyzer program.    Although Scientific-Atlanta had previously encouraged its sales force to pull sales in before quarter's end, Defendants stuffed the channel far more aggressively during the Class Period than ever before because the Company knew that missing Company forecasts and analysts' estimates would cause a steep decline in SFA's stock price.

5.    To induce Scientific-Atlanta's customers to order product not needed and to pull sales and bookings forward into earlier quarters, Scientific-Atlanta gave its customers deeper discounts, longer payment terms, and credits for the cost of warehouses used to store the unneeded excess inventory.    The highest levels of management at Scientific-Atlanta engaged in this channel stuffing.    Indeed, in one instance in which unusually long credit terms were extended to a major customer, the customer's contract was delivered to the former credit analyst responsible for this account by management before the salesperson who handled the account delivered the contract to the analyst.    This episode, the former analyst said, was highly unusual.

6.    Channel stuffing has the effect of inflating results of operations in the period in which the practice is engaged, at the expense of future quarters because the customer has to work off the excess inventory.    The effect of the channel stuffing is magnified if the practice occurs during a sluggish economy because, as the rate of the customer's sales decreases, it takes longer for the customer to work

3

off the excess inventory. Thus, unless the channel stuffing continues at the same rate or there is increased demand for the goods during the period from which the future orders were pulled forward, the customer will reduce its purchases or even stop purchasing until its inventory is reduced. Moreover, when demand declines, the customers will inevitably order less product than in previous quarters. Thus, by engaging in pervasive channel stuffing, Scientific-Atlanta mortgaged future sales and bookings.

7.    Although the practice of channel stuffing is not illegal per se, the failure to disclose the pervasive nature of the practice and the effect it would have on future sales and earnings rendered Defendants' Class Period statements about growth in sales, earnings, bookings, and backlog and number of set-tops shipped materially false and misleading.

8.    Defendants also engaged in this fraudulent scheme to gain market share and distinguish itself at a time when Scientific-Atlanta's competitors suffered from an industry-wide decline in demand and sales. Given the problems plaguing Scientific-Atlanta's competitors, the Class Period was a time of challenge for SFA.

9.    Scientific-Atlanta distinguished itself from its competitors in part because the investing public and analysts were unaware that Scientific-Atlanta was engaged in pervasive channel stuffing. Commenting on Scientific-Atlanta's strong showing during the Class Period, P. Ausnit, an analyst with Deutsche Bank Alex Brown, Inc., in a report dated April 10, 2001, differentiated Scientific-Atlanta from its largest competitor, Motorola, by pointing out (mistakenly) that Scientific-Atlanta had not boosted demand to pull sales forward, thus depressing future sales, as Motorola's warrant program the previous year may have done. Unbeknownst to the analyst, however, Scientific-Atlanta had done just that.

10.    Scientific-Atlanta gained market share during the Class Period also by misrepresenting that demand for its products was accelerating.    As Scientific-Atlanta's former employees have confirmed, and as Scientific-Atlanta's declining inventory at the end of fiscal year 2001 shows, Scientific-Atlanta was scaling back production at the same time it was publicly boasting of expanded manufacturing capacity and accelerated demand for its products.

11.    Defendants also misrepresented the Company's financial performance and operating results by engaging in deceptive and improper revenue recognition practices during the Class Period.    For example, on numerous instances during the Class Period, Defendants billed customers for products that had not been shipped, even though the transaction did not meet the requirements for "bill and hold" transactions prescribed by Generally Accepted Accounting Principles ("GAAP"). A former credit analyst even discovered that Scientific-Atlanta had billed one of the customers for which the credit analyst was responsible, even though no order had been placed after the salesperson sent the customer a quote.

12.    During the Class Period, Scientific-Atlanta repeatedly represented that it only issued invoices to customers upon shipment of product that had been ordered pursuant to a firm commitment from a customer and that the Company's financial statements were prepared in accordance with GAAP.    Because Defendants' undisclosed billing practices violated SFA's stated policies and GAAP, these statements were materially false and misleading.

13.    During the Class Period, Defendants issued press releases reporting Scientific-Atlanta's second and third quarter 2001 results.    As a result of Defendants' undisclosed improper accounting for the Company's sales, each of these earnings announcements and the Forms 10-Q the Company filed for the

second and third fiscal quarter shortly thereafter contained material misrepresentations and/or suffered from material omissions.

14.    Taking advantage of his insider knowledge and the artificial increase in the stock price that followed these press releases, Defendant McDonald sold over one million shares of Scientific-Atlanta common stock after these press releases were issued, thereby reaping proceeds of over $45,000,000. This trading was suspicious in timing and unusual in amount. McDonald, in his entire history with Scientific-Atlanta, had never before sold so many shares of stock in a three-month period. Indeed, McDonald's sales between the period February 1, 2001 through May 2, 2001 doubled the number of shares McDonald had ever previously sold in a comparable period of time.

15.    Taking advantage of his insider knowledge and the artificial increase in the stock price, Defendant Haislip sold over 53,000 shares of common stock after the Company's third quarter's press release, reaping proceeds exceeding $3,000,000. This trading was suspicious in timing and amount, representing the largest number of SFA shares that Haislip had ever sold at one time.

16.    On July 19, 2001, at the close of trading, Scientific-Atlanta was forced to admit that the demand for its products was not accelerating as Defendants had continually stated throughout the Class Period. In its July 19th earnings announcement reporting year end and fourth quarter fiscal year 2001 results of operation, Scientific-Atlanta stunned the investing public by announcing that its sales for the fourth quarter were $50,000,000 less than expected and that bookings had fallen 30% from the previous quarter. This sudden downturn, analyst Jason Ader of Thomas Weisel Partners remarked, was "unexpected." "What we didn't anticipate was how quickly and how sharply the growth would fall off," he added.

6

17.    As a result of the July 19th announcement, the price of Scientific-Atlanta's common stock plummeted, dropping over 35% from its July 19th close of $35.08 per share to close at $22.80 per share on July 20, 2001, causing a market capitalization loss on this day alone of approximately $2,000,000,000.    Over 27,000,000 shares of SFA common stock traded on July 20th, which is more than ten times the stock's average daily trading volume. Neither McDonald nor Haislip sold any shares after the stock price plummeted following the July 19th press release. And, according to insider trading data available on Yahoo Finance as of the filing of this Complaint, neither has sold a single share of Scientific-Atlanta stock on the open market since.

18.    On August 16, 2001, Defendants filed their Form 10-K for the fiscal year ending June 29, 2001 and issued a press release in which they withdrew their previous guidance for the first quarter and fiscal year 2002, citing, in part, the reduced deployment rates reported by cable operators, reflecting reduced demand. Defendant Haislip, when discussing the release, also said that the Company's customers may have accumulated inventories in 2000 and 2001. Reacting to this disclosure the next day, Reuters published an article entitled "Scientific-Atlanta Dips on Sales, Guidance Pullback", noting that Scientific-Atlanta had "stunned Wall Street by saying sales growth has essentially stalled for its set-top boxes."

19.    As a result of the August 16th announcement, the price of Scientific-Atlanta's common stock plummeted, dropping over 15% from its August 16th close of $25.01 per share to close at $21.24 per share on August 17, 2001, causing a market capitalization loss on this day alone of approximately $589,251,000. Over 10,863,000 shares of SFA common stock traded on August 17th, which is more than four times the stock's average trading volume.

7

20.  On September 28, 2001, the Company filed its Form 10-Q for the first fiscal quarter 2002 with the SEC.  Signed by Haislip and approved by McDonald, the Form 10-Q further revealed the Company's inevitable decline brought about by the channel stuffing and other practices alleged herein.  Sales declined to $410,097,000, bookings shrunk to $172,100,000--less than a third of the bookings reported in the previous quarter, and backlog dropped nearly a third from the previous quarter, to $662,900.

## JURISDICTION AND VENUE

21.  This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. 240.10b-5.

22.   The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

23.   Venue is proper as many of the acts, transactions and conduct alleged herein, including the dissemination to the investing public of the materially misleading statements at issue, occurred in substantial part in this District. Additionally, Defendants conduct significant business within this District and have consistently disseminated official Company communications, such as proxy statements, press releases and other information directly within and into this District.

24.   In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the mails and instrumentalities of interstate commerce, including, but not limited, to the mails, interstate telephone communications and the facilities of the national securities markets.

**THE PARTIES**

25.   Lead Plaintiff Hugh Petersen purchased common stock of Scientific-Atlanta during the Class Period, at an artificially inflated price, as set forth in the Shareholder Certification previously filed with this Court.

26.   Lead Plaintiff Jack Graeber purchased common stock of Scientific-Atlanta during the Class Period, at an artificially inflated price, as set forth in the Shareholder Certification previously filed with this Court.

27.   Lead Plaintiffs Roger and Jeanne Hale purchased common stock of Scientific-Atlanta during the Class Period, at an artificially inflated price, as set forth in the Shareholder Certification previously filed with this Court.

28.   Lead Plaintiff Kathryn Herani purchased common stock of Scientific-Atlanta during the Class Period, at an artificially inflated price, as set forth in the Shareholder Certification previously filed with this Court.

29.   Defendant Scientific-Atlanta is a corporation organized and existing under the laws of the state of Georgia and maintains its principal executive offices at 5030 Sugarloaf Parkway, Lawrenceville, Georgia 30042. Referred to by at least one analyst as a "digital supertanker," Scientific-Atlanta describes itself on its website, www.sciatl.com, as follows:

> Scientific-Atlanta, Inc. is a $2.5 billion company changing the way consumers interact with their televisions, and is a leading supplier of transmission networks for broadband access to the home, digital interactive subscriber systems for video, high speed Internet, voice over IP (VoIP) networks, and worldwide customer service and support. Scientific-Atlanta is applying a half-century of innovations to today's convergence of the PC and the TV and helping to extend multimedia broadband applications to new platforms via the set-top.

9

Scientific-Atlanta common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol SFA. Scientific-Atlanta's options are listed on the Chicago and Pacific Exchanges. The Company's fiscal year ends on June 30 or the Friday closest to June 30 of each year. The Company's fiscal year 2001 ended on June 29, 2001.

30.    Defendant James F. McDonald is the Chairman of the Board, Chief Executive Officer and President of the Company and served in these positions at all times relevant hereto. In fact, McDonald was appointed Chairman of the Board in November 2000, just before the economic conditions and order cancellations discussed herein took place. McDonald was also a member of the Company's executive committee of the Board of Directors during the Class Period. According to Scientific-Atlanta's web site, www.sciatl.com, since he joined the Company in 1993, McDonald has "led Scientific-Atlanta to the company's current position as a billion dollar company." During the Class Period, McDonald was the 34th highest paid executive in the United States. McDonald has a bachelor's and master's degree in electrical engineering.

31.    Defendant Wallace G. Haislip is the Senior Vice President, Chief Financial Officer and Treasurer of the Company and served in these positions at all times relevant hereto. According to Scientific-Atlanta's web site, www.sciatl.com,

> Haislip has been with Scientific-Atlanta for nine years, occupying a series of key financial and operations positions, most recently as President of Worldwide Services where he was responsible for the establishment of the company's Advanced Broadband System Services affiliate, a professional services organization to service the cable industry. Haislip previously served for 5 years as Vice President of Finance for the company's broadband cable television businesses. He has served as Vice President of Procurement and had the lead role

in the planning and start-up of the company's high-volume manufacturing facility in Juarez, Mexico. As Vice President of Business Services, Haislip was responsible for the implementation of [Scientific-Atlanta's] shared business services organization that today delivers a range of internal services such as payroll, purchasing, management information systems and some legal, human resources and communications activities.

Haislip has a degree in mathematics education and accounting.

32.    McDonald and Haislip (the "Individual Defendants"), by way of their positions as senior executives and/or members of the Board of Directors, had the power, and exercised same, to cause Scientific-Atlanta to engage in the wrongful acts and practices complained of herein. McDonald and Haislip were, therefore, "control persons" of Scientific-Atlanta within the meaning of Section 20(a) of the Exchange Act.

33.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the Individual Defendants, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest level and was privy to confidential, proprietary information concerning the Company and its business, operations, prospects, growth, finances, and financial condition as alleged herein. The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, including SEC filings, press releases, and other publications, were

aware of or recklessly disregarded that materially false or misleading statements were being issued and/or omitted regarding the Company, and approved or ratified these statements and/or omissions in violation of the federal securities laws.

34.    As officers, directors, and control persons of a publicly held company whose common stock was, and is, registered with the SEC, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, growth, operations, financial statements, business, earnings, management, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.    The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

35.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or with severe recklessness disregarded, the misstatements contained therein and the omissions therefrom, and were aware of, or with severe recklessness disregarded, the materially false and misleading nature thereof.  Because of their positions with Scientific-Atlanta, each of the Individual Defendants had access to adverse undisclosed information about Scientific-Atlanta's business prospects, financial condition and performance as particularized herein and knew or recklessly disregarded that these adverse facts rendered the positive representations made by

12

or about Scientific-Atlanta and its business, issued or adopted by the Company, materially false and misleading.

36.    The Individual Defendants, because of their positions of control and authority as officers and control persons of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each of the Individual Defendants was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports, releases, and statements detailed herein and is, therefore, primarily liable for the representations contained therein.

37.    The Individual Defendants caused, allowed and/or participated in the wrongdoing complained of herein in order to continue and prolong the Company's streak of sequential record-breaking quarters and the distorted and misleading appearance of accelerating demand for Scientific-Atlanta's products, continued revenue growth, and strong financial condition.

## BACKGROUND TO THE ACTION

38.    Scientific-Atlanta manufactures cable network equipment.  The Company provides its customers, the cable companies, with broadband transmission networks, digital interactive subscriber systems, content distribution networks and worldwide customer service and support.  Having evolved from a manufacturer of electronic test equipment for antennas and electronics to a producer of a wide variety of products for the cable television industry, including

digital video, voice and data communications products, the Company claims to be changing the way consumers interact with their televisions.

39.    The Company manufactures a set-top box, which is a network computer used in the end user's household, to facilitate the next-generation services that the cable operators seek to offer to consumers. Scientific-Atlanta is the nation's second-largest set-top box manufacturer, behind Motorola, and is continually seeking to expand its market share. Defendants sold 500,000 Scientific-Atlanta Explorer digital set-top boxes to cable companies during fiscal 1999. In fiscal 2000, the Company sold 1.8 million set-tops.

40.    Scientific-Atlanta's major business lines are its subscriber business and its transmission business. The Company's subscriber business provides the interactive digital set-top boxes and the software and computer servers that drive these digital set-tops. Also included are interactive applications, which encompass video-on-demand, Internet access, electronic commerce to the television and a Web browser that allows users complete Internet access. The Company's transmission business is fueled by the construction, expansion and upgrading of cable networks by major cable operators, which are also known as multiple system operators, or "MSO"s.

**Scientific-Atlanta's Long Term Plan Pays Off in Fiscal Years 1999 and 2000**

41.    Fiscal years 1999 and 2000 was a period of growth and celebration for Scientific-Atlanta and its employees. The Company had completed assembly of its interactive client-server cable network technologies, touted as the crowning achievement of seven years of research and development and four large field trials costing $500 million. Set-tops made by Motorola, its largest competitor, do not offer the same interactive features that Scientific-Atlanta's digital set-tops offer.

The Company distinguished itself from its competitors, claiming the investment provided a tremendous competitive advantage and one that could not be replicated without comparable time and investment. According to Scientific-Atlanta, the Company's investment was paying off.

42.    Fiscal 1999 was the beginning of what McDonald would later refer to as "ten outstanding quarters in a row."

43.    As McDonald explained in his conclusion to the Company's fourth quarter and fiscal year 1999 earnings release, which reported that digital deployments had increased 5-fold in six months:

> The broadband industry is on a growth path, and Scientific-Atlanta is positioned as a major force in that industry. We have converted our vision of a digital interactive network into a commercial success because we have remained consistent and committed to our strategy for seven years. We have devoted sufficient research and development and other resources to our vision, and we are now beginning to see some very tangible results.

44.    The end of the fiscal year 2000 (June 30, 2000) marked the Company's third sequential "record" quarter.    (See Charts attached hereto as Exhibit "A." These Charts were prepared from a review of the Company's press releases from 1999 through the first quarter of fiscal year 2001.)

45.    According to a former credit analyst, Scientific-Atlanta ended fiscal 2000 on a high note. The Company and its employees celebrated.  Scientific-Atlanta awarded its employees with bonuses and took them on expensive, departmental retreats.  The Company rewarded its executives with handsome, performance-based bonuses.

46.    Institutional investors took note.  According to Robinson-Humphrey analyst Greg Mesniaeff, Scientific-Atlanta became more attractive to large-scale investors in fiscal 2000 after Motorola announced plans to purchase General

Instruments. "A lot of institutional investors who wanted to be in on cable infrastructure but didn't want to own Motorola switched to Scientific-Atlanta," the analyst said later in an article published in the May 20, 2001 edition of the <u>Atlanta Journal-Constitution</u>.

47.    Scientific-Atlanta stock started fiscal year 2000 priced at $19.41 per share and ended the 12-month period at $74.50 per share, an increase of 287% per share.

48.    As Scientific-Atlanta entered Fiscal Year 2001, the Company was gaining much sought-after market share. In an interview with CNBC, McDonald explained Scientific-Atlanta's approach to growth and market share gain:

> Since we have started shipping the digital set tops in volume, we have picked up market share every quarter we have shipped. So, we are gaining in market share each quarter, and I think if you follow it back over the four to six quarters, you will find that we have continually improved our market share. And, as we go forward, we think that will continue to happen because we have a system that will author the whole range of interactive applications.

(Excerpt from April 2001 interview discussing Scientific-Atlanta's success since late 1999).

## Fiscal Year 2001:  A Year of Challenges

49.    Fiscal Year 2001 started off strong. Scientific-Atlanta ranked No. 1 on the Standard & Poors 500 index with a gain of 126.4% in the July-September 2000 quarter (its first quarter of fiscal year 2001).

50.    Despite its good first quarter results, things began to change for Scientific-Atlanta and the rest of the market during the fall of 2000. As one analyst explained, the July-September 2000 quarter was projected to be the last

quarter that would be strong for most S&P 500 companies due to slower economic growth, higher energy prices and the weaker Euro.

51.    Telecommunications and cable television businesses were not immune to the economic downturn. As a result of this decline, many cable operators began tightening their budgets and reducing purchases of transmission equipment and/or cable set-top boxes. Among those tightening their budgets was AT&T, one of Scientific-Atlanta's three largest customers during each of the previous three years.

52.    Indeed, by mid to late November 2000, AT&T had reduced its Scientific-Atlanta purchases by at least $15,000,000 or 23%. As Scientific-Atlanta's Form 10-K for fiscal year 2001 revealed, AT&T's sales for the entire year totaled only $50,000,000. During the previous fiscal year, AT&T had purchased over $170,000,000 in products from Scientific-Atlanta, accounting for 10% of Scientific-Atlanta's sales. If AT&T's purchases from Scientific-Atlanta had not declined, Scientific-Atlanta's sales to AT&T should have exceeded $65,000,000 by the middle of Scientific-Atlanta's second fiscal quarter.

53.    The news got worse for Scientific-Atlanta on November 24, 2000, when AT&T sent Scientific-Atlanta and several other of its suppliers a letter directing them to hold pending shipments. In the letter, AT&T reportedly told its customers that it planned to resume purchasing in mid-January 2001.

54.    In response to AT&T's announcement, several major cable-equipment companies, including Antec Corp. and CommScope Inc., issued statements warning investors that sales and earnings were likely to be lower than previously forecast due to the loss of sales to AT&T. Scientific-Atlanta, however, did not.

55.    In fact, Scientific-Atlanta did just the opposite.

**The Stage is Set:   Scientific-Atlanta Minimized the Impact of AT&T's Announcement and Resorted to Undisclosed Sales Practices To Meet Expectations and Avoid Breaking SFA's Streak of Record-Setting Quarters**

56.    On November 24, 2000, Defendants caused the Company to issue a press release over PRNewswire to distinguish itself from its competitors and stem the decline of its stock price resulting from competitors' and the press's announcements regarding AT&T's letter.   The press release, entitled "Scientific-Atlanta Comments on Sales to AT&T," reassured shareholders that

> Scientific-Atlanta ... understands that AT&T Broadband will limit its receipt of product shipments for the remainder of the quarter.  Scientific-Atlanta's business with AT&T is primarily in the Company's Transmission business.  *Any slowdown in shipments to AT&T would only impact 1% - 2% of Scientific-Atlanta's anticipated total Company sales this quarter.*

(emphasis supplied).

57.    The same day, Tom Robey, Scientific-Atlanta's Vice President of Investor Relations spoke to Dow Jones Newswires.  Robey repeated the preceding information and added:

> *That's the maximum effect that it would have.*
>
> The key point on this that I think people just don't understand is that AT&T is a valuable customer, but they're just not a very big customer.    Historically, they've been a transmission customer.   We haven't sold them any digital set-top boxes, although we continue to try.

(emphasis supplied).

58.    Within days, Scientific-Atlanta flooded the market with a series of positive statements about the accelerating demand for its products to quell investor concerns about Scientific-Atlanta's ability to withstand the downturn in domestic

transmission business. Scientific-Atlanta continued this practice throughout the Class Period.

59.    Scientific-Atlanta even re-issued its November 24 press release on November 27, 2000.

60.    On November 27, 2000, Defendants issued a second release over PRNewswire, announcing that the Company had entered into a multi-million dollar contract with another customer, Fox Cable Networks Group, to provide and install PowerVu Plus™ systems in Los Angeles and Houston.

61.    Defendants issued a third PRNewswire release on November 27, 2000, announcing that Sony Entertainment Television had purchased SFA's PowerVuPlus™ digital content distribution system for delivering its services to cable headends in India.

62.    On November 29, 2000, Defendants caused the Company to issue a release over PRNewswire announcing that Scientific-Atlanta and Intel had signed a letter of intent to develop a home network solution using Scientific-Atlanta's Explorer® set-top and interactive network. In the release, Defendants cited to a study on computer growth to reiterate their promise of increasing demand for Scientific-Atlanta's products:

> Consumer demand for wireless home networking is being driven by the rapid growth of high-speed Internet connections and multiple PC households. The number of multiple PC households will top 31 million by 2003, seven percent of which are networked today. By 2004, 26 percent of households will be networked. . . .

63.    Also on November 29, 2000, the Company announced over PRNewswire the unveiling of its new Explorer 8000 Set-Top and that Time Warner Cable, traditionally Scientific-Atlanta's largest customer, had signed

purchase orders for the Explorer 8000 which was "expected to satisfy most of the cable operator's forecasted requirements for calendar years 2001 and 2002 for this type of digital set-top."

64.    On November 30, 2000, the Atlanta Journal-Constitution reported that Scientific-Atlanta had entered into these contracts, along with contracts for the sale of significant amounts of equipment to Adelphia Communications and Cox Communications.

65.    Still working to solidify market perception of its financial strength, on December 8, 2000, the Company announced over PRNewswire:

> As Scientific-Atlanta (NYSE: SFA) heads toward the anniversary celebration of its first fifty years in 2001, it has just been named the top overall Atlanta company and the winner of the "eward 2000" for overall business and community impact, presented by the Atlanta Business Chronicle and the Technology Association of Georgia.

66.    Notwithstanding the impression which Scientific-Atlanta was trying to create that Scientific-Atlanta was hitting on all cylinders, the Company was suffering further setbacks after AT&T's purchasing freeze.

67.    In addition to AT&T, other cable operators and fiber infrastructure providers responded to stringent capital markets with conservative spending plans. One analyst explained that "so-called overbuilders," who had burned cash to aggressively build networks, had cut spending when the market turned sour and funding sources disappeared. The most prominent overbuilder, RCN Corp., whose backers included Microsoft co-founder Paul Allen, announced in late December 2000 that it would cut its 2001 capital spending budget in half. Analyst Lawrence M. Harris, who followed Scientific-Atlanta and who attended meetings with Scientific-Atlanta's senior executives, estimated that 10% of Scientific-Atlanta's

business came from overbuilders, even though Scientific-Atlanta issued no statements to the public about the effect of overbuilder cutbacks.

68.    Moreover, AT&T did more than just postpone orders. According to a former SFA product manager, between December 2000 and January 2001, AT&T and another major customer, believed to be Charter Communications, canceled millions of dollars in orders that had already been booked as firm orders.    In AT&T's case, the order was canceled altogether.    In Charter Communication's case, Charter canceled the order and ordered instead different product that was two grades down and less expensive.    At the time of the cancellation, Scientific-Atlanta had already produced at least $4,800,000 of product pursuant to these customers' specifications, which made the product difficult to resell.    By the fall of 2001, the former product manager explained, $4,200,000 of this product remained in Scientific-Atlanta's inventory.    The $600,000 of inventory that Scientific-Atlanta did sell after AT&T and Charter canceled the orders was sold at or near cost.

69.    In addition to concealing the material loss of business from AT&T and other significant customers, Scientific-Atlanta began engaging in unusual sales practices by no later than the end of the Company's second fiscal quarter of 2001 (i.e. end of December 2000).    The second fiscal quarter 2001 was an important time for the Company because declines in business put the Company at risk of breaking its then five consecutive record-breaking quarters in sales, net earnings, bookings, backlog and number of set-tops shipped.    A change of as little as $7,000,000 in net earnings, for example, or of 100,000 in the number of set-tops shipped in the second fiscal quarter, could have broken the streak.    See Charts attached as Exhibit A.

70.    In what can only be characterized as an attempt to protect its record-setting quarterly results and ensure that it would meet its November 24 prediction regarding the allegedly minimal impact that AT&T's announcement would have, Defendants convinced a large customer, Rogers Cable, to hold on "for a little while" to transmission equipment that Rogers had wanted to return in December 2000 because it had ordered the wrong equipment.  According to the Rogers Cable employee who learned of the transaction in the course of the employee's duties in planning and distribution, Scientific-Atlanta issued Rogers Cable a credit for warehousing costs for holding on to the equipment.  (Rogers Cable was an important customer of SFA as evidenced by McDonald's reference to it and just three other customers in his June 4, 2001 statement, reported in Telephony, that Scientific-Atlanta was flourishing in a weak economy because customers like Rogers Cable were doing well.)

71.    Rogers Cable was unable to discuss further details of the December 2000 transaction and other business dealings with Scientific-Atlanta because, Lead Plaintiffs learned from a Rogers former purchasing manager after speaking with the first Rogers Cable employee, Scientific-Atlanta had entered into a nondisclosure agreement with Rogers Cable.  The existence of the nondisclosure agreement itself demonstrates that Scientific-Atlanta took steps to conceal the true nature of its business dealings from the public.

### DEFENDANTS' CLASS PERIOD MISREPRESENTATIONS AND OMISSIONS AND WRONGFUL COURSE OF CONDUCT

### Scientific-Atlanta Touts Its Record-Setting Second Fiscal Quarter 2001 Results and Accelerating Demand In A Series of January 18, 2001 Announcements

72.     The Class Period begins on January 18, 2001, when the Company issued a press release over PRNewswire announcing "record financial results for its second fiscal quarter, with bookings, sales, operating profit, and backlog each setting all-time records."

73.     This press release, in relevant part, stated, "Consistent with the announcement by the Company in November, both sales and bookings for AT&T Broadband were down significantly." The release further reported:

> For the quarter ending December 29, 2000, bookings were $707.3 million, an increase of $243.4 million, or 52%, over the prior year's second quarter. Sales of $631.4 million rose by $258.7 million, or 69%, from the same period a year ago. Net earnings for the quarter were $70.8 million, or $0.42 per share. This represents a $37.4 million, or 112%, improvement in net earnings over the comparable period of the prior year, which were $0.20 per share. Earnings from operations increased $41.5 million, or 141% over the prior year. Net earnings in last year's second quarter included a $4.0 million after-tax gain on the sale of a portion of the Company's investment portfolio.

> Strong second quarter results were driven by the Company's Broadband businesses. Subscriber sales increased 162% year-over-year to $423.7 million, and Transmission sales increased 10% to $184.1 million. Subscriber bookings of $506.4 million were up 118% from the prior year. Transmission bookings of $184.9 million increased 9% year-over-year. Second quarter bookings and sales in the Media Networks business declined, as compared to the prior year.

> Backlog at the end of the second quarter was a record $964.7 million, an increase of $331.7 million from last year and up $75.8 million from last quarter.

*        *        *

Commenting on the second quarter, James F. McDonald, Scientific-Atlanta's Chairman and CEO said, "*Our performance this quarter demonstrates that our Broadband strategies are working. In our Transmission business, our scale and leading technologies are allowing us to capture market share. In Subscriber, we continue to execute very well as we expand our production capabilities*."

Broadband Subscriber Expands Capacity and Introduces PVR Set-Top

Scientific-Atlanta shipped 1.11 million Explorer® set-tops in the second quarter, versus 1.03 million in the prior quarter. More than 1.5 million units were ordered. Backlog at the end of the quarter exceeded 2.1 million units. *In response to the continuing acceleration in customer demand, the Company announced its fifth manufacturing capacity increase in 18 months.* When the new increment of capacity is available later in the third fiscal quarter, Scientific-Atlanta will have capacity to manufacture 1.5 million digital interactive set-tops per quarter.

In the second quarter, the Company announced its new Explorer 8000 set-top, which will feature a 40 gigabyte hard drive. In addition to Web browsing, email, electronic commerce, and video on demand (VOD), the Explorer 8000 set-top will deliver personal video recorder (PVR) capabilities that will allow the cable subscriber to pause, rewind, fast forward, record, and re-play live analog and digital TV programs. With two tuners, the Explorer 8000 set-top will enable the simultaneous viewing and recording of two channels of programming and support High Definition Television (HDTV). AOL-Time Warner has placed an order for Explorer 8000 set-tops for delivery later in this calendar year.

\*    \*    \*

24

>Scientific-Atlanta's Transmission business performed very well in the second quarter. Consistent with the announcement by the Company in November, both sales and bookings for AT&T Broadband were down significantly. Aside from AT&T, however, domestic sales and bookings increased as compared to both the prior year and the prior quarter. Compared to the prior year, international transmission bookings and sales increased 22% and 34%, respectively.

>\*       \*       \*

>Summarizing the quarter, McDonald concluded, "We have focused our efforts on end-to-end digital interactive architectures to ensure that our products work together to meet our customers' business objectives, in addition to their technical objectives. Our strong performance again this quarter is evidence of our customers' confidence in our ability to help them to increase revenues and cash flow and to build a strong defense against competition from DBS."

(emphasis supplied).

74.    In a second January 18, 2001 release, consistent with Scientific-Atlanta's carefully engineered plan to inspire investor confidence through continuing reports of accelerating demand, Defendants announced plans to expand manufacturing capacity at Scientific-Atlanta's Juarez, Mexico plant. Scientific-Atlanta explained in the press release that the expansion would boost Scientific-Atlanta's production of its Explorer® digital interactive set-top to 6 million per year, representing a six-fold increase in production in less than two years. In support of the expansion, Scientific-Atlanta's vice president of worldwide manufacturing stated:

>Our primary goal is to make sure we're doing everything we can to meet the growing needs of our customers. We're very

proud of our team in Juarez, which will now oversee the fifth major expansion in the last 18 months.

75.    In the January 18, 2001 conference call following the release of the Company's second quarter earnings, according to the Dow Jones News Service, Haislip said that the Company's "thriving" digital set-top box sales would "more than exceed the slowdown in transmission revenue." Defendant Haislip also forecasted that the Company's fiscal year 2001 transmission equipment revenue would still rise by 5 to 7 percent from fiscal 2000 to $735-$750 million and that the Company would ship out 4.7 million set-top units by the end of fiscal year 2001.

76.    Only 7 weeks earlier, however, on November 24, 2000 in connection with the announcement regarding the minimal impact that AT&T's temporary purchasing freeze would have on the Scientific-Atlanta, the Company predicted that it would ship 4.3 million set-tops in fiscal year 2001.

### Defendants' January 18, 2001 Statements Concerning Its Second Quarter Accomplishments Were Materially False And Misleading

77.    Defendants' statement that the Company's "performance this quarter demonstrates that [its] Broadband strategies are working" was materially false and known to be false when made.

78.    As a preliminary matter, a supposedly hugely successful S&P 500 company whose strategies are working would not need to resort to highly unusual sales practices.    By reasonable inference, Scientific-Atlanta's resort to such practices can only mean that the secret dealings must have been required for the Company to report the numbers it needed in some key measurement.

79.    Second, Scientific-Atlanta had failed in its strategy to get AT&T's set-top business.  As stated by SFA Vice President of Investor Relations Tom Robey on November 24, 2000, one of Scientific-Atlanta's strategies was to obtain set-top business from AT&T, which, according to a <u>Business Wire</u> release issued shortly after the AT&T announcement, was projected to control 26% of the MSO market by the end of 2000.    Defendant McDonald even acknowledged this longstanding strategy during an interview published by the <u>Atlanta Journal-Constitution</u> on May 20, 2001.  Not selling Scientific-Atlanta set-tops in Atlanta (which AT&T controlled), he said, had been a major disappointment to the Company and to McDonald personally, describing the failure as "a big emotional issue."  Even as of May 2001, according to an article in the <u>Atlanta Journal-Constitution</u>, Atlanta was still serviced by AT&T, a condition, the article said, Scientific-Atlanta was still working to change.

80.    As of the time of the January 18, 2001 press release, AT&T sold exclusively set-tops made by General Instruments (which was acquired by Motorola in 2000).  As a result, when the January 18 statements were made, Defendants knew that Scientific-Atlanta's strategy of obtaining AT&T's set-top business had failed.  In fact, AT&T had virtually ceased doing business with Scientific-Atlanta by January 18, 2001.  Not only had SFA's sales to AT&T materially declined before Scientific-Atlanta's receipt of AT&T's letter on or around November 24, 2000, AT&T had actually cancelled millions of dollars in orders for which product had already been produced after sending the November letter to suppliers.

## Scientific-Atlanta Misrepresented The Reasons For Its "Record" Second Quarter

81.    As noted above, Defendants claimed in the January 18 statements that:

♦       the Company's "strong second quarter results were driven by the Company's broadband businesses"

♦       the Company's "Transmission business performed very well;

♦       the Company was "doing everything it could to meet the growing needs of its customers"; and

♦       the Company's "strong performance again this quarter is evidence of [its] customers' confidence in [its] ability to help them to increase revenues."

82.    Each of these statements was known to be false when made because the Company had already lost over $61,000,000 of business from AT&T by the end of the second quarter (based on sales it would have made had it continued to purchase at least $170,000,000 in SFA product on an annual basis) and had had to resort to highly unusual and secret transactions in order to report the record results that it announced to its investing public.

83.    The Company's request that Rogers Cable hold on to transmission product that the Company was going to let it return can in no way be construed as evidence of a customer's confidence in Scientific-Atlanta.    Further, it was Scientific-Atlanta's unusual sales practices that "drove" the Company's second quarter performance, not the Broadband business as the Company stated.

84.    For the same reasons, Scientific-Atlanta's statement that its "scale and leading technologies" in its Transmission business is what allowed Scientific-

Atlanta to capture market share was false and misleading when made, and known to be so. It was Scientific-Atlanta's unusual sales practices and its nondisclosure of the material loss of AT&T business that "allowed" Scientific-Atlanta to gain coveted market share.

**Defendants Knowingly or Recklessly Misrepresented Scientific-Atlanta's Second Quarter Results**

85.     As a result of Scientific-Atlanta's secret agreement to hide product that was to be returned, Scientific-Atlanta did not have to take a hit on its profit and loss statement for the returned product. Even if Rogers Cable had exchanged the erroneously ordered equipment for equipment it did need, treating the transaction as an exchange would not have allowed Scientific-Atlanta to count in its revenue figures the full invoice amount of the new equipment because the Company would have had to issue an offsetting credit at the same time.

86.     Thus, by secretly delaying the return of the Rogers Cable transmission equipment, Scientific-Atlanta's sales, net earnings figures, and transmission revenue figures, among others, were artificially inflated and materially false and misleading. Given that Rogers Cable was one of Scientific-Atlanta's most important customers and that Scientific-Atlanta barely topped certain key measurements that it reported record results for the second quarter (see chart attached as Exhibit A), it is reasonable to infer that the dollar volume of the return was significant enough to have made a material difference to Scientific-Atlanta's quarter end financials. The fact that Rogers Cable and SFA have a confidentiality agreement that precludes discussion of the transaction also compels this conclusion.

**Defendants Knew Demand Was Not Continuing To Accelerate When It Made Its January 18 Statement To The Contrary.**

87.    At the time that Defendants stated in the January 18 press release that it was expanding the Juarez, Mexico manufacturing facility "in response to continuing acceleration in customer demand," Defendants already knew that demand was beginning to decline.

88.    According to a former SFA electronics manufacturing supervisor, Scientific-Atlanta had a "Business Analyzer" program on its in-house computer system that forecasted orders for the next six to eight months. The forecast was based on data inputted into the system from the customer's historical purchasing patterns with SFA and any information the customer had provided concerning its future orders with SFA. This system, the former supervisor said, was available to all management, from supervisors up.

89.    Because Scientific-Atlanta's Business Analyzer program provided the Defendants with a six to eight month forecast, the fact that the decline in rolling orders surfaced by June 29, 2001 (the end of the fourth fiscal quarter 2001) proves that Defendants knew at the time they issued the January 18, 2001 press release that demand for its products was not accelerating as they had represented.

**Defendants Also Misrepresented Its Return Policy**

90.    Scientific-Atlanta's return practices for major customers was not unique to Rogers Cable. According to a former credit analyst who tracked credits as part of her job duties, the "Big 6" customers could return product with a simple phone call for any or no reason at all. The Big 6 included AT&T, Comcast,

Charter Communications, Rogers Cable, Time Warner and Adelphia. According to the 2001 Form 10-K, three of these customers, Time Warner (22%), Charter (20%) and Adelphia (18%), collectively accounted for 60% of SFA's revenue.

91.    A former warehouseman for Adelphia confirmed this undisclosed return policy based upon his personal experience with Scientific-Atlanta, noting that Adelphia regularly returned merchandise, even fiber optic equipment that had been sitting on Adelphia's shelves for years. Returning merchandise required nothing more, he said, than a call to customer service to obtain a RA (return authorization) number.

92.    By allowing major customers to return product liberally, Scientific-Atlanta violated its stated return policy. According to the policy, returns were supposed to be allowed only if the product does not conform to product specifications and the customer notifies the Company in writing that it is rejecting the product for non-conformance within 10 days of receipt.

93.    Although Scientific-Atlanta did not repeat this disclosure during the Class Period, it had a duty to correct its pre-Class Period disclosure if it knew it to be incorrect. Because Scientific-Atlanta's practice of allowing major customers to return product virtually at will, Scientific-Atlanta breached its duty to the Class to correct a material misrepresentation. Since the policy violations occurred with the Company's largest customers, the conclusion is manifest that the Defendants were aware of the special treatment accorded these customers. Defendants breached their duty to the Class by failing to correct the misrepresentation that their publicly disclosed, but false, policy created.

**Defendant McDonald Makes Over $11,000,000 As A Result Of Insider Trading After The False And Misleading January 18 Statements Are Issued.**

94.    While in possession of the foregoing undisclosed adverse information, McDonald sold 200,000 shares of Scientific-Atlanta common stock between February 1, 2001 and February 9, 2001, generating proceeds in excess of $11,000,000.

**Scientific-Atlanta's Form 10-Q for the Second Quarter of Fiscal Year 2001, Filed February 9, Misrepresented That Scientific-Atlanta Had Not Already Lost Material Business From a Significant MSO.**

95.    On February 9, 2001, Defendants caused the Company to file its fiscal 2001 second quarter Form 10-Q with the SEC, which repeated the false and misleading statements contained in its January 18, 2001 earnings release.   Haislip signed the 10-Q and McDonald approved it.

96.    In addition, the Company's second quarter 2001 Form 10-Q, filed with the SEC on February 9, 2001, stated in its Exhibit 99 re Cautionary Statements ("Exhibit 99"):

> Sales of products to AT&T, which merged with MediaOne during fiscal year 2000, and its affiliates were 10 percent of our total sales in fiscal year 2000, were 16 percent of total sales in fiscal year 1999, and 12 percent of total sales in 1998...*The loss of business from a significant MSO could have a material adverse effect on our business."*

(emphasis supplied).

97.    As demonstrated above, Scientific-Atlanta had already lost a material amount of business from AT&T and Charter Communications.   In addition, as reported on April 12, 2001 by analyst Joseph Harris of Josephthal & Co. Inc., the

fact that AT&T still had not resumed purchasing from the Company shows that by this February 9 statement, Scientific-Atlanta had lost even more AT&T business. In addition, by February 9, AT&T had already canceled orders that had already been booked as firm orders.

98.    Scientific-Atlanta's Exhibit 99 was thus materially misleading because the Company did not disclose that what Scientific-Atlanta was warning generally *could happen* in the future had in fact *already happened*.

**Defendants Continued To Misrepresent That Demand Was Accelerating in the Second Fiscal Quarter Form 10-Q**

99.    Scientific-Atlanta bragged, for example, in its second quarter Form 10-Q that "[s]ales for the quarter ending December 29, 2000 were $631.4 million, up 69% over the prior year, driven by the rapid acceleration in the deployment of digital interactive systems by our customers." Defendants intentionally or with severe recklessness indicated that sales were continually improving, despite the downturn suffered by most of Scientific-Atlanta's customers and despite Defendants' knowledge from the Business Analyzer program that demand would be off within the next six to eight months.

100.    The decline which the Business Analyzer alerted Defendants to six to eight months beforehand manifested itself in disappointing results in Scientific-Atlanta's fourth quarter (which ended June 29, 2001). As reported by SFA in its July 19, 2001 press release announcing its fourth fiscal quarter results, sales in the April to June, 2001 quarter fell short of analyst's expectations by $50,000,000; bookings declined 30% from the third fiscal quarter, and backlog fell 10%. With the foresight of the Business Analyzer program, Defendants knew demand was falling off at the time the February 9 statement was issued.

**Scientific-Atlanta Conceals Mounting Internal Concerns Over Performance During Third Fiscal Quarter 2001**

101. Pressure on Scientific-Atlanta in the third fiscal quarter to continue posting record results was mounting, as Scientific-Atlanta approached the celebration of its fiftieth anniversary. Scientific-Atlanta's competitors, including Motorola, were conceding difficulties. Indeed, Motorola announced in February, 2001 that it would miss its forecasts due to a slowing economy, the Atlanta Constitution reported on March 7, 2001.

102. In addition to the loss of AT&T's business throughout the entire third fiscal quarter of 2001, Scientific-Atlanta's troubles were compounded by the loss of other material business as well. Sometime early in the third quarter, Scientific-Atlanta lost Cablevision's set-top business. According to the head of corporate engineering at Cablevision, Cablevision stopped buying set-tops from Scientific-Atlanta in the beginning of 2001, when Cablevision's Boston operation was sold.

103. Adding to the stress, Defendants also encountered problems with Charter Communications, Scientific-Atlanta's second largest customer (as reported in the Company's Form 10-K filed August 15, 2001). According to a former Scientific-Atlanta customer service coordinator assigned to the Charter account during the Class Period, Scientific-Atlanta's sales to Charter decreased dramatically in the first six weeks of SFA's third fiscal quarter 2001.

104. During this time, the former SFA customer service coordinator explained, Charter encountered problems with Scientific-Atlanta's set-tops. Charter attributed the equipment problems to flaws in Scientific-Atlanta's equipment design. Consequently, Charter returned huge quantities of equipment to

34

Scientific-Atlanta, estimated by the former employee to have totaled between $1 and $2 million over a five-month period. (Charter's problems with Scientific-Atlanta's equipment were so extensive that Scientific-Atlanta assembled a four person team just to address Charter's problems.) Charter, the former salesperson revealed, had also complained about receiving invoices for product that it had not received.

105.    As a former Scientific-Atlanta manufacturing supervisor explained, the Juarez, Mexico facility, where most of the set-tops were manufactured, was reputed within the Company to have problems as a result of the high rate of defective set-tops manufactured. The Company was so aware of the problem that when a customer returned a set-top that was defective, the employee said, Scientific-Atlanta not only replaced the defective set-top but also provided an extra one for each defective set-top received. A former Digital Operations Consultant confirmed the report that the Company had a problem with defective set-tops, noting that there were "a lot of complaints" about defective set-tops during the employee's tenure. This employee interfaced with many cable operators because the employee's job duties included visiting cable service providers and educating them on how to use digital cable network equipment.

106.    In March 2001, presumably as a result of these problems, Charter Communications announced that it would be introducing Motorola's set-tops, according to a May 28, 2001 report in Cable World.

107.    Moreover, in the third quarter, a former SFA electronics manufacturing supervisor revealed, Scientific-Atlanta began cutting back production due to the lack of rolling orders on the Business Analyzer.

108. A former project manager in another division of Scientific-Atlanta, who coordinated product and delivery from production to the salespersons, confirmed the third fiscal quarter cutback in production in her department as well.

109. In addition to the Business Analyzer program, the Defendants had a host of reports available to them to assess current and future sales and orders.

110. For example, the resume of a former Scientific-Atlanta World Wide Sales Financial Analyst (who served in this capacity during the entirety of the third quarter fiscal 2001) detailed the kind of reports the Company's financial analysts prepared. According to her resume, as a financial analyst, she prepared Company-wide Sales and Booking Reports, which were distributed directly to SFA's senior executives, including the Individual Defendants. This same former employee had previously served as a business unit analyst from July 2000 through January 2001. In this capacity, her resume noted that she prepared regular departmental reports, which detailed all sales, backlog, bookings, opportunities and risks associated with reaching departmental forecasts. The employee wrote in her resume that, in this role, she also coordinated communications between the sales teams, manufacturing department, customer program managers, engineers, and the procurement department.

111. According to a former credit analyst for Scientific-Atlanta, SFA's credit department also ran numerous forecast and performance reports for SFA's senior management. These reports, the former credit analyst said, were either personally reviewed by or were summarized for Defendant Haislip. The reports included Excel spreadsheets using revenue numbers from the Company's GEMS SAP system. Charlie Kinneman, director of credit, compiled the reports from department members and produced reports for Defendants Haislip and McDonald

as well as a Mr. Robert Hunt, the Company's Assistant Treasurer. Each of the executives also regularly received Forecast Reports and a Bad Debt Report from the credit department. During the Class Period, the credit department prepared reports for management at least once a week.

112. Several former SFA employees confirmed that Scientific-Atlanta was internally expressing concern over its ability to meet market expectations and over declining demand for its product.

113. The Company's reports, a former SFA credit analyst who worked for SFA during the entire Class Period said, showed that the Company's orders were likely to be 25% short of the previous quarter's numbers, (i.e. that demand was declining). Senior management, this employee commented, was concerned about the effect the declining third quarter performance would have on the stock price.

114. As a result, the former credit analyst noted, Scientific-Atlanta pushed harder than it had ever pushed before to pull sales and orders forward to meet goals by giving special discounts, longer payment terms, and credits to customers agreeing to receive and store excess inventory in warehouses. Had Scientific-Atlanta not done so, the former credit analyst said, Scientific-Atlanta would have been in the same position as Motorola.

115. The push involved every one of the large customers that SFA had boasted about that had not already stopped doing business with SFA.

116. In March 2001, for example, Scientific-Atlanta asked Rogers Cable to accept delivery $5,500,000 to $6,000,000 in transmission equipment three to five months before it was needed, according to a former SFA credit analyst who worked on the Rogers Cable account. Rogers Cable was given discounts and extended payment terms in connection with the transaction and a $20,000 credit to

warehouse the excess equipment. According to the former credit analyst, by October 2001, Rogers Cable still owed over $3,600,000 from this March 2001 sale.

117. Rogers Cable's March 2001 transaction, the former credit analyst commented, was much larger than its normal order. It was clear to him, he said, that Scientific-Atlanta was pulling orders from the next quarter(s) and that senior management was involved in this aggressive channel stuffing. In this particular instance, the former credit analyst explained, the transaction was approved by a national accounts manager.

118. A former customer service representative also noticed the unusually large volume of orders that were pulled in during the last half of the third fiscal quarter of 2001. Program managers in the sales group had told this former employee that they would not meet goals without the big push.

119. This same former employee, familiar with the Cablevision account, also reported that Cablevision had received a credit from Scientific-Atlanta to rent additional warehouse space some time in the last six weeks of the quarter. John Wharton, Vice President of Finance (whom Pat McCabe later replaced) had to approve the credit.

120. Adelphia, one of SFA's three largest accounts in fiscal year 2001 according to the Company's Form 10-K filed August 15, 2001 (the "2001 Form 10-K") and the MSO forecasted to have a 14% market share at the end of 2001 with 14% of the total market (behind AT&T Broadband with 26%, Comcast Corporation with 15% and Time Warner Cable with 14%, according to a November 28, 2000 Business Wire release) also received "special terms" to pull sales and bookings into the third quarter of 2001, according to a former credit analyst. During the third quarter of 2001, SFA agreed to allow Adelphia to pay

once per quarter, rather than the net 30 terms that Scientific-Atlanta traditionally gives its customers. Because Adelphia was such a large account, the former credit analyst explained, Defendant Haislip was personally involved in the Adelphia deals, and Haislip approved the extended payment terms for Adelphia.

121.    Time Warner, SFA's largest account in fiscal year 2001 according to the Company's 2001 Form 10-K, learned of the Adelphia deal during the Class Period, and demanded equal treatment. Scientific-Atlanta agreed. Thus, Time Warner, like Adelphia, the credit analyst noted, began paying only once per quarter in the third fiscal quarter. The credit analyst was familiar with these extended payment terms because the credit department is involved in collection of invoices.

122.    Comcast, which was one of the four important customers specifically mentioned by McDonald in an interview quoted in Telephony, also received extended payment terms of either 60 or 90 days to pull sales into the third quarter, a former SFA credit analyst recalled. Because the terms exceeded 30 days, SFA policy required management approval of the transaction. Payment terms of over 60 days had to be approved specifically by Defendant Haislip. The former credit analyst also noted that Comcast had received unspecified rebates during the Class Period.

123.    Similarly, according to a former Scientific-Atlanta customer service coordinator who worked on the Charter account during the Class Period, Charter took equipment from Scientific-Atlanta before it was needed by the customer, in exchange for special incentives. This former employee personally processed "big dollar credits," amounting to tens of thousands of dollars that were part of the incentives given by Scientific-Atlanta to Charter.

124.   Other Scientific-Atlanta customers also received extended payment terms, a former Scientific-Atlanta credit analyst said, of as long as sixty to ninety days.

125.   This former credit analyst also discovered that Scientific-Atlanta had violated its own revenue recognition policies during the third fiscal quarter which resulted in premature revenue recognition in violation of GAAP, showing the lengths to which Scientific-Atlanta went in order to meet or beat analyst expectations and to shore up its fiscal year 2001 results.

126.   Scientific-Atlanta's revenue recognition policy was set forth in the Company's fiscal year 2000 Form 10-K and by reference in its Forms 10-Q for fiscal 2001:

> Scientific-Atlanta's revenue recognition policies are in compliance with Staff Accounting Bulletin No. 101 "Revenue Recognition in Financial Statements" issued by the Securities and Exchange Commission. Revenue is recognized at the time product is shipped or title passes pursuant to the terms of the agreement with the customer which include a standard right of return, the amount due from the customer is fixed and collectability of the related receivable is reasonably assured.

127.   Scientific-Atlanta's stated (but not followed) policy comports with GAAP, which provides that "revenue should not be recognized until an exchange has occurred, the earnings process is complete, and the collection of the sales price is reasonably assured. These conditions ordinarily are met when products are exchanged for cash or claims to cash, and when the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue." (Accounting And Auditing Enforcement Release No. 812 (September 5, 1996)).

128.   According to Paragraph 84(a) of SFAC No. 5, revenues from manufacturing and selling activities are commonly recognized at time of sale, usually meaning delivery. (Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Financial Statements of Business Enterprises).

129.   Despite the Company's policy, Scientific-Atlanta, the former credit analyst learned, improperly recognized millions of dollars in revenue in the third fiscal quarter of 2001 by invoicing for product the Company had not delivered to the customer.

130.   The credit analyst made this discovery in the course of following up with several customers for whom she was responsible if the customer was late in paying invoices. She reported that customers had told her that they had entered into an agreement with Scientific-Atlanta that they would not have to pay the invoices until they actually received the product. Based on her calls with these customers and investigation, it was her understanding that the purpose of the arrangement was to benefit Scientific-Atlanta, not its customers. The former credit analyst recalled that one or more customers had said they did not expect to have to pay for the product until they needed it.

131.   In each instance when this former Scientific-Atlanta credit analyst investigated a customer's explanation for non-payment, the analyst found that the customer's story was substantiated, often by verbal agreements entered into between the customer and Scientific-Atlanta management.

132.   The former credit analyst brought this practice to the attention of Charlie Kinneman, the director of credit, who, like the analyst, at first thought an error had been made since billing without shipping or an order violated the Company's stated revenue recognition policies. Based on the analyst's

conversations with Kinneman, the analyst believes that Kinneman discussed the aberrant billing practices directly with Defendant Haislip.

133.  The former credit analyst personally discovered millions of dollars in deals in which this practice had occurred during the third quarter. This analyst was only one of seven analysts in the credit department, each of whom had different customers to follow up with concerning unpaid invoices.

134.  The credit analyst even discovered at least one instance, she related, in which the product was shipped but no sale had occurred. The customer there had explained that although the salesperson had quoted the order, no firm order was actually ever placed. When the analyst verified the explanation, the analyst had to credit the invoice so that no payment was due.

135.  The transactions discussed infra in which the customer was billed but no product was delivered resulted in premature revenue recognition by the Company, in violation of its own policies and GAAP. Although there is an exception to the normal revenue recognition rules for "bill and hold" transactions, Scientific-Atlanta's unusual third quarter sales practices do not meet the qualifications of bill and hold transactions and accordingly do not fall within this exception to GAAP's revenue recognition principles.

136.  A "bill and hold" transaction is one whereby, *at the customer's request and for the customer's business purpose*, a customer agrees to purchase goods but the seller retains physical possession until the customer requests shipment to designated locations.  (SEC Exchange Act Release No. 23,507). (Accounting Principles Board Opinion No. 10, paragraph 12).

137.  The GAAP provisions governing the recognition of revenues associated with "bill and hold" transactions were initially promulgated by the SEC

in its Exchange Act Release No. 23,507. This Release (the continuing authority of which has been reaffirmed by the SEC through its issuance of SAB No. 101, discussing "bill and hold" transactions at length) states that in order to be permitted to recognize revenue, a "bill and hold" transaction should meet the following conditions:

a.    The risks of ownership must have passed to the buyer.

b.    The customer must have made a fixed commitment to purchase the goods, preferably reflected in written documentation.

c.    The buyer, not the seller, must request that the transaction be on a "bill and hold" basis and the buyer must have a substantial business purpose for ordering the goods on a "bill and hold" basis.

d.    There must be a fixed schedule for delivery of the goods and the date for delivery must be reasonable and must be consistent with the buyer's business purpose (e.g. storage periods are customary in the industry).

e.    The seller must not have retained any specific performance obligations such that the earning process is not complete.

f.    The ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders.

g.    The ordered goods must be complete and ready for shipment.

138. Because it was the Company and not the customers that requested the invoice be sent before the product was shipped and because the transactions were done for the Company's benefit, not for the customers', the Company violated GAAP by recognizing revenue before the product was delivered. As a result, the

Company's financial statements were not in compliance with GAAP because a material amount of revenue and earnings was generated by sales for which no order had been placed and/or for which no "delivery" to the customer was made.

139. The Company's financial statements were also not in compliance with GAAP because "side" agreements existed which were not properly documented so as to provide reasonable assurances that sales transactions affected by said "side" agreements were properly accounted for in accordance with generally accepted accounting principles. This was in contravention of SAB No. 101 which states:

> The staff is aware that sometimes a customer and seller enter into "side" agreements to a master contract that effectively amend the master contract. Registrants should ensure that appropriate policies, procedures, and internal controls exist and are properly documented so as to provide reasonable assurances that sales transactions, including those affected by side agreements, are properly accounted for in accordance with generally accepted accounting principles and to ensure compliance with Section 13 of the Securities Exchange Act of 1934 (i.e., the Foreign Corrupt Practices Act). Side agreements could include cancellation, termination, or other provisions that affect revenue recognition. The existence of a subsequently executed side agreement may be an indicator that the original agreement was not final and revenue recognition was not appropriate.

140. SFA's financial statements for the third quarter 2001 thus also failed to comply with GAAP because Scientific-Atlanta violated APB Opinion No. 22, paragraph 12 which provides that:

> Disclosure of accounting policies should identify and describe the accounting principles followed by the reporting entity and the methods of applying those principles that materially affect the determination of financial position, changes in financial position, or results of operations. *In general, the disclosure*

> *should encompass important judgments as to appropriateness*
> *of principles relating to recognition of revenue...*

(emphasis supplied)

141. SEC Regulation S-X (17 C.F.R. Section 210.4.01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. Section 210.10-01(a).

142. Rather than discuss its troubles during the third quarter, Defendants took every opportunity to distinguish itself from its competitors, including Motorola (which had issued warnings in early February), by advising the public that it was immune from the otherwise market-wide decrease in demand.

143. For example, on February 13, 2001, Defendants caused Scientific-Atlanta to issue a release over PRNewswire announcing that an Argentine cable supplier had recently begun supplying cable television, telephone and Internet access services over a multimedia broadband network for the 100,000 residents of a popular tourist site, using a wide range of transmission products purchased from Scientific-Atlanta. In support of the transaction, Scientific-Atlanta's Commercial Director for part of Latin America reported "the demand for digital cable is expected to grow dramatically across Latin America."

144. To further the illusion of enduring and increasing demand, the Defendants issued a release on February 15, 2001 over PRNewswire announcing that Scientific-Atlanta had been selected, as part of a consortium led by Nortel

Networks, to provide HFC technology and professional services in support of Germany's Kabel NRW's network upgrade over the next three years.

145.    On February 26, 2001, the Defendants issued a release over PRNewswire announcing that cable industry giant Cox Communications planned to purchase at least 240,000 of Scientific-Atlanta's Explorer 2100 digital interactive set-tops in 2001.

146.    A March 6, 2001 story by Bloomberg News even highlighted the supposed contrast between Scientific-Atlanta and its peers, so carefully engineered by Defendants:

> Scientific-Atlanta, Inc. shares rose 4.6 percent on optimism. The No. 2 U.S. maker of cable-television set-top boxes won't mimic rivals and reduce its 2001 profit forecast, analysts said.
>
> The stock rose $4.64 to $51.12. Scientific-Atlanta is up 57 percent this year while the Standard & Poor's Communication Equipment Index fell 28 percent as some members said 2001 would disappoint.
>
> * * *
>
> A dozen other makers of cable and phone equipment have said 2001 will miss their forecasts because of a slowing U.S. economy, including Motorola, Inc., Scientific-Atlanta's top rival.
>
> * * *
>
> Motorola said last month it may have a first-quarter loss from operations, its first in at least 15 years, because the Schaumberg, Illinois-based company had a slump in orders for chips and cell phones. The company also said sales in the unit that makes set-top boxes will have little if any growth.

46

> Scientific-Atlanta "is standing out as a good story in what
> otherwise is a tough environment," said Deutsche Banc Alex.
> Brown analyst Peter Ausnit, who has a "strong buy" rating on
> the shares.

147. On March 28, 2001, the <u>Atlanta Constitution</u> published an article entitled "Scientific-Atlanta keeps boom going. Worldwide sales, flexibility shelter company from hard times in industry." The article reported that "international sales are responsible for 45 percent of growth in the company's network transmission business," and discussed the five international contracts signed by Scientific-Atlanta since October 2000. In discussing the benefits of overseas sales, Defendant Haislip stated:

> It costs Scientific-Atlanta 5 percent more to sell products and
> services overseas than at home, but the company makes up that
> difference by charging more for products in those less
> competitive markets.

Ultimately, however, the foreign markets did not prove to be such an easy mark. (According to the Company's Forms 10-K for fiscal years ending 1999, 2000 and 2001, the Company's transmission business was on the decline and Scientific-Atlanta's international sales sank from 22% of total sales in fiscal year 1999 to 21% of total sales in fiscal year 2000 to 15% of total sales in 2001.)

148. On March 28, 2001, The <u>Atlanta Constitution</u> ran an article on Scientific-Atlanta that reiterated the same themes the Company had flooded on the market throughout the second and third fiscal quarters. The article noted that Scientific-Atlanta was "selling as many digital set-tops as they can produce." Noting the Company's backlog of 2.1 million units, the article concluded that Scientific-Atlanta had sufficient security in its set-top numbers to take risks in other areas, such as international sales. The article quoted Defendant Haislip's

explanation for Scientific-Atlanta's success: "It is the diversity of our customer base as well as our product line that held us in good stead . . . the set-top boxes have pumped up the company's bottom line ... and ha[ve] driven expansion at the SFA plant in Mexico."

## Defendants Knowingly Concealed Throughout The Third Fiscal Quarter Their Pervasive Channel Stuffing And Declining Demand

149.    Defendants were engaged in highly unusual, unprecedented channel stuffing during SFA's third fiscal quarter. Yet, nowhere in Scientific-Atlanta's many third quarter disclosures or in SEC filings does Scientific-Atlanta talk about or even refer to verbal side agreements, unusually long extended payment terms, the issuance of warehouse credits for customers to take product earlier than needed, or the practices of billing without shipping or without firm orders.

150.    Because Defendants knew that this practice would jeopardize its future results and in light of Defendants' previous statements concerning accelerating demand, its many successes and its forecasts, Defendants had a duty to disclose its channel stuffing practices. Defendants manifestly breached this duty.

151.    Facing the cancellation of orders, loss of major accounts, the failure of AT&T to resume doing business with SFA during the third fiscal quarter, cutbacks in production and Defendants' pervasive channel stuffing, Defendants failed to disclose that Scientific-Atlanta had fallen on hard times and that demand was in fact declining. Defendants had a duty to do so and knowingly breached that duty for fear that they would lose market share, end their streak of record-setting quarters, and suffer a drop in SFA common stock's price and in the Individual

Defendants' own year end compensation, which was based on the Company's performance, as discussed below.

152.  Scientific-Atlanta also failed to disclose that the Company began cutting back production in the third fiscal quarter of 2001.  The cut back, too, is evidence of the Company's knowledge of the declining demand.

## Defendants Knowingly Misrepresented The Reasons For Their Success And For The Increase In The Number Of Set-Tops Shipped In the Third Quarter.

153.  Defendants repeatedly misrepresented during the third quarter the reasons underlying their reported success, as is evidenced in the <u>Atlanta Constitution's</u> March 28, 2001 article based on statements made by Defendant Haislip and the Company.  These representations, that:

- ◆  SFA was "selling as many digital set-tops as they can produce";
- ◆  SFA had "sufficient security in its set-top numbers to take risks in other areas";
- ◆  "It is the diversity of our customer base as well as our product line that held us in good stead…" (quoting Haislip); and
- ◆  "the set-top boxes have pumped up the company's bottom line…" (quoting Haislip)

were all false and known by the Defendants to be false when made.  For the reasons set forth above, the truth, which Defendants knew or with severe recklessness disregarded, is that it was Defendants' pervasive channel stuffing and GAAP violations that had propelled Scientific-Atlanta's numbers and third quarter's "success."  The rampant channel stuffing and GAAP violations also concealed declining demand and allowed SFA to stand out when its competitors

were suffering, a goal Defendants surely had in mind when they orchestrated their fraudulent scheme.

## McDonald Misrepresented Demand and The Reasons For The Company's Third Quarter Performance

154. On April 9, 2001, the Wall Street Transcript published an interview with Defendant McDonald, in which McDonald gave no hint of trouble, touting the strength of demand for Scientific-Atlanta products:

> . . . the rollout (of digital set-tops) has been very successful with consumer demand on the rise.

> \*    \*    \*

> . . . we have continued expansion into these [digital] systems that we won, and we continue to win new systems every quarter. So the rollout of digital, I think, is a key technology and a key measurement for us, and of course, it's driven the economics of our subscriber business.

155. During the interview, in response to the question, "[d]o the analysts expect you to continue your remarkable increase in sales and earnings, or come anywhere near it," McDonald responded:

> I think they're quite bullish on us. Almost all the analysts that track us have a buy recommendation; they are very optimistic about our business, as are we. Not only are we in a very good market, but they see in the bulk of our business areas, subscriber and transmission, that we have significant technological leads. So we've not only produced good financial results, we've produced products and systems that we thing are significantly ahead of our competitors. I think that's validated by all the analysts.

156.  In response to the question, "[r]ecently your operating margins have been very high. *Can you comment on what you've done to bring that about, and what you will continue to be doing in that area," McDonald responded:*

> *We've had tremendous growth in our business . . . our sales are growing so fast that we get continued leverage all the way to the bottom line. The result now, we have double-digit after-tax profit.*

157.  In a report issued the following day, Deutsche Banc Alex. Brown Inc. analyst P. Ausnit reasoned:

> We expect Scientific-Atlanta to offer a much more positive outlook and upbeat preliminary guidance [than Motorola] for 2002.
>
>       *       *       *
>
> We believe that Motorola suffers from three problems that Scientific-Atlanta does not share. First, Motorola is undergoing difficulties throughout its other businesses, which may be distracting.    Second, Motorola's most important customer, AT&T, has deferred additional purchasing.    Third, Motorola offered substantial discounts through a warrant program that has just ended.    The discounts may have pulled demand forward, from 2001 to 2000, potentially lowering future orders. Scientific-Atlanta has not engaged in any comparable warrant incentive sales programs and has neither boosted 2000 demand nor depressed 2001 demand.

158.  Unbeknownst to this analyst, Scientific-Atlanta had in fact boosted demand and depressed future results, and Defendants knew it.

159.  McDonald's April 9 statements were replete with misrepresentations and omissions for the same reasons that Haislip's March 2001 statements to the Atlanta Constitution were false.  McDonald, at the time of the interview, knew or recklessly disregarded that:

- ◆ demand was not "on the rise"
- ◆ the reasons Scientific-Atlanta produced "good financial results" in the third fiscal quarter was that the Company was engaged in unprecedented and undisclosed channel stuffing;
  - ◆ Scientific-Atlanta was not then "in a good market"; and
  - ◆ Scientific-Atlanta's sales were not "growing so fast."

160. In addition, Defendant McDonald failed to disclose that the Company was engaging in pervasive channel stuffing when he was directly asked to "comment on what you've done to bring [to bring your operating margins so high.] What McDonald failed to say, but should have said, was that the margins were so high because the Company was artificially inflating demand, violating GAAP, and, at the same time, cutting back its own production to save costs in light of declining demand.

161. In fact, the third quarter channel stuffing that Defendants orchestrated was so far-reaching that they crippled the Company's performance in the next two quarters. As later reported by SFA in its July 19, 2001 press release announcing its fourth fiscal quarter results, fourth quarter sales fell short of analyst's expectations by $50,000,000; bookings declined by 30% from the third fiscal quarter; and backlog fell 10%. In the Company's first fiscal quarter 2002, the Company reported that sales, bookings and backlog fell even further to $410.1 million, $172.1 million, and $662.9 million, respectively. See Charts attached as composite Exhibit B, which were prepared using Scientific-Atlanta's press releases and/or SEC filings for the periods represented.

**Defendants Misrepresent Their Third Fiscal Quarter 2001 Operating Results**

162.  On April 19, 2001, after the close of trading, the Company issued a press release, which was approved by the Individual Defendants and contained false statements by McDonald, disclosing the Company's results for the third quarter of fiscal 2001, ended March 30, 2001.  The April 19, 2001 press release highlighted the dollar volume and growth of bookings during that quarter:

> *For the quarter ending March 30, 2001, bookings were $712.6 million, an increase of $117.8 million, or 20%, over the prior year's third quarter.*  Sales of $663.7 million rose by $223.0 million, or 51%, from the same period a year ago.  Net earnings for the quarter were $76.2 million, or $0.46 per share.  This represents a $38.1 million, or 100%, improvement over the comparable period of the prior year, when net earnings were $0.23 per share.
>
> Backlog at quarter end was a record $1.0 billion, an increase of $227.8 million from last year and up $48.9 million from last quarter.
>
> Scientific-Atlanta's balance sheet remains strong, with cash and short-term investments of $723.8 million at the end of the third quarter.  This represents an increase of $200.7 million, or 38%, over the fiscal year-end balance at June 30, 2000 and an increase of $145.9 million, or 25%, from last quarter's balance. The Company continues to have no significant debt.

(Emphasis supplied.)

163.  In addition to the positive statements concerning the third quarter results, Scientific-Atlanta drew particular attention to its increases in sales during the third quarter:

> Sales for the first nine months of fiscal year 2001 were $1.9 billion, an increase of 63%, versus $1.2 billion in the

comparable period of the prior year. Net earnings for the nine-month period were $260.3 million, or $1.55 per share, an improvement of 169% compared to $96.7 million, or $0.59 per share in the comparable period of the prior year. Excluding one-time events, net earnings for the nine-month period were $210.9 million, or $1.26 per share, an increase of 127% compared to $92.7 million, or $0.57 per share in the first nine months of the prior year.

164. Scientific-Atlanta's announced earnings beat consensus estimates by 9.5%.

165. Defendants' third fiscal quarter 2001 report of sales, earnings, number of set-tops shipped, bookings, backlog, accounts receivable and other financial results of operation were each false and misleading, and Defendants knew it. Because Defendants had prematurely recognized revenue in the third fiscal quarter and because Defendants had engaged in extensive channel stuffing which made invoices unreliable (i.e., cannot tell when and whether the invoice will actually become due and payable), Defendants' financial statements were prepared in violation of GAAP. For this reason, Defendants' representations that its revenue recognition policy comported with GAAP was also knowingly false and misleading. Defendants' two-for-one replacement policy for defective parts also surely pumped up Defendants' number of set-tops shipped, thus making this key measurement unreliable as well.

166. Defendants' failure to disclose that they were engaged in extensive channel stuffing and GAAP violations, notwithstanding their stated policies on revenue recognition, is also actionable. Similarly, Defendants had a duty to disclose by this time that demand was in fact declining and that they were cutting back production.

**Defendants Knowingly Misrepresented The Reasons For The Company's
Third Quarter Results**

167.   Defendants, through CEO McDonald, also misrepresented the reasons
for the Company's purported third quarter results in the April 19th press release.
Commenting on the current state of Scientific-Atlanta's business, identifying
certain market weaknesses, but emphasizing Scientific-Atlanta's success in
increasing digital set-top box sales:

> *Our success this quarter reflects the priorities of our North
> American customers.*   Digital services continue to be very
> popular with consumers and economically attractive to the
> cable companies.   *The resulting demand for our Explorer®
> digital interactive set-tops,* coupled with international
> transmission growth, *has been able to compensate for any
> weakness in the domestic transmission market.*

(Emphasis supplied)

168.   Defendants also stated in this press release that "the Company's
transmission product performed very well in the third quarter despite softness in
the domestic market, posting only a slight decline in sales compared to the prior
year."

169.   McDonald emphasized the positive growth Scientific-Atlanta would
experience in the coming quarters:

> The keys to our ongoing success are our diversity and balance:
> we are both an end-to-end supplier of transmission
> infrastructure equipment, and a leading provider of subscriber
> products.  Our Transmission products are balanced between RF
> electronics and optoelectronics.   *Our Subscriber products
> provide a fully integrated network solution including both
> hardware and software.   At this time of transition in the
> domestic cable market, the diversity of our geographical*

> *presence enables us to seek new sources of growth. We believe*
> *that our balance and diversity, coupled with favorable customer*
> *economics, should enable our growth in the quarters ahead.*

(Emphasis supplied.)

170.  On April 19, 2001, Scientific-Atlanta held an earnings conference call for analysts and institutional investors.  In a report issued the following day, analyst Truc Do, of Lazard Freres & Co. LLC, summarized the "Highlights" of Scientific-Atlanta's Earnings Conference Call as follows:

- Revenues were $664 million, up 50.5% year over year, driven by strong growth in set-top sales.

- EPS were $0.46, up 100% y/y [year-over-year], exceeding our estimate of $0.42, driven by higher revenues and better gross margins.

- Book-to-bill ratio was 1.07. Bookings were $712.6 million, up 20% y/y.

- Digital set-top backlog increased to 2.2 million units from 2.1 million in F2Q01.

- Gross margin for F3Q01 was 31.3% versus 30.8% in F2Q01.

- Production capacity of digital set-tops reached 1.5 million units per quarter in the March quarter.

- DSO [days sales outstanding] was 55 days, down from 63 days in F2Q01.

171.  When trading resumed on April 20, 2001, Scientific-Atlanta's stock price rose to $64, closing at $63.05 per share, up $4.34 from the previous day's closing price.

172. In response to Defendants' April 19, 2001 guidance, on April 20, 2001, Analyst Lawrence M. Harris, of Josephthal & Co. Inc., rated Scientific-Atlanta stock a "Strong Buy" and advised the market that:

> The Company's March quarter earnings per share of $0.46 beat our estimate of $0.43 and the consensus of $0.42. The company achieved this despite a soft market for cable transmission equipment. . . .
>
> We are raising our 2001 EPS estimate to $1.72, from $1.68.
>
> Scientific-Atlanta remains our number-one stock selection based on the company's earnings growth, cash flow and ROI performance, strong near-term revenue visibility, and the fact that the company is growing its market share versus its closest competitors.
>
> \*      \*      \*
>
> Demand for Scientific-Atlanta's products, especially set-tops, remains robust. . . .
>
> Scientific-Atlanta's backlog grew to a record $1.0 billion in the quarter. The book-to-bill ration was 1.07, the eighth consecutive quarter above one. Digital set-top backlog is now up to 2.2 million units, up from 2.1 million last quarter. Scientific-Atlanta continues to have about five months of production in backlog, which gives the company excellent revenue visibility into both the June and September quarters.

173. Similarly, Wachovia Securities, Inc. analyst George Hunt increased his estimates for the Company's fiscal year 2001 performance and rated Scientific-Atlanta stock a "Strong Buy." In his April 20, 2001 report, Hunt focused on the Company's reported backlog and concluded:

> Results exceeded consensus expectations due to the strong demand for digital cable set-top boxes, which more than compensated for the shortfall in transmission numbers.

174.    Hunt praised the Company's improved gross and operating margins, attributing credit for the successful quarter to the individual Defendants, particularly Haislip:

> Jim McDonald, the company's CEO, is often cited as an industry visionary, and rightfully so. Credit here, however, should go to the excellent job done by the company's CFO, Wally Haislip. Increased digital set-top box manufacturing efficiencies gained on volume increases and sound procurement procedures were the primary drivers to margins expanding.

175.    Robinson-Humphrey analyst Greg Mesniaeff issued a similar April 20, 2001 report in which he rated Scientific-Atlanta a "buy" and raised his revenue and earnings estimates for FY01 and FY02. Mesniaeff then discussed what he perceived to be "low" inventory levels of the Company's customers, based upon his knowledge of Scientific-Atlanta's ability to monitor its customers' inventory levels:

> Although customer inventories of set-tops are not disclosed, we believe levels remain low based on installation trends and customer relationships. . . Also, Scientific-Atlanta's services and support network where SFA is actually connected to the cable operator's digital subscriber systems, allows SFA to keep close tabs on set-top channels and helps avoid significant inventory builds at major customers.

176.    Mesniaeff concluded his report by announcing his view of Scientific-Atlanta as "the bellwether cable equipment supplier, upholding that position with continued robust subscriber sales momentum and market share gains in the transmission arena."

177. On April 20, 2001, McDonald appeared on the CNBC Newscast Squawk Box. During the interview, McDonald touted the demand for Scientific-Atlanta's products, stating, for example,

> *So our business is booming because it's a good economic situation for our customers.*
>
> \*        \*        \*
>
> And since we've started shipping the digital set-tops in volume, we've picked up market share every quarter we've shipped. . . . And as we go forward, we think that'll continue to happen because we have a system that will offer up the whole range of interactive applications.

178. In the response to the question of whether Scientific-Atlanta was on track for 75 percent growth in 2001 profits, McDonald stated:

> . . . we've had 10 outstanding quarters in a row. The last six have been sequential records. You know, this quarter our sales were up 58 percent. *We've had 100 percent improvement in sales and generated more than 160 million from operations in cash flow, so this thing's been moving along quite well.*

(Emphasis added.)

179. McDonald repeated these sentiments in a Bloomberg interview conducted the afternoon of April 20, 2001, during which he stated:

> We've had 10 very solid quarters in a row. *In fact, the last six have been sequential records. So our business has been running fine for the last couple of years.*
>
> \*        \*        \*
>
> [W]e've given guidance to the street in the fourth quarter. . . .We think we will have a similar quarter next quarter.
>
> \*        \*        \*
>
> [W]e would expect to continue to have double digit growth clearly [in 2002].

(Emphasis added.)

180.  In each of the italicized statements above, Defendants misrepresented the reasons for the Company's apparent success.

181.  Contrary to Defendants' statements, Scientific-Atlanta was not, for example, "moving along quite well" as McDonald assured the public. Nor had the business been "running fine." Moreover, because it was the Defendants' pervasive channel stuffing and their GAAP violations that produced the third quarter results, it was not, as McDonald stated, "the resulting demand for our Explorer digital interactive set-tops ... [that] has been able to compensate for any weakness in the domestic transmission market." (This statement is false, even if the international sales are considered, since international sales were also declining.)

182.  Similarly, the Company's alleged "success" this quarter did not, as McDonald claimed, "reflect the priorities of [its] North American customers." The results reflect the Defendants' inappropriate and undisclosed channel stuffing practices and GAAP violations.

183.  Defendants' forecasts of future growth and continued comparable success were also knowingly false when made or were made with severe recklessness. As a result of reports available to management and their own conduct, Defendants knew or were reckless in not knowing that future results were being robbed for the benefit of the third fiscal quarter 2001.

184.  Even a former Scientific-Atlanta sales person commented that the "handwriting was on the wall" by April 2001 that Scientific-Atlanta would not be able to reach future sales goals.

**Defendants Reaped Over $50,000,000 As A Result Of Insider Trading After The False And Misleading April 19 Statements Are Issued.**

185.   While in possession of this adverse, undisclosed information, between April 24, 2001 and April 30, 2001, McDonald exercised options for 715,000 shares of Scientific-Atlanta common stock priced between $10.81 and $11.88 per share, totaling $8,097,300, and sold the shares at inflated prices ranging from $55 to $58.72 per share, for a total of approximately $41,170,588.

186.   On May 2, 2001, Haislip acquired 53,000 shares of Scientific-Atlanta common stock by exercising options at $11.69 to $23.31 per share, a total cost of $993,785 and then promptly sold these 53,000 shares for $59.75 each, generating proceeds of $3,166,750.

187.   On May 2, 2001, McDonald acquired 100,000 shares of Scientific-Atlanta common stock by exercising options at $11.88 per share, and sold them for $59.95 each, generating proceeds of $4,807,000.

**Defendants' May 9th Press Release and its May 11th Form 10-Q For The Third Fiscal Quarter 2001 Perpetuated The Same Misrepresentations Concerning Demand, Performance And Financial Results As Did Defendants' Third Quarter Misrepresentations.**

188.   On May 9, 2001, Scientific-Atlanta issued a release over PRNewswire promoting the unveiling of the Company's Explorer 4100 and 3100 HD Set-Tops. The release quoted Dr. H. Allen Ecker, President of Scientific-Atlanta's Subscriber Networks, speaking during the Cable-Tec Expo, "our Explorer 3100 HD digital set-top is designed to meet *growing consumer demand* for high definition television." (emphasis supplied)

189.  On May 11, 2001, Scientific-Atlanta filed its quarterly report on Form 10-Q for the third quarter of fiscal 2001 with the SEC (the "10-Q"). Haislip signed and McDonald approved the Form 10-Q.

190.  The third quarter Form 10-Q reiterated the relevant financial information from the Company's April 19, 2001 press release and offered additional statements regarding the strong growth that Scientific-Atlanta was experiencing in its "subscriber business," or sales of "set-top boxes" and related products to cable television providers:

> Sales for the quarter ended March 30, 2001 were $663.7 million, up 51 percent over the prior year, *driven by the rapid acceleration in the deployment of digital interactive systems by our customers. A 119 percent increase year-over-year in sales of subscriber related products more than offset a 4 percent decline in sales of transmission related products. We shipped over 1.4 million digital interactive set-tops during the quarter as compared to 0.5 million in the prior year.* Sales of transmission opto-electronic and analog headend products increased by 49 percent and 18 percent year-over-year, respectively, but were more than offset by declines in sales in other product areas, primarily RF products. International sales in the quarter ended March 30, 2001 decreased 7 percent from the prior year.
>
> The increase in shipment year-over-year *is a reflection of the strong demand for our digital set-top products and our increase in manufacturing capacity for such products.*

(Emphasis supplied)

191.  The Company also boasted its in its third quarter Form 10-Q that

> sales for the nine months ended March 30, 2001 were $1.9 billion, up 63 percent over the prior year, driven by the rapid acceleration in the deployment of digital interactive systems by our customers. We shipped over 3.5 million digital interactive

> set-tops during the nine months ended March 30, 2001 versus
> 1.0 million in the same period a year ago. The increase in
> shipments year-over-year *is a reflection of the strong demand*
> *for our digital set-top products and our increase in*
> *manufacturing capacity for such products.*

(Emphasis supplied)

192. The Form 10-Q further stated that: "Sales of products to AT&T, which merged with MediaOne during fiscal year 2000, and its affiliates were 10 percent of our total sales in fiscal year 2000, were 16 percent of total sales in fiscal year 1999, and 12 percent of total sales in 1998 ... *The loss of business from a significant MSO could have a material adverse effect on our business.*" (emphasis supplied)

193. Defendants also indicated that Defendants were now able to keep up with the continually increasing product demand, by announcing:

> During the third quarter of fiscal year 2001, we increased
> production capacity of the Explorer digital interactive set-tops
> to 1.5 million set-tops per quarter.

194. The Defendants' statements italicized above in paragraphs 188-190 were materially false and misleading because Defendants actively concealed the declining demand through their undisclosed pervasive channel stuffing and improper sales and accounting practices, as a result of which Defendants' financial statements violated both Company policy and GAAP and misrepresented the Defendants' true results of operations. Defendants also, again, misrepresented that the loss of a major MSO could materially affect its business adversely when the loss had already occurred.

195.  For the same reasons, Defendants' representation in its May 9th press release that demand was growing is contradicted by Defendants' internal reports and own actions.

**Defendants Failed to Correct Their Material Misstatements and Omissions Throughout the Fourth Fiscal Quarter of 2001**

196.  Scientific-Atlanta's undisclosed push during the third fiscal quarter paid off.  On May 20, 2001, the Atlanta Journal-Constitution named Scientific-Atlanta Georgia's fourth highest performing company, based on revenue, return on equity, year-over-year revenue change, change in profit margin and return on investment.

197.  In the fourth quarter, however, Scientific-Atlanta still had a need to stuff the channels, notwithstanding the allegedly increasing demand for its products.  According to a former customer program manager whose job entailed assisting sales managers, the sales group and supporting staff knew that Scientific-Atlanta was unlikely to meet projected sales goals in the fourth quarter.

198.  The former customer program manager explained that the Company always reviewed upcoming orders but, by the fourth quarter, was reviewing upcoming orders almost weekly.  When the numbers weren't at the level needed, the employee said, Pat McCabe, Vice President of Finance, called the program managers and sales staff and instructed them to pull sales in early.  Directives to move sales into earlier quarters to meet goals even came by email.

199.  In the fourth fiscal quarter 2001, Mr. McCabe gave the directive to pull sales in early, and Scientific-Atlanta's sales staff acted on this instruction.

200.  For example, according to a Comcast employee involved in monitoring purchase orders for Comcast who was privy to a conversation with a

Comcast officer concerning Scientific-Atlanta, SFA asked Comcast in May or June of 2001 to purchase converter boxes much earlier than Comcast had planned to in its annual budget. (Comcast gave Scientific-Atlanta a forecast at the beginning of each year of what Comcast planned to buy from Scientific-Atlanta during the year, including exactly what products each Comcast division planned to buy and when.) Comcast agreed to take the shipment, which consisted of "several months" of inventory, this employee believed. *Payment for the product, however, was not due until December 2001.*

201. A former Scientific-Atlanta employee was also aware of this unusual transaction as well. The former employee was responsible for monitoring sales and invoices to Comcast. According to the former SFA employee, Comcast had received special incentives to take an additional $3,000,000 set-tops in June of 2001. The deal included extended terms so that the customer would not have to pay the invoice until six months after it went out. Although the merchandise was shipped in June to a Comcast warehouse and thus included in fiscal year and fourth quarter 2001 numbers, Comcast did not have to pay for the product until December 2001, six months later. This deal, the employee noted, was approved by Defendant Haislip. In fact, Mr. McCabe had delivered a signed copy of the contract to the former credit analyst before the SFA salesperson responsible for Comcast had brought the contract to the analyst. This was highly unusual. Ordinarily, the former credit analyst explained, he would receive the contract and learn about the deal from the salesperson responsible for the account.

202. The Defendants gave no indication of Scientific-Atlanta's irregular sales and accounting practices during the week of May 21, 2001 when Josephthal

65

& Co. Inc. and institutional investors hosted a series of meetings with one of Scientific-Atlanta's senior marketing executives.

203. After participating in the meetings, in reliance upon the "robust" demand alleged by Scientific-Atlanta, as well as the Company's backlog, purportedly increasing profitability and strong cash flow, analyst Lawrence M. Harris reported that he "remain[ed] very positive on the company's outlook" and continued his "Strong Buy" rating for the Company's stock.

204. On June 4, 2001, Bob McIntyre, Scientific-Atlanta's Chief Technology Officer, gave a presentation on behalf of the Company at the DB Media Conference in New York, NY. According to Deutsche Banc Alex. Brown Inc. analyst P. Ausnit, Scientific-Atlanta made the following three points at the Conference:

- First, total US cable expenditures may plateau and then decline over the next three years, but the mix is clearly shifting from construction (laying cable) to deploying equipment (primarily digital set top boxes and cable modems), favoring Scientific-Atlanta.

- Second, Scientific-Atlanta's international cable customers are capital constrained and in need of substantial upgrades if they are to compete with digital satellite services, which is comparable to the position of the US cable industry several years ago. We believe Scientific-Atlanta's international growth over the next three years will compare favorably with its US performance over the last 3 years.

- Third, Scientific-Atlanta has assembled complete interactive client-server cable network technologies, which took 7 years of research and development and 4 large field trials costing $500 million. This investment represents a tremendous competitive advantage and cannot be replicated without comparable time and investment. We are unaware of any

competitor making a comparable investment in cable technology.

205. As a result of these statements, Ausnit concluded, "these market trends and investments position Scientific-Atlanta for continuing double digit revenue and profit growth. In addition, we see a large US digital set top box 'backfill opportunity' opening for the company." (Ausnit/Duetsche Banc Alex. Brown Inc. report dated June 5, 2001).

206. On June 4, 2001, the periodical Telephony published an article detailing an interview with McDonald. McDonald minimized the effect of the loss of sales to AT&T, claiming that Scientific-Atlanta was not and had never been joined at the hip with AT&T, which was suffering its own mini-slump. McDonald also touted the growing demand for digital video. Given Scientific-Atlanta's performance and unaware of what Scientific-Atlanta had done in the third fiscal quarter to achieve it, the author said:

> You can't really blame McDonald if he smiles when he ponders his winnings. After all, he laid some pretty hefty bets to reap that pile of success.

> McDonald's company, Scientific-Atlanta, took a longer more precarious route to playing in the digital cable TV market. While archrival General Instrument (now a part of Motorola) profitably rolled out millions of digital boxes for Prime customer Tele-Communications Inc. (now AT&T Broadband), S-A hunkered down, following a more complicated, longer term route with Time Warner Cable (now AOL Time Warner).

> [SFA's] plan was simple in design: Make interactivity an integral component of digital cable.

> [N]ow the market is changing. More channels don't necessarily equate to more customers but more features might help [increase the number of customers].

> Things continue to look up in the money area too. S-A has posted 10 consecutive record quarters and is flourishing in a weak economy. It is, according to UBS Warburg, a "digital supertanker."

207. The article also reported McDonald as saying, "our customers, in general, are doing quite well. If you look at Time Warner Cable, Cox, Comcast, Rogers, they're all doing quite well. *As a result of them doing quite well, we've done quite well.*"

208. On June 7, 2001, the Company issued a <u>PRNewswire</u> release announcing its plans to "showcase its interactive strategy at work" at the NCTA Cable 2001 in Chicago during the week of June 11 through June 15, 2001. McDonald was scheduled to "outline the company's set-top strategy and interactive vision: during the June 11, 2001 panel discussion." The Company invited members of the press and analysts to attend its golden anniversary celebration on June 20, 2001, as well as to meet one-on-one with Scientific-Atlanta representatives at the trade show. In addition, the Company scheduled a June 12, 2001 meeting with analysts.

209. On June 7, 2001, the Company also announced over the <u>PRNewswire</u> that Telwest Communications of the United Kingdom had selected Scientific-Atlanta Western Europe, a subsidiary of Scientific-Atlanta, to provide a minimum of 200,000 set-tops through 2003 along with 25,000 cable modems, which, along with other sales, was deemed favorable news by Lawrence M. Harris. In a June 8, 2001 Josephthal & Co. Inc. report, Harris reiterated his "Strong Buy" rating for Scientific-Atlanta stock and declared Scientific-Atlanta to be his "favorite choice in the cable equipment sector."

210.  On June 11, 2001, the Company announced over <u>PRNewswire</u> that Horizon Telecom, a Brazilian cable operator, had expanded its contract with Scientific-Atlanta to include 22 additional cities and called for Scientific-Atlanta to provide the key elements of Horizon's network build, as part of a five-year plan including 37 cities and 1.6 million homes.

211.  On June 11, 2001, the Company announced at the NCTA Cable 2001 trade show and over PRNewswire that Comcast had selected Scientific-Atlanta to support its large scale commercial video-on-demand ("VOD") deployment. According to Scientific-Atlanta, Comcast planned to have 500,000 cable subs with access to VOD by year-end.

212.  These announcements, along with Scientific-Atlanta's presentation at the NCTA trade show, were looked upon with great favor by analysts. At least five analysts, including those from Kaufman Bros., Janco Partners, Inc., Josephthal & Co. Inc., Wachovia Securities, Inc. reported favorably on Scientific-Atlanta's condition. They based their perception of Company strength on factors including but not limited to the new contracts, increased production capacity, and the safety net provided by the purported backlog reported in March 2001.

213.  For example, after participating in the Company's June 12, 2001 meeting with analysts, Lawrence M. Harris of Josephthal & Co. Inc. concluded that "[a]t a time when many companies have been reporting declining asset turnover, Scientific-Atlanta's performance has been stellar."

214.  Similarly, with respect to demand issues, Wachovia Securities, Inc. analyst George H. Hunt reported, after participating in the June 12, 2001 meeting, "there currently is no hard evidence that take-up rates for digital cable are in a

downward trend. We are therefore maintaining our current estimates and Strong Buy rating on Scientific-Atlanta stock."

215. In his June 14, 2001 report detailing Scientific-Atlanta's June 12, 2001 analyst meeting, George Hunt, of Wachovia Securities, Inc., addressed the issue of seasonality. According to Hunt, any seasonal effects would be seen in March, but not in June.

> Several reasons could explain the [March] quarterly decline including seasonaility, cable MSOs let users who do not pay their bills ride free during the holiday season and then disconnect them in early January, and many satellite TV promotions expired in December easing competitive pressure in some market. We are monitoring this statistic carefully and will be concerned if the digital cable rate of growth slows again in the June quarter.

216. In his June 18, 2001 report on the June 12, 2001 meeting, analyst James W. Reynolds of Wells Fargo Van Kasper, identified Scientific-Atlanta as a "major buying opportunity." Reynolds reported the following:

> We attended the National Cable Television Association trade show last week in Chicago and did not find any direct evidence of a slowdown of cable build-outs by the leading MSOs. Scientific-Atlanta held an analyst meeting at the show but did not change its guidance. We expect that a change in guidance, if any most likely come on the year-end EPS conference call, which should be in the third week of July.
>
> We continue to believe that cable operators need to upgrade to interactive services or face the risk of losing their top-paying customers to satellite service providers, such as DIRECTV. These cable operators are experiencing improving EBITDA margins and growth in subscriber revenues. Furthermore, historically, cable television revenues have been fairly immune to economic slowdowns.

217.  The June 18, 2001 issue of <u>Business Week</u> placed Scientific-Atlanta third on its "Info Tech 100" list, identifying Scientific-Atlanta as "one of a dozen or so midsize companies on the list that struck gold by conquering a niche market."

218.  None of these analysts, however, was aware of the Company's pervasive channel stuffing or other improper sales and accounting practices because Scientific-Atlanta did not disclose them, choosing instead to flood the market with positive statements about record breaking performances in key measurements such as sales, earnings, bookings, backlog and number of set-tops shipped.

219.  Defendants' failure to correct the market's perception (created by SFA's misrepresentations) that demand for Scientific-Atlanta's products was still growing was a knowing and material omission, in the face of Defendants' cutbacks in production and knowledge of their extensive and continuing channel stuffing practices.  Indeed, McDonald perpetuated the myth that it was demand from SFA's customers that was propelling Scientific-Atlanta to the record numbers which it had achieved when he said that Scientific-Atlanta was doing well because its customers were.  In point of fact, many of its major MSOs had growing inventories and a decreasing rate of growth in their deployment of digital set-tops.  Although Scientific-Atlanta claims later in its August 16, 2001 press release that it had limited visibility into its customer's inventories, a former credit analyst said that the salespersons for the large customers spent a lot of time at the major MSOs and, to her knowledge, were familiar with their inventory needs.

**Scientific-Atlanta Reports Its Alleged "Excellent" Year End Results**

220.  As a result of Defendants' continued channel stuffing and nondisclosures throughout the Class Period, fiscal year 2001 ended with record

sales of $2.5 Billion and net earnings of $337.0 million. In fact, Defendants caused the Company to issue a pres release on July 19, 2001 in which Scientific-Atlanta reported "An Excellent Year" and record net earnings of $1 per share for fiscal year 2001.

**The Truth Begins to Emerge**

221. Despite the Defendants' report of its "excellent" year-end results, Defendants were forced to admit in their July 19 earnings release that it had failed to meet its revenue forecasts and analysts' expectations for fiscal year 2001, due to decreased demand for its products, and that it was reducing its earnings forecasts for the first quarter of 2002.

222. In the July 19, 2001 release, the Company admitted that demand was not accelerating, as Defendants has continually misrepresented to the public, but, in fact the demand was declining, stating:

> Sales of Transmission products declined 18% to $166.8 million, and bookings of Transmission products fell by 45% to $111.8 million. *Growing international demand for Transmission products was not sufficient to offset the slowing of the domestic market."*

(emphasis supplied)

223. McDonald himself admitted that, in direct contravention to the numerous Class Period prior statements identified herein, domestic demand for *all* of Scientific-Atlanta's products had declined:

> The *current flattening of demand for our Subscriber [set-top boxes] and Transmission products notwithstanding,* we expect that the upcoming mass deployment of interactive applications will create new opportunities for our customers and, as a result, new opportunities for the growth of Scientific-Atlanta.

(emphasis supplied).

224. Defendants announced bookings of $507 million in the fourth quarter 2001, which declined by $132.3 million, or 21 percent from the fourth-quarter 2000. Significantly, this number also represented a decrease of over $205 million from bookings of $712.6 million in the third-quarter of 2001. The Company's 2001 Form 10-K, filed with the SEC on August 16, 2001, reported total fiscal year 2001 transmission sales of only $714.1 million, materially less than Haislip's earlier forecast of $735 to $750 million. Defendants' statements regarding the continuing strength of Scientific-Atlanta's business through the fourth-quarter were materially false and misleading. That fact was demonstrated most notably by the 28.8 percent decline in bookings between the third and fourth quarters of fiscal year 2001.

225. In an attempt to explain away the enormous and allegedly unexpected decline in bookings, the Company stated:

> The decline in bookings is attributable to the uncertain economic climate and reduced digital marketing efforts by cable operators during the slower summer vacation period, in addition to customer inventory levels and the slower than expected deployment of interactive applications.

226. The Company's past financial results, however, do not support Defendants' explanation, which was obviously designed to cover up the effect of its channel stuffing that had led to decreased sales, bookings and backlog in the fourth quarter. In the third quarter of fiscal 2000, the Company reported bookings of $594.9 million. Bookings for the fourth-quarter of fiscal 2000 increased substantially over that level to $639.3 million. The results for fiscal 2000 indicate that any seasonal effect on fourth quarter bookings is likely to result in an increase,

not a decrease in bookings, demonstrating that the decrease reported for the fourth quarter of 2001 was not caused by any seasonal factors.

227. In fact, according to the Company's Forms 10-Q and 10-K for the four years preceding the end of the Class Period, the Company's fourth quarter was always one of its strongest—if not the strongest—quarter. The fourth quarter decline in 2001 was the first time in five years that Scientific-Atlanta experienced a decline in fourth quarter bookings. The decline thus simply cannot be attributed to seasonality, as shown below:



228. Moreover, the conditions which had previously plagued Scientific-Atlanta's competitors, i.e., loss of sales to AT&T, inflated customer inventory levels and declining demand, which Defendants stated would not affect them, are among the reasons cited for a massive shortfall in bookings.

229. On August 16, 2001, Defendants caused the Company to file its fiscal 2001 Form 10-K with the SEC. Contrary to the Company's November 24, 2000, press release, in which it downplayed the impact of the loss of AT&T sales ("*Any*

*slowdown in shipments to AT&T would only impact 1% - 2% of Scientific-Atlanta's anticipated total Company sales this quarter")*, the Company ultimately admitted the magnitude of the loss:

> Sales of products to AT&T and its affiliates were 2 percent, 10 percent and 16 percent of our total sales in fiscal years 2001, 2000 and 1999, respectively.

230.  Overall, the decline in sales to AT&T actually impacted almost 5% of Scientific-Atlanta's fiscal year 2001 total sales.  Had AT&T continued to purchase $170,000,000 of product from Scientific-Atlanta (assuming no growth), then AT&T would have contributed an additional $120,000,000 in revenue in fiscal year 2001.  The total sales SFA achieved without this $120,000,000 was five percent less than it would have been had AT&T continued to purchase product from SFA in at least an amount equal to its level of purchases the previous fiscal year.

231.  In the July 19, 2001 Scientific-Atlanta conference call following the earnings release, Defendant Haislip admitted that the estimated revenue of $480 million and per-share earnings of 28 cents to 30 cents for the quarter were lower than the Company had expected.  He further revealed that Scientific-Atlanta had more than 150,000 unsold set-top boxes in its inventory.

232.  Scientific-Atlanta's inventory numbers are telling.  At the end of the third fiscal quarter 2001, the Company reported inventory of $227.5 million.  At the end of the fourth quarter (fiscal year-end 2001), the Company reported inventory of $201.76 million.  Thus, Scientific-Atlanta's inventory materially decreased over $25.7 million in the fourth quarter, although sales, bookings, and backlog also decreased during fiscal fourth quarter 2001.  The decrease in inventory shows that Defendants scaled back production in the fourth quarter,

anticipating well before their disclosure, that demand was materially declining. If Defendants expected demand in the fourth quarter to continue accelerating, as McDonald indicated in the Company's April 19, 2001 press release, then the Company should have reported an increase in inventory at the end of the fourth fiscal quarter. As Defendants explained on the July 19, 2001 conference call regarding fourth quarter and fiscal year 2001 results, most of the Company's sales were made in the last part of the quarter. Therefore, if Defendants truly had an "unexpected" shortfall, Scientific-Atlanta should have had *more inventory* than it had at the end of the third quarter. The *decrease in inventory* in the fourth quarter demonstrates that Defendants knew that their pervasive third quarter channel stuffing was likely to and in fact had caused a decline in fourth quarter sales, bookings, and backlog. Defendants obviously scaled back production to save money well before Scientific-Atlanta admitted to the market that demand had declined.

233.    On August 16, 2001, Defendants issued a press release in which they withdrew their previous guidance for the first quarter and fiscal year 2002, citing, in part, the declining demand reported by cable operators. Reacting to this disclosure, a commentator wrote the next day in an article entitled "Scientific-Atlanta Dips on Sales, Guidance Pullback", that Scientific-Atlanta had "stunned Wall Street by saying sales growth has essentially stalled for set-top boxes."

234.    As a result of Scientific-Atlanta's July 19, 2001 disclosures, Scientific-Atlanta's stock was punished severely. The stock fell 35 percent, down $12.28 per share to close at $22.80, in very heavy trading, causing damages to Lead Plaintiffs and the Class.

235.   Commenting on the drastic stock decline, on or about July 20, 2001, Jason Ader of Thomas Weisel Partners stated:

> Our lingering fear with SFA's business has been the potential for slowing growth in *fiscal year 2002* as North American digital (box) shipments hit the flat part of the growth curve.
>
> What we didn't anticipate was how quickly and how sharply the growth would fall off.

(emphasis supplied).

236.   As a result of the August 16th announcement, the price of Scientific-Atlanta's common stock plummeted, dropping over 15% from its August 16th close of $25.01 per share to close at $21.24 per share on August 17, 2001, causing a market capitalization loss on this day alone of approximately $589,251,000.  Over 10,863,000 shares of SFA common stock traded on August 17th, which is more than four times the stock's average trading volume.

**Further Evidence Of The Extent Of Defendants' Channel Stuffing Practices**

237.   On September 28, 2001, the Company filed its Form 10-Q for the first fiscal quarter 2002 with the SEC.  Signed by Haislip and approved by McDonald, the Form 10-Q revealed the Company's inevitable decline brought about by the channel stuffing and other practices alleged herein.  Sales declined to $410,097,000, bookings shrunk to $172,100,000-- less than a third of the bookings reported in the previous quarter, and backlog dropped nearly a third from the previous quarter, to $662,900.

**Additional Scienter Allegations**

238.   Since the filing of the initial complaints in this action, Scientific-Atlanta has laid off many employees.   In an attempt to conceal their wrongdoing, Scientific-Atlanta had numerous director level former employees execute

confidentiality agreements. In fact, every former director level employee Lead Plaintiffs called indicated they had a confidentiality agreement that precluded them from talking with us voluntarily. One former director explained that the agreement he had signed precluded him from assisting in the litigation.

**Scientific-Atlanta Ends Fiscal Year 2001 with Record Results; Individual Defendants Reap Financial Rewards as a Result**

239. Notwithstanding their conduct and the Company's resort to improper sales and disclosure practices, the Individual Defendants reaped millions of dollars in bonuses in both cash and stock compensation as a direct result of the Company's fiscal year 2001 performance.

240. According to the Company's 2001 Proxy Statement, McDonald received awards from the Senior Officer Annual Incentive Plan and the Annual Incentive Plan ("AIP"). His award determination for the Senior Officer Annual Incentive Plan was based on whether McDonald satisfied the quantitative objectives established by the Human Resources and Compensation Committee ("HRCC") earlier in the fiscal year. As a result of Scientific-Atlanta's fiscal year 2001 results, McDonald received a bonus of $645,800. Furthermore, he received additional incentive pay of $450,800 under the AIP, based on his performance against qualitative objectives, such as the Company's having achieved another successive year of record financial performance by Scientific-Atlanta: bookings, sales, net income, earnings per share, and cash/short-term investments reached all time records. Also during fiscal year 2001, McDonald was granted stock options of 340,000 shares. As a result of fiscal year 2001's performance, restrictions lapsed on at least 46,982 performance-based restricted shares granted to McDonald under a long-term incentive plan. Defendant McDonald converted these shares

into over $2.7 million in cash. Also, 90,000 options the Company granted to McDonald vested immediately, based upon performance in fiscal year 2001, and otherwise would have vested after 6 years.

241. Haislip's AIP award, according to the Company's 2001 Proxy Statement, was also based on the quantitative performance of Scientific-Atlanta, as measured by earnings per share, gross margin, revenue and working capital, and an assessment of his individual performance against personal qualitative objectives. Like McDonald, Haislip also profited from the Company's fiscal year 2001 performance. Defendant Haislip converted restricted stock that vested because of the Company's performance into $540,602.

242. Scientific-Atlanta's 2001 Proxy Statement shows that the Individual Defendants received over half of their fiscal year 2001 compensation in bonuses, as illustrated in the chart below:

| Name | 2001 Salary | 2001 Bonus | Other 2001 Compensation | Securities Underlying Options | LTIP Payouts[1] | Other Compensation |
|---|---|---|---|---|---|---|
| James F. McDonald | $796,539 | $1,096,600 | $188,577 | 340,000 | $4,856,660 | $149,013 |
| Wallace G. Haislip | $316,923 | $307,000 | $37,459 | 58,000 | $960,962 | $39,331 |

[1] Long-Term Incentive Plan (LTIP) permits the HRCC to use one or more long-term incentives to motivate excellent long-term performance. In fiscal year 2001, performance-based awards were granted in the form of cash and stock options to 18 key executives, including Defendants McDonald and Haislip. The amounts shown in this column represent: (a) the payout of amounts mandatorily deferred in August 2000 pursuant to the terms of the LTIP grants with respect to performance-based restricted stock awards that vested as a result of Scientific-Atlanta's performance during fiscal years 1996 through 2000; (b) the value of the performance-based restricted stock awards that vested as a result of Scientific-Atlanta's performance during fiscal years 1997 through 2001 as described below; and (c) the vesting of long-term incentive cash awards granted with respect to Scientific-Atlanta's performance during fiscal years 1997 through 2001.

## Defendants Also Reaped Millions From Their Massive Class Period Insider Trading

243.   Taking advantage of the artificially inflated price of SFA stock during the Class Period, the Individual Defendants together sold **1,068,000 shares of SFA stock, reaping proceeds in excess of $61 million**. These sales were unusual in both timing and amount.

244.   On the following dates during the Class Period, Defendants McDonald exercised options and sold the underlying shares, in the amounts indicated:

| Date | Shares | Price Per Share | Proceeds |
| --- | --- | --- | --- |
| 02/01/2001 | 25,000 | $55.10-56.61 | $  1,397,490 |
| 02/02/2001 | 10,000 | $57.12-57.26 | $     572,124 |
| 02/05/2001 | 15,000 | $53.54-53.90 | $     805,669 |
| 02/06/2001 | 50,000 | $53.70-54.70 | $  2,692,656 |
| 02/07/2001 | 50,000 | $52.00-52.30 | $  2,607,700 |
| 02/08/2001 | 25,000 | $54.00 | $  1,350,000 |
| 02/09/2001 | 25,000 | $50.70-51.55 | $  1,275,153 |
| 04/24/2001 | 148,200 | $57.90-58.72 | $  8,695,580 |
| 04/25/2001 | 50,000 | $55.00-55.14 | $  2,753,500 |
| 04/26/2001 | 141,800 | $56.34-57.77 | $  8,113,508 |
| 04/27/2001 | 100,000 | $55.02-57.61 | $  5,631,000 |
| 04/30/2001 | 275,000 | $57.25-58.70 | $15,976,500 |
| 05/02/2001 | 100,000 | $59.95 | $  5,995,000 |

| Date | Shares | Price Per Share | Proceeds |
|------|--------|-----------------|----------|
| TOTAL | 1,015.000 | | $57,865,880 |

245. The 1,015,000 shares sold by McDonald currently would be valued at approximately $26 million, which is less than half of the amount McDonald received by capitalizing on non-public information.

246. On the following date during the Class Period, Haislip exercised options and sold underlying shares in the amounts indicated:

| Date | Transaction | Shares | Price Per Share | Proceeds |
|------|-------------|--------|-----------------|----------|
| 05/02/2001 | Options Exercise | 53,000 | $59.75 | $3,166,750 |

247. As of March 31, 2001, Defendant Haislip indicated that he directly held 33,392 shares. The options he exercised represent more then one and a half times the total number of shares Haislip owned a month earlier. Moreover, Haislip sold on the same day as McDonald, May 2, 2001, which interestingly is the last day insiders like Haislip and McDonald were allowed to sell SFA stock prior to the earnings release for fourth quarter fiscal year 2001. Thus, Haislip was able to personally profit from the continuing scheme to inflate the share price of Scientific-Atlanta common stock, as detailed herein. In so doing, Haislip was able to realize proceeds in excess of $3 million dollars prior to the Company's July 19, 2001 announcement that the Company experienced a substantial decline in customer demand and failed to meet its revenue forecasts.

248. The 53,000 shares of SFA stock Haislip sold currently would be valued at approximately $1.36 million, which again is less than half of the amount he received by capitalizing on non-public information.

249. McDonald's sales far exceeded his previous sales. He sold 1,015,000 shares of SFA stock during the period February through May 2001, compared to 680,000 shares of SFA stock that he sold during the entire previous year. Incredibly, McDonald sold 815,000 shares of SFA stock in the 3-month period preceding Scientific-Atlanta's devastating announcement on July 19, 2001 of weakening demand in the marketplace as detailed herein.

250. Each of the Individual Defendants had motives to pursue a fraudulent scheme in furtherance of their common goal, i.e., inflating the reported profits of Scientific-Atlanta and the trading price of SFA stock, to meet performance-based targets set for the Company and themselves and enable the Individual Defendants to sell their own shares of SFA stock at artificially inflated prices while in possession of material adverse information regarding the Company's soon to be reported financial status.

251. Attached as Exhibit "C" is a chart showing the suspicious timing of the Individual Defendants' massive insider trading. (Note, the chart was prepard before the August 16, 2001 press release).

## ANALYSTS' AND INVESTORS' RELIANCE ON DEFENDANTS' STATEMENTS

252. At all times relevant to this complaint, Scientific-Atlanta was followed by securities analysts employed by brokerage houses and/or broker/dealers, which issued reports and made recommendations to their clients concerning Scientific-Atlanta's common stock. Among the securities firms that followed the Company during the Class Period were A.G. Edwards & Sons, Inc., ABC AMRO, Inc., CIBC World Markets, Credit Suisse First Boston, Deutsche Banc Alex Brown, Inc., Gerard Klauer Mattison, Kaufman Brothers, Merrill

Lynch, Morgan Stanley Dean Witter, Ragen Mackenzie, Inc., Raymond James & Associates, Inc., Soundview Technology Group, SunTrust Robinson-Humphrey, Thomas Weisel Partners, and UBS Warbug.

253. In writing their reports and making recommendations concerning investments in the Company's stock, these securities analysts relied in substantial part upon information provided by Defendants.

254. The effects of Defendants' material misstatements and omissions, which disguised the Company's true financial condition and operating results, were reflected in the consistently high ratings that financial analysts gave to the Company's common stock.

255. The investment community relied and acted upon information communicated in securities analysts' reports, as well as Company-published data, that presented the Company's performance and prospects in a favorable light and recommended that investors purchase the Company's common stock. Defendants manipulated and inflated the market price of Scientific-Atlanta's common stock and artificially deflated the price of SFA put options by falsely presenting to analysts the performance and prospects of the Company and by failing to disclose true adverse information about the Company.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

256. At all relevant times, the market for Scientific-Atlanta common stock was an efficient market for the following reasons, among others:

(a) Scientific-Atlanta common stock met the requirements for listing, and was listed and actively traded, on the New York Stock Exchange, an open and efficient market;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC;

(c) During the Class Period, approximately 387,937,300 shares of Scientific-Atlanta common stock were traded on the open market;

(d) During the Class Period, the trading volume of the Company's common stock averaged approximately 2,639,029 shares per day;

(e) During the Class Period, the price of the Company's common stock ranged from $19.44 to $65.73 per share;

(f) Scientific-Atlanta regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(g) Scientific-Atlanta was widely followed by numerous securities analysts employed by brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

257. As a result, the markets for Scientific-Atlanta securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Scientific-Atlanta's securities. Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of securities at artificially inflated prices or sale of put options at artificially deflated prices, and a presumption of reliance applies.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

258.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.   The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this complaint that actual results "could differ materially from those projected," and there were no meaningful accompanying cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Scientific-Atlanta who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

259.   Lead Plaintiffs brings this action on their own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the proposed Class, which is defined above.

260.   Members of the Class are so numerous that joinder of all members is impracticable.   As of June 2001, there were over 160 million shares of Scientific-

Atlanta common stock outstanding, held by hundreds of holders of record. Scientific-Atlanta securities trade on the New York Stock Exchange ("NYSE") and the Chicago and Pacific options exchanges, each of which is an efficient and highly developed market. Thousands of brokers nationwide had immediate access to trading information about Scientific-Atlanta, through the NYSE, options exchanges, news and wire services. Information concerning the Company is displayed within minutes of its occurrence or disclosure.

261. Lead Plaintiffs' claims are typical of the claims of the other members of the Class. Lead Plaintiffs and other members of the Class have sustained damages because of Defendants' unlawful activities alleged herein. Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation and intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Lead Plaintiffs. Lead Plaintiffs have no interests which are contrary to or in conflict with those members of the Class whom Lead Plaintiffs seek to represent.

262. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Lead Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

263. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants violated Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder;

b. whether Defendants participated in and pursued the common course of conduct complained of herein;

c. whether documents, filings, releases and statements disseminated to the investing public omitted and/or misrepresented material facts about Scientific-Atlanta;

d. whether the market price of Scientific-Atlanta's common stock was artificially inflated and the market price of Scientific-Atlanta's put options were artificially deflated throughout the Class Period due to the nondisclosure and/or misrepresentations complained of herein;

e. whether Defendants acted knowingly, willfully, or recklessly in omitting to state and/or misrepresenting material facts;

f. whether the Individual Defendants violated Section 10(b) of the Exchange Act by engaging in insider trading during the Class Period; and

g. whether the members of the Class have sustained damages as a result of Defendants' misconduct and, if so, the proper measure of such damages.

## COUNT I
### AGAINST ALL DEFENDANTS FOR
### VIOLATIONS OF SECTION 10(b) OF
### THE EXCHANGE ACT AND RULE 10b-5

264. Lead Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs, as if fully set forth herein. This claim is asserted against all Defendants.

265. Defendants, jointly and severally, carried out a plan, scheme and course of conduct which was intended to and did deceive the investing public, including Lead Plaintiffs and other Class members, and artificially inflate and maintain the market price of the Company's common stock and artificially deflated

the price of SFA put options, as alleged herein. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, jointly and severally, took the actions set forth herein.

266. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the members of the proposed Class in an effort to maintain artificially high market prices for Scientific-Atlanta securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

267. In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, the Individual Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and Regulation S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

268. Scientific-Atlanta and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous

course of conduct to conceal adverse material information about the Company's financial results, business, operations, and future outlook as specified herein. Scientific-Atlanta and the Individual Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure purchasers of Scientific-Atlanta common stock concerning the value and performance and continued substantial growth of Scientific-Atlanta. This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company's financial and business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein. Defendants engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the members of the proposed Class.

269. The Individual Defendants' primary liability, and control person liability, arises from the following facts: (i) the Individual Defendants were high-level executives at the Company during the period when the false statements were made and were members of the Company's management team, or were members of the Board of Directors; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior officers or directors of the Company, were privy to and participated in the drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about Scientific-Atlanta, and the Individual Defendants signed and/or approved the Company's public filings with the SEC, which public filings contained the allegedly materially misleading statements; (iii) the Individual Defendants knew or

had access to the material adverse non-public information about Scientific-Atlanta's financial results, business, operations, and future outlook, which were not disclosed; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

270.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were undertaken knowingly or recklessly and for the purpose and effect of concealing the true state of Scientific-Atlanta's operations and business affairs from the investing public and supporting the artificially inflated price of SFA's securities, except for the put options, the price of which was artificially deflated.

271.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Scientific-Atlanta securities was artificially inflated (or deflated, in the case of put options) throughout the Class Period.  Unaware of the fact that the market price of Scientific-Atlanta securities was artificially inflated (except for the SFA put options, the price of which was artificially deflated), and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and the truth of any representations made to appropriate agencies as to the investing public, at the times at which any statements were made, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed to the public, Lead Plaintiffs and the other members of the Class

purchased Scientific-Atlanta at artificially high prices (or artificially low prices, in the case of SFA's put options) and were damaged thereby.

272.   At the time of said misrepresentations and omissions, Lead Plaintiffs and the other members of the Class were unaware of their falsity and believed them to be true.  Had Lead Plaintiffs and the other members of the Class and the marketplace known of the true nature of the operations of the Company and the noncompliance with federal law, which were not disclosed by Defendants, Lead Plaintiffs and the other members of the Class would not have purchased their Scientific-Atlanta securities or, if they had acquired such securities, they would not have done so at the artificially inflated prices which they paid.  In the case of proposed Class members who sold put options, such persons would not have sold such options or have done so at the artificially deflated price they sold them at, had such Class members known the truth.

273.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

274.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their acquisition of Scientific-Atlanta securities.

## COUNT II
### AGAINST THE INDIVIDUAL DEFENDANTS FOR
### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT

275.   Lead Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs, as if fully set forth herein.  This claim is asserted against the Individual Defendants.

276.   The Individual Defendants acted as control persons of Scientific-Atlanta within the meaning of Section 20(a) of the Exchange Act as alleged herein.

By virtue of their executive positions and/or Board membership, as alleged above, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's internal reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

277. In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

278. As set forth above, Scientific-Atlanta violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Scientific-Atlanta, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their acquisition of Scientific-Atlanta securities.

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper Class action and certifying Lead Plaintiffs as the Class representatives under Rule 23 of the Federal Rules of Civil Procedure and their counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this Action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY**

DATED this 31st day of Jan., 2002.

CHITWOOD & HARLEY

Martin D. Chitwood
Ga. Bar No. 124950
Lauren S. Antonino
Ga. Bar No. 652408
Lauren E. Wagner
Ga. Bar No. 730179
M. Krissi Temple
Ga. Bar No. 687020
2900 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
Tel: (404) 873-3900
Fax: (404) 876-4476

KELLER ROHRBACK LLP.
Lynn Lincoln Sarko
Juli F. Desper
Elizabeth A. Leland
1201 Third Avenue
Suite 3200
Seattle, WA 98101-3052
Tel: (206) 623-1900
Fax: (206) 623-3384

**CO-LEAD COUNSEL FOR
PLAINTIFFS
AND THE CLASS**

MILBERG WEISS BERSHAD HYNES
& LERACH L.L.P.

Kenneth J. Vianale
5355 Town Center Road
Suite 900
Boca Raton, FL 33486
Tel: (561) 361-5000
Fax: (561) 367-8400

**EXECUTIVE COMMITTEE
COUNSEL FOR PLAINTIFFS AND
THE CLASS**

## Local Rule 7.1D Certification

Counsel for Plaintiffs hereby certifies that the text of this Motion and

Memorandum of Law has been prepared with Times New Roman 14 point, one of

the fonts and point selections approved by the Court in Local Rule 5.1B.


M. Krissi Temple
Ga. Bar No. 687020

# Exhibit A

# Scientific-Atlanta Sales



# Scientific-Atlanta Bookings



# Scientific-Atlanta
## Backlog in Amount



* No data found for 1Q 99 and 2Q 99

# Scientific-Atlanta
## Number of Set-Top Boxes Shipped



*Info for 1Q 99 not found

# Scientific-Atlanta
# Net Earnings



# Exhibit B

# Scientific-Atlanta Sales



# Scientific-Atlanta Bookings



# Scientific-Atlanta
## Backlog in Amount



# Scientific-Atlanta
## Number of Set-Top Boxes Shipped



# Scientific-Atlanta Net Earnings



# Exhibit C

# DAILY REPORT

**TUESDAY**
AUGUST 7, 2001
2 SECTIONS

$1.00    VOL. 112, NO. 153            ESTABLISHED 1890            FULTON COUNTY DAILY REPORT

---

**Stockholders claim executives released misleading data that inflated stock prices, then sold their shares before the bad news hit.**



CEO James F. McDonald

April 19 Company reports record results for third quarter.

May 11 Company says it will increase production capacity to accommodate higher demand.

July 19 Company says it is cutting earnings forecast for first quarter fiscal 2002. Orders decline 21 percent from a year earlier. Stock plummets 34 percent.

May 2 CFO Wallace Haislip sells 53,000 shares at $59.75. McDonald sells 100,000 shares at $59.95.

April 24 CEO James F. McDonald sells 148,200 shares for $58.67 each, or $7 million.

April 25 McDonald sells 50,000 shares for $55.14 each, or $2.7 million.

April 26 McDonald sells 141,800 shares for $57.22 each, or $6.8 million.

April 27 McDonald sells 100,000 shares for $56.31 each, or $4.5 million.

April 30 McDonald sells 275,000 shares for $58.70 each, or $16 million.

March   April   May   June   July   August

Jason R. Bodet/Daily Report

---

# INVESTORS: CEO SOLD STOCK, KNEW DROP DUE

## *Scientific-Atlanta's McDonald accused of using insider data*

R. ROBIN MCDONALD
rmcdonald@amlaw.com

Two months before Scientific-Atlanta's stock plummeted 34 percent, the company's chief executive officer sold 815,000 shares. Now some shareholders claim he engaged in insider trading and are suing the company in U.S. District Court here.

CEO James F. McDonald sold those shares in April as the company's stock surged with news of record sales and earnings. In one week, McDonald sold stock valued at $42.8 million, according to the suits. That same week, the company's chief financial officer, Wallace Haislip Sr., sold 53,000 stock shares for $3.2 million.

*See CEO, Page 2*

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the within and foregoing CONSOLIDATED CLASS ACTION COMPLAINT by first-class U.S. Mail, postage prepaid, upon defendants' counsel as indicated below and to plaintiffs' counsel on the attached service list:

Oscar N. Persons
Ga. Bar No. 573500
Susan E. Hurd
Ga. Bar No. 379628
ALSTON & BIRD
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
(404) 881-7000
(404) 881-7777 (facsimile)

ATTORNEYS FOR DEFENDANTS

This 31st day of January , 2002.

M. Krissi Temple

## SCIENTIFIC-ATLANTA PLAINTIFFS' COUNSEL - 1/31/2002

Sherrie R. Savett
Carole A. Broderick
BERGER & MONTAGUE, PC
1622 Locust Street
Philadelphia, PA 19103-6365
Tel: 215-875-3000
Fax: 215-875-5715

Sandy A. Liebhard
BERNSTEIN LIEBHARD &
LIFSHITZ,LLP
10 East 40th Street
New York, NY 10016
Tel: 212-779-1414
Fax: 212-779-3218

Kenneth J. Vianale
Robert R. Adler
MILBERG WEISS BERSHAD
HYNES & LERACH LLP
5355 Town Center Road, Suite 900
Boca Raton, FL 33486
Tel: 561-361-5000
Fax: 561-367-8400

Steven G. Schulman
Samuel H. Rudman
MILBERG WEISS BERSHAD
HYNES & LERACH LLP
One Pennsylvania Plaza
New York, NY 10119
Tel: 212-594-5300
Fax: 212-868-1229

Jack G. Fruchter
FRUCHTER & TWERSKY
60 East 42nd Street, 47th Floor
New York, NY 10165
Tel: 212-687-6655

Fax: 212-557-6151
Marian P. Rosner
James A. Harrod
WOLF POPPER LLP
845 Third Avenue
New York, New York 10022
Tel: 212-759-4600
Fax: 212-486-2093

Fred Taylor Isquith
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
212-545-4600

Charles J. Piven
LAW OFFICES OF
CHARLES J. PIVEN, P.A.
The World Trade Center B Baltimore
401 East Pratt Street, Suite 2525
Baltimore, MD 21202
410-332-0030

Lynn L. Sarko
Juli E. Farris
Elizabeth Leland
KELLER ROHRBACK LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: 206-623-1900
Fax: 206-623-3384

Jeffrey R. Krinsk
Gregory A. Hartlett
FINKELSTEIN & KRINSK
501 W. Broadway, Suite 1250
San Diego, CA 92101
619-238-1333

Alfred G. Yates, Jr.
LAW OFFICE OF
ALFRED G. YATES, JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219-1649
412-391-5164

Karen Hanson
LOCKRIDGE GRINDAL NAUEN
P.L.L.P.
100 Washington Avenue South
2200 Washington Square
Minneapolis, MN 55401-2179
612-339-6900

Linda Ann Klein
Ga. Bar No. 425069
Steven G. Hall
Ga. Bar No. 319308
Kevin A. Stine
Ga. Bar No. 682588
GAMBRELL & STOLZ
303 Peachtree Street, NE
4300 SunTrust Plaza
Atlanta, Georgia 30308
(404) 577-6000
(404) 221-6501 (facsimile)

Jeff H. Squire
Ira M. Press
KIRBY McINERNEY & SQUIRE
LLP
830 Third Avenue
New York, NY 10022
212-317-2300
FAX 212-751-2540

Corey D. Holzer
Ga. Bar No. 364698
HOLZER & HOLZER
6135 Barfield Road, Suite 102
Atlanta, GA 30328
(404) 847-0085
(404) 847-0036 (facsimile)

Paul J. Geller
CAULEY GELLER BOWMAN &
COATES, LLP
One Boca Place
2255 Glades Road, Suite 421A
Boca Raton, FL 33431
561-750-3000

Marc Topaz
Darren Check
SCHIFFRIN & BARROWAY, LLP
3 Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
610-667-7706

Kip B. Shuman
Jeffrey A. Berens
DYER & SHUMAN, LLP
801 East 17th Avenue
Denver, CO 802183
303-861-3003

Aaron Brody
STULL STULL & BRODY
6 East 45th Street
New York, NY 10017
212-687-7230

LAW OFFICES OF MARC S.
HENZEL
273 Montgomery Avenue
Suite 202
Bala Cynwyd, PA 19004
610-660-8000

Jeffrey Kodroff
SPECTOR ROSEMAN & KODROFF
1818 Market Street, Suite 2500
Philadelphia, PA  19103
215-496-0300

William B. Federman
DREIER BARITZ & FEDERMAN
120 N. Robinson, Suite 2720
Oklahoma City, OK  73102
405-235-1560
ATTORNEYS FOR PLAINTIFFS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE SCIENTIFIC-ATLANTA, INC. SECURITIES LITIGATION | ) ) ) ) | Civil Action File No. _____ |

RECEIVED

SEP 2 8 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## [PROPOSED] ORDER

Having considered the arguments and papers submitted by the parties, the Court hereby **GRANTS** Defendants' Motion To Quash Or Modify Subpoena Served On The Securities And Exchange Commission Or, In The Alternative, For Protective Order. Plaintiffs' August 8, 2006 subpoena served upon the Securities and Exchange Commission is quashed, and the requested discovery sought in that subpoena is hereby denied.

**SO ORDERED**, this _____ day of _____, 2006.

_____
United States District Judge

# APPENDIX OF NAMES OF PERSONS TO BE SERVED WITH PROPOSED ORDER

Pursuant to Local Rule 7(k), the following attorneys are entitled to be notified of the entry of this proposed order:

Meryl W. Edelstein
Chitwood Harley Harnes LLP
2300 Promenade II
1230 Peachtree Street NE
Atlanta, GA 30309

Juli Farris
Keller Rohrback LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101

Celia L. Jacoby
United States Securities and Exchange Commission
Office of the General Counsel
100 F Street NE
Washington, DC 20549

LEGAL01/13020174v1

This 28th day of September, 2006.

_____
Robert N. Driscoll
D.C. Bar No. 486451

ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004-1404
(202) 756-3300


Oscar N. Persons
Georgia Bar No. 573500
Susan E. Hurd
Georgia Bar No. 379628
Kelly C. Wilcove
Georgia Bar No. 185682

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
(404) 881-7000

Counsel for Defendants

LEGAL01/13020174v1